# Exhibit A

FILED
Clay Co. Circuit Court
4th Judicial Circuit
Date: 5/13/2020 4:01 PM
Crystal Ballard

**IN THE CIRCUIT COURT
FOR THE FOURTH JUDICIAL CIRCUIT
CLAY COUNTY, ILLINOIS**

| | |
|---|---|
| Darren Bailey, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Case No. 2020-CH-06 |
| | ) |
| Governor Jay Robert Pritzker, | ) |
| in his official capacity. | ) |
| | ) |
| Defendant. | ) |

**FIRST AMENDED VERIFIED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

COMES NOW Plaintiff, Darren Bailey, in his individual capacity, (hereinafter referred to as "Bailey") by and through his attorneys, Thomas G. DeVore, Erik Hyam, and DeVore Law Offices, LLC, and for his First Amended Verified Complaint for Declaratory Judgment and Injunctive Relief against Defendant, Governor Jay Robert Pritzker (hereinafter referred to as "Pritzker"), in his official capacity, hereby alleges as follows:

1.      Pritzker is currently the duly elected Governor of the State of Illinois.

2.      Bailey is a citizen and lawful resident of Clay County Illinois.

3.      On March 09, 2020, Pritzker issued a proclamation declaring, as of that date, a disaster existed within Illinois as a result of the COVID-19 virus. (See Exhibit 1 hereinafter referred to as "COVID #1")

4.      Pritzker issued the proclamation pursuant to the authority granted him under the Illinois Emergency Management Agency Act. (See 20 ILCS 3305 *et seq.*, hereinafter referred to as the "IEMAA")

1

5.      The IEMAA states: "In the event of a disaster, as defined in Section 4, the Governor may by proclamation declare that a disaster exists."  (See 20 ILCS 3305/7)

6.      Section 4 of The Act defines a disaster as follows:

"Disaster" means an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause, including but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, hostile military or paramilitary action, public health emergencies, or acts of domestic terrorism.  (See 20 ILCS 3305/4)

7.      In COVID#1, Pritzker states the COVID-19 virus is a novel severe acute respiratory illness. (See 2nd whereas clause of COVID#1)

8.      In COVID#1, Pritzker determined the respiratory illness not to be a disaster but to be a currently existing "public health emergency." (See 15th whereas clause of COVID#1.)

9.      In COVID#1, Pritzker declared all 102 counties within Illinois a disaster area as a result of COVID-19. (See Section 1 of COVID#1)

10.     Under the auspices of COVID#1, Pritzker utilized his emergency powers wherein he issued various executive orders.

11.     On April 01, 2020, Pritzker issued another disaster proclamation. (See Exhibit 2 hereinafter referred to as "COVID#2")

12.     In COVID#2, Pritzker states the COVID-19 virus is novel severe acute respiratory illness. (See 1st whereas clause of COVID#2)

13.     In COVID#2, Pritzker found COVID-19 is a public health emergency. (See 15th whereas clause of COVID#2.)

14.     As such in COVID#2, Pritzker declares the COVID-19 illness to be a  "continuing disaster".  (See Section 1 of COVID#2.)

2

15.     Because he construed COVID#2 as a continuing proclamation of disaster, Pritzker further declared a <u>continuation</u> of his authority to wield the emergency powers of section 7 of the IEMAA. (See Section 1 of COVID#2.)

16.     As a result of COVID#2, Pritzker utilized his emergency powers wherein he executed and continued various executive orders from that time through and including April 30, 2020.

17.     On April 30, 2020, Pritzker issued yet another proclamation of disaster. (See Exhibit 3 hereinafter referred to as COVID#3.)

18.     In COVID#3, Pritzker states the COVID-19 virus is novel severe acute respiratory illness. (See 3rd whereas clause of COVID#3.)

19.     Yet again, Pritzker acknowledges in COVID#3 that COVID-19 <u>is</u> a current public health emergency. (See whereas clause 52 and 53 in COVID#3.)

20.     As a result of COVID#3, Pritzker utilized his emergency powers wherein he executed and continued various executive orders until May 31, 2020.

21.     As a result of COVID#1, COVID#2 and COVID#3, Pritzker is attempting to wield the emergency powers under the IEMAA for approximately 81 days.

22.     The very occurrence for which Pritzker found a disaster existed in COVID#1, COVID#2 and COVID#3 was the exact same novel severe acute respiratory illness.

23.     COVID#2 and COVID#3 were both issued for exact 30-day periods.

24.     Subsequent to a proper disaster proclamation, the IEMAA confers specific enumerated powers upon the Governor of the State of Illinois.  (See 20 ILCS 3305/2(a)(2).)

25.     Amongst those enumerated powers are fourteen (14) emergency powers as provided in section 7 of The Act.  (See 20 ILCS 3305/7)

26.     Section 7 of the IEMAA expressly states: "Upon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days the following emergency powers.... (See 20 ILCS 3305/7)

27.     As a result of Proclamation #3, Pritzker issued Executive Order 2020-32 (hereinafter "EO 32").  (See Exhibit 4)

28.     As alleged authority to issue EO 32, Pritzker relies on two authorities:

a)      Powers vested in him as the Governor of the State of Illinois.

b)      Sections 7(1), 7(2), 7(3), 7(8), 7(9) and 7(12) of the IEMAA.

(See the "THEREFORE" clause on page 2 of EO 32)

29.     Pritzker further states the emergency powers exercised in EO 32 were consistent with public health laws. (See the "THEREFORE" clause on page 2 of EO 32)

30.     Upon information and belief, the public health laws which Pritzker states are consistent with his authority in EO 32 is assuredly the Illinois Department of Public Health Act, being 20 ILCS 2305 *et seq.* (hereinafter referred to as "IDPHA") (See the "THEREFORE" clause on page 2 of EO 32)

31.     IDPHA provides for general supervision of the interests of the health and lives of the people of the State.  (See 20 ILCS 2305/2(a))

32.     Under the IDPHA, the Department of Public Health (the "Department") has supreme authority in matters of quarantine and isolation. Id. (Emphasis Added)

33.     The Department may declare and enforce quarantine and isolation, when none exists, and may modify or relax quarantine and isolation when it has been established.  Id.

34.     Subject to the provisions of subsection (c), the Department may order a person or group of persons to be quarantined or isolated or may order a place to be closed and made off

limits to the public to prevent the probable spread of a dangerously contagious or infectious disease, including non-compliant tuberculosis patients, until such time as the condition can be corrected or the danger to the public health eliminated or reduced in such a manner that no substantial danger to the public's health any longer exists. (See 20 ILCS 2305/2(b).)

35.     The IDPHA specifically admonishes that no person or a group of persons may be ordered to be quarantined or isolated and no place may be ordered to be closed and made off limits to the public except with the consent of the person or owner of the place or upon the prior order of a court of competent jurisdiction.  (See 20 ILCS 2305/2(c).)

36.     The Department may, however, order a person or a group of persons to be quarantined or isolated or may order a place to be closed and made off limits to the public on an immediate basis without prior consent or court order if, in the reasonable judgment of the Department, immediate action is required to protect the public from a dangerously contagious or infectious disease. Id.

37.     In the event of an immediate order issued without prior consent or court order, the Department shall, as soon as practical, within 48 hours after issuing the order, obtain the consent of the person or owner or file a petition requesting a court order authorizing the isolation or quarantine or closure. Id.

38.     To obtain a court order for isolation, quarantine, or closure, the Department, by clear and convincing evidence, must prove that the public's health and welfare are significantly endangered by a person or group of persons that has, that is suspected of having, that has been exposed to, or that is reasonably believed to have been exposed to a dangerously contagious or infectious disease or by a place where there is a significant amount of activity likely to spread a dangerously contagious or infectious disease. Id.

39.    The Department must also prove that all other reasonable means of correcting the problem have been exhausted and no less restrictive alternative exists. Id.

40.    Persons who are or are about to be ordered to be isolated or quarantined and owners of places that are or are about to be closed and made off limits to the public shall have the right to counsel. Id.

41.    Persons who are ordered to be isolated or quarantined or who are owners of places that are ordered to be closed and made off limits to the public, shall be given a written notice of such order. Id.

42.    The written notice shall additionally include the following: (1) notice of the right to counsel; (2) notice that if the person or owner is indigent, the court will appoint counsel for that person or owner; (3) notice of the reason for the order for isolation, quarantine, or closure; (4) notice of whether the order is an immediate order, and if so, the time frame for the Department to seek consent or to file a petition requesting a court order as set out in this subsection; and (5) notice of the anticipated duration of the isolation, quarantine, or closure. Id.

43.    Because the Department is an agency of the State of Illinois and because Pritzker is the chief executive officer of the State of Illinois, upon information and belief, Pritzker is familiar with and charged with knowledge of the IDPHA.

44.    Pritzker is also familiar with and charged with knowledge of the Plan and administrative rules of the Department attached herein.  (See Exhibits 5 and 6 respectively)

45.    The Plan, consistent with relevant provisions of state law provides:

"[The Department] is authorized to order a person to be quarantined or isolated or a place to be closed and made off limits to the public to prevent the probable spread of a dangerously contagious or infectious disease until such time as the condition may be corrected or the danger to the public health eliminated or reduced in such a manner that no substantial danger to the public's health any longer exists (20 ILCS 2305/2(b)). No person may be ordered to be quarantined or isolated and no place

6

may be ordered to be closed and made off limits to the public, however, except with the consent of the person or the owner of the place or upon the order of a court of competent jurisdiction (20 ILCS 2305/2(c)). In order to obtain a court order, IDPH must prove, by clear and convincing evidence, that the public's health and welfare are significantly endangered and all other reasonable means of correcting the problem have been exhausted and no less restrictive alternative exists (20 ILCS 2305/2(c))." (See Page 71 of The Plan.)

46.     The Department has explicitly delegated its authority to order isolation, quarantine and closure to certified local health departments. (See Page 71 of The Plan.) (Emphasis Added)

47.     The IDPHA generally defines quarantine as restricting the movement of people or restricting their activities.

48.     IDPH's promulgated administrative rules regarding procedural safeguards must be followed when restricting the movements or activities of the people, or closing businesses, to control disease spread.  (See Exhibit 6.).

49.     The board of health of each county or multiple-county health department shall:

a)  Within its jurisdiction, and professional and technical competence, enforce and observe all State laws pertaining to the preservation of health….. See 55 ILCS 5/5-25013 (A)(6).

b)  Within its jurisdiction, and professional and technical competence, investigate the existence of any contagious or infectious disease and adopt measures, not inconsistent with the regulations of the State Department of Public Health… See 55 ILCS 5/5-25013 (A)(7).

**COUNT I**
**DECLARATORY JUDGMENT FINDING**
**THE APRIL 30 PROCLAMATION IS VOID FOR FAILING TO**
**MEET THE DEFINITION OF A DISASTER AS DEFINED IN THE IEMAA**

50.     Plaintiff incorporates paragraphs 1-49 as if more fully stated herein.

51.     In the event of a disaster, as defined in Section 4, the Governor may, by proclamation declare that a disaster exists. (See 20 ILCS 3305/7)

52.     Section 4 defines a disaster as follows:

"Disaster" means an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause, including but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, hostile military or paramilitary action, public health emergencies, or acts of domestic terrorism."

53.     Thus, under Section 4, a "disaster" exists only if there is an occurrence or threat requiring emergency action to avert its effects.

54.     For purposes of this action, Bailey does not dispute that on March 09, 2020 when Pritzker issued COVID#1 an occurrence or threat of a widespread natural cause which could cause loss of life existed and as such there was a requirement of emergency action to avert a public health emergency.

55.     In order to trigger executive authority under the IEMAA, the proposed emergency action by the executive must be necessary to avert the danger or damage or epidemic.

56.     However, COVID#2 which is ostensibly predicated on the same provision of the IEMAA, the same independent analysis applies, as only in the event of a disaster, as defined in Section 4, may the Governor by proclamation declare that a disaster exists. (See 20 ILCS 3305/7)

57.     Once again, as defined in the IEMAA, a disaster by definition must require emergency action to avert, *inter alia*, a public health emergency.

58.     Pritzker states in COVID#2 "based upon the foregoing, the circumstances surrounding COVID-19 constitute a continuing public health emergency under section 4 of the IEMAA" (See 12th whereas of COVID #2)

8

59.     On April 30, 2020, Pritzker signed COVID#3.

60.     The analysis concerning the triggering of executive authority applies equally to COVID#3. In other words, the prerequisite to a disaster declaration under the IEMAA is the necessity of action to avert, *inter alia*, a public health emergency.

61.     As the ever-increasing amount of ink is consumed with each serial proclamation, the relevant provision can be found at the 9th whereas clause on page 4 of COVID#3. It states in relevant part: "the current circumstances in Illinois surrounding the spread of COVID-19 constitute an epidemic emergency and a public health emergency under section 4 of the IEMAA."

62.     Since it purports to restrict his rights and interests, Bailey has a right to insist COVID#3, which declared a disaster, was within the authority granted Pritzker by the legislature.

63.     Contrary to Pritzker' contention in COVID#3, Section 4 of the IEMAA does not define what constitutes an epidemic or a public health emergency.

64.     As such, the emergency powers of Section 7 of the IEMAA can only be invoked to try and prevent or ward off those enumerated matters such as a public health emergency.

65.     Pritzker admits in COVID#2 and COVID#3 that COVID-19 constitutes a then-existing public health emergency.

66.     Given Pritzker's express acknowledgment in COVID#3 on April 30, 2020 that a public health emergency then existed, it is impossible for him to legally declare a disaster.

67.     By definition, Pritzker could only declare a disaster in regard to the COVID-19 virus if emergency action was required to avert a public health emergency.

68.     Pritzker admits the public health emergency exists and makes it clear he is engaging in numerous efforts to manage the existing public health emergency.

69.     However, Pritzker cannot declare a disaster to manage a then present public health emergency as such acts are beyond the powers granted him by the legislature.

70.     Bailey has a right to insist COVID#3 which declared a disaster was within the authority granted Pritzker by the legislature.

71.     An actual controversy exists between the parties in regard to the authority of Pritzker to issue and enforce his executive orders and proclamations which have the effect of restricting Bailey's movements and preventing Bailey from attending worship services.

72.     An immediate and definitive determination is necessary to clarify the rights and interests of the parties.

WHEREFORE, Plaintiff, Darren Bailey, herein requests that this court enter an Order:

A.      declaring Pritzker admitted in COVID#2 that a public health emergency existed on that date;

B.      declaring Pritzker admitted in COVID#3 that a public health emergency existed on that date;

C.      declaring that Section 4 of the IEMAA defines a disaster exists only when it requires emergency powers to avert a public health emergency;

D.      finding COVID#3 is void ab initio as no disaster existed on that date as defined in Section 4 of the IEMAA;

E.      finding that any emergency powers under Section 7 of the IEMAA which were invoked in EO 32 are null and void ab initio;

F.      Awarding Bailey his costs incurred in this matter as may be allowed by law;

G.      That the Court grant such other and further relief as is just and proper.

## COUNT II
### DECLARATORY JUDGMENT FINDING PRITZKER HAD NO AUTHORITY TO UTILIZE EMERGENCY POWERS AFTER APRIL 08, 2020

73.     Bailey restates paragraphs 1-72 as if more fully stated herein.

74.     Upon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days the following emergency powers.  (See 20 ILCS 3305/7)

75.     Pritzker has by devise been exercising emergency powers under Section 7 of the IEMAA since March 09, 2020.

76.     Pritzker has issued serial proclamations from March 09, 2020 through April 30, 2020.

77.     Each time he issues a new proclamation, he contemporaneously issues new executive order(s) under the emergency power of section 7 of the IEMAA.

78.     Notwithstanding there is no 30-day requirement under the IEMAA as to disaster proclamations, Pritzker has included arbitrary 30-day deadlines in COVID#1, COVID#2, COVID#3.

79.     In each and every disaster proclamation, Pritzker refers to the same COVID-19 virus as the genesis of his proclaiming a disaster.

80.     The IEMAA has no such requirement regarding any termination date in a proclamation of disaster.

81.     Upon information and belief, Governor Rauner was the first Governor who placed arbitrary 30-day deadlines in his disaster proclamations.

82.     Upon information and belief, Governor Rauner never issued back to back 30-day proclamations.

11

83.     Upon information and belief, Pritzker is the first Governor of this state to issue serial proclamations back to back for the purpose of energizing the 30-day emergency powers to attempt to seize control the movement and activities of the people, and forcible closure of businesses, of the entire State of Illinois.

84.     Among these emergency powers, Pritzker has taken unilateral control over the movement and livelihood of every citizen in the State.

85.     The legislative branch during this period of executive rule under the emergency powers has been rendered meaningless.

86.     In this Court on April 27, 2020, the Illinois Attorney General's office, on behalf of Pritzker, took the position that a clear reading of Section 7 leaves only one conclusion and that is the proclamation gives rise to the 30 day emergency powers and that as long as a proclamation is done in good faith then there is no limit the duration of the emergency powers extensions that can be had as long as a new proclamation issued.

87.     That is a precarious proposition given each serial proclamation is for the exact same occurrence which gave rise to the initial proclamation.

88.     What is even more precarious is an Illinois Attorney General opinion exists which glaringly contradicts the proposition of Pritzker.  (See Exhibit 7)

89.     On or about July 02, 2001, Attorney General Jim Ryan was presented this very question by then acting Director of the Illinois Emergency Management Authority.

90.     Attorney General Ryan, and his staff, properly acknowledged he must attempt to give meaning to the expressed intent of the legislature and to avoid construction that would render any portion void. (Pg. 5 of Exhibit 8)

91.     Attorney Ryan went on to advise that the act was clear in that it authorized emergency powers for 30 days and construction of the statute any other way would render the limitation clause meaningless. *Id.*

92.     He further advised more reasonable construction, taking into consideration the other provisions of the Act, is that the Governor would be required to seek <u>legislative approval</u> for the exercise of extraordinary measures extending beyond 30 days. *Id.*

93.     This construction is supported by references to section 9 of the Act (20 ILCS 3305/9 (West 2000)), which pertains to the financing of disaster response measures.  Section 9 provides for the Governor's use of particular appropriated funds for emergency purposes, and, if necessary and the General Assembly is not in session, the transfer of funds from other accounts or the borrowing of additional funds, but only "until such time as a quorum of the General Assembly can convene in regular or extraordinary session".The purpose of this provision, like section 7 of the Act, is to empower the Governor to deal immediately with emerging emergency situations.  Even though many disaster situations could require remediation for a period long in excess of 30 days, normal governmental processes, including legislative action, can be set in motion to meet such needs within 30 days of the occurrence. *Id.*

94.     Pritzker did not advise the Honorable Court of this analysis by Attorney General Ryan.

95.     This Attorney General opinion lays bare the overreach of the executive branch being perpetrated by this gamesmanship.

96.     Bailey has a right to insist Pritzker not engage in activities designed to circumvent limitations on his authority imposed by the legislature.

97.     An actual controversy exists between the parties in regard to the authority of Pritzker to issue serial proclamations for the same disaster for the purpose of continuing to exercise emergency powers.

98.     An immediate and definitive determination is necessary to clarify the rights and interests of the parties.

WHEREFORE, Plaintiff, Darren Bailey, herein requests that this court enter an Order:

A) declaring Pritzker issued COVID#2 and COVID#3 for the same COVID-19 virus which gave rise to the issuance of COVID#1 on March 09, 2020;

B) declaring the 30-days of emergency powers provided under Section 7 of the IEMAA lapsed on April 08, 2020;

C) declaring COVID#2 and COVID#3 did not reset the 30-day emergency provisions under Section 7 of the IEMAA;

D) declaring any executive orders finding their authority under the emergency powers of Section 7 of the IEMAA after April 08, 2020 are void ab initio;

E) Awarding Bailey his costs incurred in this matter as may be allowed by law;

F) That the Court grant such other and further relief as is just and proper.

## COUNT III
## DECLARATORY JUDGMENT FINDING THAT THE ILLINOIS DEPARTMENT OF HEALTH ACT GOVERNS THE CONDUCT OF STATE ACTORS IN THIS CONTEXT

99.     Bailey restates paragraphs 1-98 as if more fully stated herein.

100.    In relation to the specific matters raised herein, in order to restrict a citizen's movement or activities, or close a citizen's business, Pritzker must have acted under the Illinois constitutional powers vested in him as Governor, or under the powers delegated to him under The IEMAA by the legislative branch.

101.    Nowhere in EO 32 does Pritzker identify what Illinois constitutional power is vested in him to restrict a citizen's movement or activities or seize control of any citizen's business and order the premises closed.

102.    His suggestion of having constitutional authority is nothing but conclusory.

103.    As Governor, he is the supreme executive of the State of Illinois.

104.    In that role, he is charged with the faithful execution of the laws of the State and not the making of laws.

105.    Restrict a citizen's movement or activities or seizing control of citizen's business premises and ordering it closed is a clear utilization of the police powers of the State.

106.    Police powers are vested in the sound discretion of the legislative branch of government.

107.    As such, Pritzker must find authority to restrict a citizen's movement or activities, or forcibly close any citizen's business premises under the cited sections of the IEMAA.

108.    The power would have been delegated to him by the legislative branch, and if he has none, the order restricting a citizens' movement or activities and/or closure of any citizen's business premises would be unlawful and void.

109.    Even under the most strained interpretation of Pritzker's cited sections 7(1), 7(2), 7(3), 7(8), 7(9) and 7(12) of The IEMAA, nowhere can it be found where the legislative branch delegated any power to Pritzker to forcibly restrict a citizen's movement or activities and/or close private businesses.

110.    Pritzker made it clear EO 32 was not intended to alter or modify any existing State, County or local authority over restrict a citizens' movement or activities and/or ordering business closures.  (See Section 19 of EO 32)

111.   Bailey does not dispute in times such as these, and at all times for that matter, the Department has the authority to restrict a citizen's movement or activities and/or forcibly close the business premises if circumstances give rise to a public health risk.

112.   The legislative branch in its sound discretion placed the supreme authority over such matters with the Department pursuant to the IDPHA.

113.   Pritzker attempts to cobble together a basis for delegated authority under his cited sections of EO 32, should not remotely compel this Court that Pritzker's strained and desperate interpretation might in anyway supersede the express supreme authority vested in the Department of Health by the people's lawmaking branch of our government.

114.   The <u>supreme authority</u> over matters restricting a citizen's movement or activities and closure of businesses due to health risks is quite compelling language the legislature used when granting the Department this extraordinary power.

115.   The Department has determined that relevant authority under the IDPHA must be exercised by each county's board of health in a manner consistent with state law.

116.   Baily has a right to insist Pritzker act solely within the scope of the authority granted to him by the legislature, and, specifically, be constrained from acting beyond the authority granted to him under the IEMAA.   Among other things, Pritzker is subject to the limitations on his authority under the IEMAA and must conform his actions to provisions of the IDPHA.

117.   An actual controversy exists between the parties in regard to the authority of Pritzker to enter and enforce those provisions of EO 32 which restrict the movement and activities of persons, and the closure of businesses.

118.   An immediate and definitive determination is necessary to clarify the rights and interests of the parties.

WHEREFORE, Plaintiff, Darren Bailey, herein requests that this court enter an Order:

A.     declaring Pritzker had no Illinois constitutional authority as Governor to restrict a citizen's movement or activities and/or forcibly close the business premises in EO 32;

B.     declaring that none of the cited provisions of the IEMAA in EO 32 delegated Pritzker any authority to restrict a citizen's movement or activities and/or forcibly close their business premises;

C.     declaring the proper authority to restrict a citizen's movement or activities and/or forcibly close their business due to any public health risks has been expressly delegated to the Department of Health under the Illinois Department of Public Health Act;

D.     Awarding Bailey his costs incurred in this matter as may be allowed by law;

E.     That the Court grant such other and further relief as is just and proper.

**COUNT IV**
**FOR INJUNCTIVE RELIEF**

119.   Plaintiff restates paragraphs 1-118 as if more fully stated herein.

120.   Bailey has the following separate and distinct rights as it relates to this cause:

a)     To insist Pritzker not exceed his authority by issuing disaster proclamations which fail to meet the definition of a disaster under Section 4 of the IEMAA;

b)     To insist Pritzker not exceed his authority in arbitrarily extending the emergency powers of section 7 of the IEMAA beyond the 30-day limitation.

c)     To insist Pritzker does not have any authority to restrict the movement or activities or business closures under the IEMAA, as that authority was expressly delegated to the Department.

121.    Bailey is being irreparably harmed each and every day in which he continues to be subjected to Pritzker's ultra vires executive order.   Among other things, Bailey is prohibited from attending worship services and is subject to potential enforcement actions in the event and to the extent he engages in activities proscribed by EO 32 and the other relevant executive orders and declarations.

122.    Bailey has no adequate remedy at law to prohibit Pritzker from enforcing the executive orders against him absent an injunction from this Court ordering the same.   In that respect, the relevant executive orders and declarations constitute prior restraints which cannot be fully remedied by an award of damages.

123.    There is a reasonable likelihood of success on the merits as COVID#3 clearly was not issued pursuant to a disaster as defined by the IEMAA.

124.    There is a reasonable likelihood of success on the merits as Pritzker has no authority to extend the emergency powers of section 7 of the IEMAA beyond 30 days.

125.    There is a reasonable likelihood of success on the merits as Pritzker has no authority under the IEMAA to restrict the movement or activities of people, or business closures.

126.    There is a reasonable likelihood of success on the merits because the IDPHA governs the matters at issue in connection with COVID-19, the Department has delegated its authority under the IDPHA to county public health departments for purposes of enforcement consistent with applicable law, and county public health departments have not acted within the scope of and subject to the limitations on their authority under the IDPHA.

WHEREFORE, Plaintiff, Darren Bailey, prays that this Court enter judgment in his favor and:

A.     Find and determine Plaintiff has a right to insist that Pritzker act only within the scope of the

18

authority granted to him by the legislature.

B.     Find and determined Bailey is irreparably harmed each day he is subjected to the executive

orders relative to this cause.

C.     Find and determine Bailey has no adequate remedy at law to protect his rights against any

unlawful orders of Pritzker beyond injunctive relief.

D.     Find and determine Bailey has a likelihood of success on the merits.

E.     Enter an injunction permanently enjoining Pritzker, or anyone under his authority, from

enforcing EO 32 from this date forward.

F.     For such other relief as this Court deems just and proper.


                    Respectfully submitted,


By:     /s/ Thomas Devore
        Thomas G. DeVore
        IL Bar Reg. No. 6305737
        **DeVore Law Offices, LLC**
        Attorneys for Plaintiff
        118 N. 2nd St.
        Greenville, IL 62246
        Telephone - 618-664-9439
        tom@silverlakelaw.com

        /s/ Erik Hyam
        Erik Hyam
        IL Bar No.  6311090
        **DeVore Law Offices, LLC**
        Attorneys for Plaintiff
        118 N. Second Street
        Greenville, IL  62246
        Tel.  (618) 664.9439
        Fax  (618) 664.9486
        erik@silverlakelaw.com

## VERIFICATION

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil

Procedure, the undersigned certifies that the statements set forth in this instrument are true

and correct except as to matters therein stated to be on information and belief, if any, and as

to such matters the undersigned certifies as aforesaid that the undersigned verily believes the

same to be true.

Date: 5 - 13 , 2020          By: _____

                                          Darren Bailey

20

## <u>GUBERNATORIAL DISASTER PROCLAMATION</u>

**WHEREAS**, in late 2019, a new and significant outbreak of Coronavirus Disease 2019 (COVID-19) emerged in China; and,

**WHEREAS**, COVID-19 is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS**, certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS**, we are continuing our efforts to prepare for any eventuality given that this is a novel illness and given the known health risks it poses for the elderly and those with serious chronic medical conditions; and,

**WHEREAS**, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS**, the World Health Organization has reported 109,578 confirmed cases of COVID-19 and 3,809 deaths attributable to COVID-19 globally as of March 9, 2020; and,

**WHEREAS**, in response to the recent COVID-19 outbreaks in China, Iran, Italy and South Korea, the Centers for Disease Control and Prevention ("CDC") has deemed it necessary to prohibit or restrict non-essential travel to or from those countries; and,

**WHEREAS**, the CDC has advised older travelers and those with chronic medical conditions to avoid nonessential travel, and has advised all travelers to exercise enhanced precautions; and,

**WHEREAS**, the CDC currently recommends community preparedness and everyday prevention measures be taken by all individuals and families in the United States, including voluntary home isolation when individuals are sick with respiratory symptoms, covering coughs and sneezes with a tissue, washing hands often with soap and water for at least 20 seconds, use of alcohol-based hand sanitizers with at least 60% alcohol if soap and water are not readily available, and routinely cleaning frequently touched surfaces and objects to increase community resilience and readiness for responding to an outbreak; and,

**WHEREAS**, a vaccine or drug is currently not available for COVID-19; and,

**WHEREAS**, in communities with confirmed COVID-19 cases, the CDC currently recommends mitigation measures, including staying at home when sick, when a household



member is sick with respiratory disease symptoms or when instructed to do so by public health officials or a health care provider and keeping away from others who are sick; and,

**WHEREAS**, despite efforts to contain COVID-19, the World Health Organization and the CDC indicate that it is expected to spread; and,

**WHEREAS**, there are currently 11 confirmed cases of COVID-19 and an additional 260 persons under investigation in Illinois; and,

**WHEREAS**, one of the confirmed cases of COVID-19 in Illinois has not been linked to any travel activity or to an already-confirmed COVID-19 case, which indicates community transmission in Illinois; and,

**WHEREAS**, based on the foregoing, the circumstances surrounding COVID-19 constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS**, it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that the effects of COVID-19 are mitigated and minimized and that residents and visitors in the State remain safe and secure; and,

**WHEREAS**, this proclamation will assist Illinois agencies in coordinating State and Federal resources, including the Strategic National Stockpile of medicines and protective equipment, to support local governments in preparation for any action that may be necessary related to the potential impact of COVID-19 in the State of Illinois; and,

**WHEREAS**, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the issuance of a proclamation of disaster;

**NOW, THEREFORE**, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1**. Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area.

**Section 2**. The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3**. The Illinois Department of Public Health is further directed to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4**.  The Illinois Emergency Management Agency is directed to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

**Section 5**.  To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law.  If necessary, and in accordance with Section 7(1) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6**.  Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation activates the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7**.  The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to recommend, and, as appropriate, take necessary actions to ensure consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8**.  The Illinois State Board of Education is directed to recommend, and, as appropriate, take necessary actions to address chronic absenteeism due to transmission of COVID-19 and to alleviate any barriers to the use of e-learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9**.  Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect:

**Section 10**.  This proclamation can facilitate a request for Federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

**Section 11**.  This proclamation shall be effective immediately and remain in effect for 30 days.

Issued by the Governor March 9, 2020
Filed by the Secretary of State March 9, 2020



# State of Illinois
## Executive Department
### Springfield, Illinois

**FILED**
INDEX DEPARTMENT
APR 1 2020
IN THE OFFICE OF
SECRETARY OF STATE

# Proclamation

**WHEREAS,** Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS,** certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS,** the State of Illinois is continuing its efforts to prepare for any eventuality given that this is a novel illness and given the known health risks it poses for the elderly and those with serious chronic medical conditions; and,

**WHEREAS,** the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and has reported more than 750,000 confirmed cases of COVID-19 and 36,500 deaths attributable to COVID-19 globally as of March 31, 2020; and,

**WHEREAS,** the Centers for Disease Control and Prevention (CDC) currently recommends that all United States residents take precautions to contain the spread of COVID-19, including that they: (1) practice social distancing by maintaining 6 feet of distance from others and avoiding all gatherings; (2) be alert for symptoms such as fever, cough, or shortness of breath, and take their temperature if symptoms develop; and (3) exercise appropriate hygiene, including covering coughs and sneezes with a tissue, washing hands often with soap and water for at least 20 seconds, using of alcohol-based hand sanitizers with at least 60% alcohol if soap and water are not readily available, and routinely cleaning frequently touched surfaces and objects to increase community resilience and readiness for responding to an outbreak; and,

**WHEREAS,** the CDC also recommends the following precautions for household members, caretakers and other persons having close contact with a person who is symptomatic, during the period from 48 hours before onset of symptoms until the symptomatic person meets the criteria for discontinuing home isolation:  (1) stay home until 14 days after last exposure and maintain social distance (at least 6 feet) from others at all times; (2) self-monitor for symptoms, including checking their temperature twice a day and watching for fever, cough, or shortness of breath; and (3) avoid contact with people at higher risk for severe illness (unless they live in the same home and had the same exposure); and,

**WHEREAS,** a vaccine or drug is currently not available for COVID-19; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization and the CDC indicate that it is expected to continue spreading; and,

**WHEREAS,** as of March 31, 2020, there were 5,994 confirmed cases of COVID-19 and 99 deaths in Illinois resulting from COVID-19; and,



EXHIBIT
2

**WHEREAS**, the outbreak of COVID-19 has resulted in significant negative economic impact, including loss of income and wages, that threatens to undermine housing security and stability and overall financial stability and security for individuals and businesses throughout Illinois; and,

**WHEREAS**, on March 13, 2020, the President declared a nationwide emergency pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"), covering all states and territories, including Illinois; and,

**WHEREAS**, on March 26, 2020, the President declared a major disaster in Illinois pursuant to Section 401 of the Stafford Act; and,

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 in response to the outbreak of COVID-19; and,

**WHEREAS**, based on the foregoing, the circumstances surrounding COVID-19 constitute a continuing public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS**, the circumstances surrounding COVID-19 have resulted in the occurrence and threat of widespread and severe damage, injury, and loss of life and property under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS**, it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that the effects of COVID-19 are mitigated and minimized to the greatest extent possible and that Illinoisans remain safe and secure; and,

**WHEREAS**, this proclamation will assist Illinois agencies in coordinating State and Federal resources, including the Strategic National Stockpile of medicines and protective equipment, to support local governments in preparation for any action that may be necessary related to the potential impact of COVID-19 in the State of Illinois; and,

**WHEREAS**, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the issuance of a proclamation of disaster;

**NOW, THEREFORE**, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1.** Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a continuing disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area. This proclamation continues the Governor's authority to exercise all of the emergency powers provided in Section 7 of the Illinois Emergency Management Agency Act, 20, ILCS 3305/7, including but not limited to those specific emergency powers set forth below.

**Section 2.** The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to continue to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3.** The Illinois Department of Public Health is further directed to continue to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development and implementation of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4.** The Illinois Emergency Management Agency is directed to continue to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

**Section 5.** To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois

Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law. If necessary, and in accordance with Section 7(1) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6.** Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation continues the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7.** The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to continue to recommend, and, as appropriate, take necessary actions to ensure consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8.** The Illinois State Board of Education is directed to continue to recommend, and, as appropriate, take necessary actions to address chronic absenteeism due to transmission of COVID-19 and to alleviate any barriers to the use of e-learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9.** All State agencies are directed to cooperate with the Governor, other State agencies and local authorities in the development and implementation of strategies and plans to cope with and recover from the economic impact of COVID-19.

**Section 10.** Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect.

**Section 11.** This proclamation can facilitate requests for federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

**Section 12.** This proclamation shall be effective immediately and remain in effect for 30 days.

*In Witness Whereof, I have hereunto set my hand and caused the Great Seal of the State of Illinois to be affixed.*

*Done at the Capitol in the City of Springfield, this first day of April, in the Year of Our Lord two thousand and twenty, and the State of Illinois two hundred and second.*

Secretary of State

FILED
INDEX DEPARTMENT
APR 9 1 2020
IN THE OFFICE OF
SECRETARY OF STATE

Governor



# Gubernatorial Disaster Proclamation

**WHEREAS,** protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS,** it is critical that Illinoisans who become sick are able to be treated by medical professionals, including when a hospital bed, emergency room bed, or ventilator is needed; and,

**WHEREAS,** it is also critical that the State's health care and first responder workforce has adequate personal protective equipment (PPE) to safely treat patients, respond to public health disasters, and prevent the spread of communicable diseases; and,

**WHEREAS,** Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that has spread among people through respiratory transmissions, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and has reported more than 3 million confirmed cases of COVID-19 and 200,000 deaths attributable to COVID-19 globally as of April 30, 2020; and,

**WHEREAS,** a vaccine or treatment is not currently available for COVID-19 and, on April 24, 2020, the World Health Organization warned that there is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization and the federal Centers for Disease Control and Prevention (CDC) indicated that the virus was expected to continue spreading and it has, in fact, continued to spread rapidly, resulting in the need for federal and State governments to take significant steps; and,

**WHEREAS,** on March 9, 2020, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area in response to the outbreak of COVID-19 (First Gubernatorial Disaster Proclamation); and,

**WHEREAS,** on March 13, 2020, the President declared a nationwide emergency pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"), covering all states and territories, including Illinois; and,

**WHEREAS,** on March 26, 2020, the President declared a major disaster in Illinois pursuant to Section 401 of the Stafford Act; and,

**WHEREAS,** on April 1, 2020, due to the exponential spread of COVID-19 in Illinois, I again declared all counties in the State of Illinois as a disaster area (Second Gubernatorial Disaster Proclamation); and,

**EXHIBIT**

**3**

WHEREAS, as circumstances surrounding COVID-19 rapidly evolve, there have been frequent changes in information and guidance from public health officials as a result of emerging evidence; and,

WHEREAS, from the outset, data suggested that older adults and those with serious underlying health conditions are more likely to experience severe and sometimes fatal complications from COVID-19; and,

WHEREAS, emerging evidence has shown that young people, including infants and toddlers, are also at risk for such complications; and,

WHEREAS, as of March 16, 2020, an analysis by the CDC showed that 38 percent of hospitalized COVID-19 patients were between the ages of 20 and 54, and there is evidence that COVID-19 causes blood clots and strokes, and has caused deadly strokes in young and middle-aged patients who exhibited few symptoms; and,

WHEREAS, the understanding on spread from infected individuals who have not shown symptoms has changed and, on April 12, 2020, the CDC changed the period of exposure risk from "onset of symptoms" to "48 hours before symptom onset"; and,

WHEREAS, previously, the CDC recommended against wearing cloth face coverings or masks as protection and, now, in light of new research on asymptomatic and pre-symptomatic transmission, the CDC now recommends wearing cloth face coverings in public settings where social distancing measures are difficult to maintain; and,

WHEREAS, as COVID-19 has spread in Illinois over the course of the Gubernatorial Disaster Proclamations, the circumstances causing a disaster throughout the State have changed; and,

WHEREAS, at the time I issued the First Gubernatorial Disaster Proclamation, there were 11 confirmed cases of COVID-19 in one Illinois county; and,

WHEREAS, as of today, April 30, 2020, there have been nearly 53,000 confirmed cases of COVID-19 in 97 Illinois counties; and,

WHEREAS, the first death attributed to COVID-19 in Illinois was announced on March 17, 2020; and,

WHEREAS, as of April 30, 2020, Illinois has had more than 2,350 deaths resulting from COVID-19, including 141 deaths reported over a 24-hour period on April 30; and,

WHEREAS, studies suggest that for every confirmed case there are many more unknown cases, some of which are asymptomatic individuals, meaning that individuals can pass the virus to others without knowing; and,

WHEREAS, the Illinois Department of Public Health activated its Illinois Emergency Operations Plan and its Emergency Support Function 8 Plan to coordinate emergency response efforts by hospitals, local health departments, and emergency management systems in order to avoid a surge hospital resources and capacity; and,

WHEREAS, as the virus has progressed through Illinois, the crisis facing the State has developed and now requires an evolving response to ensure hospitals, health care professionals and first responders are able to meet the health care needs of all Illinoisans and in a manner consistent with CDC guidance that continues to be updated; and,

WHEREAS, in order to ensure that health care professionals, first responders, hospitals and other facilities are able to meet the health care needs of all residents of Illinois, the State must have critical supplies, including PPE, such as masks, face shields, gowns, and gloves; and,

WHEREAS, the State of Illinois maintains a stockpile that supports the existing PPE supply chains and stocks at various healthcare facilities; and,

WHEREAS, across the State, hospitals and long-term care facilities use approximately 1.5 million N95 masks, 25 million gloves, 4.4 million gowns, and 700,000 surgical masks during a 10-day period; and,

**WHEREAS,** the State had distributed among all 102 Illinois counties millions of surgical masks and N95 masks, tens of thousands of gowns, millions of pairs of gloves, and hundreds of thousands of face shields from the State stockpile; and,

**WHEREAS,** the Illinois Department of Public Health has provided guidance to all hospitals and EMS providers recommending the immediate elevation of their conservation and contingency strategies as it relates to PPE; and,

**WHEREAS,** while the State is making every effort to procure additional PPE, if those procurement efforts are disrupted or Illinois experiences a surge in COVID-19 cases, the State faces a life-threatening shortage of respirators, masks, protective eyewear, face shields, gloves, gowns, and other protective equipment for health care workers and first responders; and,

**WHEREAS,** Illinois is using a high percentage of hospital beds, ICU beds, and ventilators as a result of the number of COVID-19 patients that require hospitalization and, if cases were to surge higher, the State would face a shortage of these critical health care resources; and,

**WHEREAS,** Illinois currently has a total of 32,010 hospital beds with 3,631 ICU beds, of which, as of April 30, 2020, only 33% of hospital beds and 25% of ICU beds were available statewide, and only 17% of ICU beds were available in the Chicago region; and,

**WHEREAS,** the State worked with top researchers from the University of Illinois at Urbana-Champaign, the Northwestern School of Medicine, the University of Chicago, the Chicago and Illinois Departments of Public Health, along with McKinsey and Mier Consulting Group, and Civis Analytics, to analyze two months' worth of daily data on COVID-19 deaths and ICU usage and model potential outcomes; and,

**WHEREAS,** the State's modeling shows that its health care resource utilization will not peak until May, and that health care resources will continue to be limited after the peak; and,

**WHEREAS,** the State's modeling shows that without extensive social distancing and other precautions, the State will not have sufficient hospital beds, ICU beds or ventilators; and,

**WHEREAS,** Illinois currently has a total of 32,010 hospital beds, and the State's modeling shows that without a "stay at home" order, more than 100,000 hospital beds would be necessary; and,

**WHEREAS,** Illinois currently has a total of 3,631 ICU beds, and the State's modeling shows that without a "stay at home" order, more than 25,000 ICU beds would be necessary; and,

**WHEREAS,** Illinois currently has a total of 3,378 ventilators, and the State's modeling shows that without a "stay at home" order, upwards of 20,000 ventilators would be necessary; and,

**WHEREAS,** the State's modeling shows that without a "stay at home" order, the number of deaths from COVID-19 would be between 10 to 20 times higher than with a "stay at home" order in place; and,

**WHEREAS,** the epidemiology concept of $R_0$ (R-naught) – which represents the number of cases, on average, an infected person will cause during their infectious period – is an important measure of progress in combatting a virus like COVID-19, and that an Ro of below 1 is a critical milestone because it suggests that the disease is declining rather than spreading; and,

**WHEREAS,** the State's estimated effective $R_0$ was approximately 3.5 at the beginning of the outbreak, but the number has improved to approximately 1.25 based on the State's emergency measures, including the "stay at home" order; and,

**WHEREAS,** hospital beds, ICU beds, and ventilators are needed not for just patients with COVID-19, but also for any number of additional illnesses and injuries; and,

WHEREAS, fewer Illinoisans have sought non-COVID-19 related medical care and emergency care in recent weeks and it is critical that Illinoisans are able to and willing to seek non-COVID-19 related medical care and emergency care; and,

WHEREAS, Illinoisans will be able to and willing to seek non-COVID-19 related medical care and emergency care if there are sufficient hospital beds, ventilators, and if medical personnel are able to protect themselves with PPE; and,

WHEREAS, the State has been limited in the number of COVID-19 tests that can be taken and processed due to a limited number of testing sites and labs, as well as a shortage of necessary supplies, including the swabs needed to take samples; and,

WHEREAS, at the time I issued the First Gubernatorial Disaster Proclamation, Illinois had capacity to test no more than a few hundred people per day for COVID-19 at a small number of testing sites; and,

WHEREAS, the State has developed testing sites throughout the State and now has increased the COVID-19 tests per day to more than 10,000; and,

WHEREAS, as of April 30, 2020, Illinois has tested nearly 270,000 total specimens for COVID-19; and,

WHEREAS, national projections adjusted for Illinois' population suggest the state may need to process several thousand more tests per day as part of the effort to permanently slow and reduce the spread of COVID-19; and,

WHEREAS, the World Health Organization has identified a positive test rate of 10% as a benchmark for adequate testing but currently over 20% of the COVID-19 tests administered in Illinois have positive results, suggesting that Illinois must continue increasing testing; and,

WHEREAS, based on the foregoing facts, and considering the expected continuing spread of COVID-19 and the resulting health impacts that will be felt over the coming month by people across the State, the current circumstances in Illinois surrounding the spread of COVID-19 constitute an epidemic emergency and a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, based on the foregoing, the new circumstances surrounding the threatened shortages of hospital beds, ICU beds, ventilators, and PPE, and critical need for increased COVID-19 testing capacity constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that that our healthcare delivery system is capable of serving those who are sick and that Illinoisans remain safe and secure and able to obtain medical care; and,

WHEREAS, this proclamation will assist Illinois agencies in coordinating State and Federal resources, including materials needed to test for COVID-19, personal protective equipment, and medicines, in an effort to support the State responses as well as the responses of local governments to the present public health emergency; and,

WHEREAS, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the new issuance of a proclamation of disaster; and,

WHEREAS, the Illinois Constitution, in Article V, Section 8, provides that "the Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws," and states, in the Preamble, that a central purpose of the Illinois Constitution is "provide for the health, safety, and welfare of the people";

NOW, THEREFORE, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1.** Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area. The proclamation authorizes the exercise of all of the emergency powers provided in Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, including but not limited to those specific emergency powers set forth below.

**Section 2.** The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3.** The Illinois Department of Public Health is further directed to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development and implementation of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4.** The Illinois Emergency Management Agency is directed to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

**Section 5.** To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law. If necessary, and in accordance with Section 7(1) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6.** Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation activates the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7.** The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to recommend, and, as appropriate, take necessary actions to ensure expanded access to testing for COVID-19 and that consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8.** The Illinois State Board of Education is directed to recommend, and, as appropriate, take necessary actions to address any impact to learning associated with the present public health emergency and to alleviate any barriers to the use of remote learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9.** All State agencies are directed to cooperate with the Governor, other State agencies and local authorities in the development and implementation of strategies and plans to cope with and recover from the economic impact of the present public health emergency.

**Section 10.** Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect.

**Section 11.** This proclamation can facilitate requests for federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

**Section 12.** This proclamation shall be effective immediately and remain in effect for 30 days.

𝕴𝕹 𝖂𝖎𝖙𝖓𝖊𝖘𝖘 𝖂𝖍𝖊𝖗𝖊𝖔𝖋, *I have hereunto set my hand and caused the Great Seal of the State of Illinois to be affixed.*

*Done at the Capitol in the City of Springfield this 30ᵗʰ day of April, in the Year of Our Lord two thousand and twenty, and of the State of Illinois two hundred and second.*



*Jesse White*
SECRETARY OF STATE

GOVERNOR

⊕ View up to date information on how Illinois is handling the Coronavirus Disease 2019 (COVID-19) from the State of Illinois Coronavirus Response Site (https://coronavirus.illinois.gov/)                                              ✕

---

Illinois.gov (/)                                                                                    ⮜ SHARE

# Executive Order 2020-32

April 30, 2020
Executive Order 2020-32

**EXECUTIVE ORDER 2020-32**

**(COVID-19 EXECUTIVE ORDER NO. 30)**

**WHEREAS,** protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS,** it is critical that Illinoisans who become sick are able to be treated by medical professionals, including when a hospital bed, emergency room bed, or ventilator is needed; and,

**WHEREAS,** it is also critical that the State's health care and first responder workforce has adequate personal protective equipment (PPE) to safely treat patients, respond to public health disasters, and prevent the spread of communicable diseases; and,

**WHEREAS,** Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that has spread among people through respiratory transmissions, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and has reported more than 3 million confirmed cases of COVID-19 and 200,000 deaths attributable to COVID-19 globally as of April 30, 2020; and,

**WHEREAS,** a vaccine or treatment is not currently available for COVID-19 and, on April 24, 2020, the World Health Organization warned that there is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization and the federal Centers for Disease Control and Prevention (CDC) indicated that the virus was expected to continue spreading and it has, in fact, continued to spread rapidly, resulting in the need for federal and State governments to take significant steps; and,

**WHEREAS,** the CDC currently recommends that all United States residents take precautions to contain the spread of COVID-19, including that they: (1) stay home as much as possible; (2) if they must leave their home, practice social distancing by maintaining 6 feet of distance from others and avoiding all gatherings; (3) wear cloth face coverings in public settings where other social distancing measures are difficult to maintain; (4) be alert for symptoms such as fever, cough, or shortness of breath, and take their temperature if symptoms develop; and (5) exercise appropriate hygiene, including proper hand-washing; and,

**WHEREAS,** the CDC also recommends the following precautions for household members, caretakers and other persons having close contact with a person with symptomatic COVID-19, during the period from 48 hours before onset of symptoms until the symptomatic person meets the criteria for discontinuing home isolation:  (1) stay home until 14 days after last exposure and maintain social distance (at least 6 feet) from others at all times; (2) self-monitor for symptoms, including checking their temperature twice a day and watching for fever, cough, or shortness of breath; and (3) avoid contact with people at higher risk for severe illness (unless they live in the same home and had the same exposure); and,

**WHEREAS,** as circumstances surrounding COVID-19 rapidly evolve, there have been frequent changes in information and guidance from public health officials as a result of emerging evidence; and,

**WHEREAS,** as of April 30, 2020, there have been nearly 53,000 confirmed cases of COVID-19 in 97 Illinois counties and 2,350 deaths from COVID-19; and,

### GOVERNMENT (/GOVERNMENT)

Executive Branch (/government/executive-branch)

Executive Orders (/government/executive-orders)

Judicial Branch (/government/judicial-branch)

Legislative Branch (/government/legislative-branch)

Resources & Records (/government/resources-records)

Transparency & Accountability (/government/transparency-accountability)

### BUSINESS (/BUSINESS)

Consumers (/business/consumers)

Manage your Business (/business/manage-your-business)

Manage your Employees (/business/manage-your-employees)

Registration, Licenses, & Permits (/business/registration-licenses-permits)

### EMPLOYMENT (/EMPLOYMENT)

Employee Rights (/employment/employee-rights)

Find Jobs (/employment/find-jobs)

Professional Licenses



Educators

069

WHEREAS, studies suggest that for every confirmed case there are many more unknown cases, some of which are asymptomatic individuals, meaning that individuals can pass the virus to others without knowing; and,

WHEREAS, as the virus has progressed through Illinois, the crisis facing the State has developed and now requires an evolving response to ensure hospitals, health care professionals and first responders are able to meet the health care needs of all Illinoisans and in a manner consistent with CDC guidance that continues to be updated; and,

WHEREAS, Illinois is using a high percentage of hospital beds, ICU beds, and ventilators as a result of the number of COVID-19 patients that require hospitalization and, if cases were to surge higher, the State would face a shortage of these critical health care resources; and,

WHEREAS, Illinois currently has a total of 32,010 hospital beds with 3,631 ICU beds, of which, as of April 30, 2020, only 33% of hospital beds and 25% of ICU beds were available statewide, and only 17% of ICU beds were available in the Chicago region; and,

WHEREAS, the State worked with top researchers from the University of Illinois at Urbana-Champaign, the Northwestern School of Medicine, the University of Chicago, the Chicago and Illinois Departments of Public Health, along with McKinsey and Mier Consulting Group, and Civis Analytics, to analyze two months' worth of daily data on COVID-19 deaths and ICU usage and model potential outcomes; and,

WHEREAS, the State's modeling shows that its health care resource utilization will not peak until May, and that health care resources will continue to be limited after the peak; and,

WHEREAS, the State's modeling shows that without extensive social distancing and other precautions, the State will not have sufficient hospital beds, ICU beds or ventilators; and,

WHEREAS, Illinois currently has a total of 32,010 hospital beds, and the State's modeling shows that without a "stay at home" order, more than 100,000 hospital beds would be necessary; and,

WHEREAS, Illinois currently has a total of 3,631 ICU beds, and the State's modeling shows that without a "stay at home" order, more than 25,000 ICU beds would be necessary; and,

WHEREAS, Illinois currently has a total of 3,378 ventilators, and the State's modeling shows that without a "stay at home" order, upwards of 20,000 ventilators would be necessary; and,

WHEREAS, the State's modeling shows that without a "stay at home" order, the number of deaths from COVID-19 would be between 10 to 20 times higher than with a "stay at home" order in place; and,

WHEREAS, I declared all counties in the State of Illinois as a disaster area on April 30, 2020 because the current circumstances in Illinois surrounding the spread of COVID-19 constitute an epidemic and a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, I declared all counties in the State of Illinois as a disaster area on April 30, 2020 because the current circumstances surrounding the threatened shortages of hospital beds, ICU beds, ventilators, and PPE, and critical need for increased COVID-19 testing capacity constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, the Illinois Constitution, in Article V, Section 8, provides that "the Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws," and states, in the Preamble, that a central purpose of the Illinois Constitution is "provide for the health, safety, and welfare of the people;" and,

WHEREAS, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take measures consistent with public health guidance to slow and stop the spread of COVID-19 and to prevent shortages of hospital beds, ICU beds, ventilators, and PPE and to increase COVID-19 testing capacity;

THEREFORE, by the powers vested in me as the Governor of the State of Illinois, pursuant to the Illinois Constitution and Sections 7(1), 7(2), 7(3), 7(8), 7(9), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective May 1, 2020:

Section 1. Public Health Requirements for Individuals Leaving Home and for Businesses

1. <u>Wearing a face covering in public places or when working</u>. Any individual who is over age two and able to medically tolerate a face-covering (a mask or cloth face-covering) shall be required to cover their nose and mouth with a face-covering when in a public place and unable to maintain a six-foot social distance. Face-coverings are

(/education/educators)

Learning Resources (/education/learning-resources)

Parents (/education/parents)

Students (/education/students)

RESIDENTS (/RESIDENTS)

Cars & Transportation (/residents/cars-transportation)

Citizen Resources (/residents/citizen-resources)

Family & Home (/residents/family-home)

Health & Safety (/residents/health-safety)

Neighborhoods/Housing (/residents/neighborhoods-housing)

Parent/Child Resources (/residents/parent-child-resources)

Senior Citizen Resources (/residents/senior-citizen-resources)

Veteran Resources (/residents/veteran-resources)

VISITING (/VISITING)

Arts and Culture (/visiting/arts-and-culture)

Family Attractions (/visiting/family-attractions)

Museums (/visiting/museums)

Outdoors (/visiting/outdoors)

Travel & Recreation (/visiting/travel-recreation)

ABOUT (/ABOUT)

History (/about/history)

State Information (/about/state-information)

EMAIL UPDATES (/PAGES/COMMUNICATIONSOPT

SEARCH (/SEARCH)

News (/search/news)

AGENCIES (/AGENCIES)

SERVICES (/SERVICES)

NEWS (/NEWS)

Release (/news/release)

required in public indoor spaces such as stores.

2. <u>Requirements for essential stores.</u>  Retail stores (including, but not limited to, stores that sell groceries and medicine, hardware stores, and greenhouses, garden centers, and nurseries) designated as Essential Businesses and Operations under this Order shall to the greatest extent possible:
   - provide face coverings to all employees who are not able to maintain a minimum six-foot social distance at all times;
   - cap occupancy at 50 percent of store capacity, or, alternatively, at the occupancy limits based on store square footage set by the Department of Commerce and Economic Opportunity;
   - set up store aisles to be one-way where practicable to maximize spacing between customers and identify the one-way aisles with conspicuous signage and/or floor markings;
   - communicate with customers through in-store signage, and public service announcements and advertisements, about the social distancing requirements set forth in this Order (Social Distancing Requirements); and
   - discontinue use of reusable bags.
   Households must limit the number of members who enter stores to the minimum necessary.

3. <u>Requirements for non-essential stores.</u>  Retail stores not designated as Essential Businesses and Operations may re-open for the limited purposes of fulfilling telephone and online orders through pick-up outside the store and delivery – which are deemed to be Minimum Basic Operations. Employees working in the store must follow the social Distancing Requirements, and must wear a face covering when they may come within six feet of another employee or a customer.

4. <u>Requirements for manufacturers.</u>  Manufacturers that continue to operate pursuant to this Order must follow Social Distancing Requirements and take appropriate precautions, which may include:
   - providing face coverings to all employees who are not able to maintain a minimum six-foot social distance at all times;
   - staggering shifts;
   - reducing line speeds;
   - operating only essential lines, while shutting down non-essential lines;
   - ensuring that all spaces where employees may gather, including locker rooms and lunchrooms, allow for social distancing; and
   - downsizing operations to the extent necessary to allow for social distancing and to provide a safe workplace in response to the COVID-19 emergency.

5. <u>Requirements for all businesses.</u>  All businesses must evaluate which employees are able to work from home, and are encouraged to facilitate remote work from home when possible.  All businesses that have employees physically reporting to a work-site must post the guidance from the Illinois Department of Public Health (IDPH) and Office of the Illinois Attorney General regarding workplace safety during the COVID-19 emergency.  The guidance will be posted on the IDPH webpage.

Section 2. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations

1. <u>Stay at home or place of residence.</u> With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order.  To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order.  All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.
Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health (IDPH)).  Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.  For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. <u>Non-essential business and operations must cease.</u>  All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below.  For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

071

All Essential Businesses and Operations may remain open consistent with the express provisions of this Order and the intent of this Order as set forth in Section 2, Paragraph 16 below. To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order. Pursuant to current guidance from the CDC, any gathering of more than ten people is prohibited unless exempted by this Executive Order. Nothing in this Executive Order prohibits the gathering of members of a household or residence.

   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

4. **Prohibited and permitted travel.** All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.** For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities, and must follow the Social Distancing Requirements set forth in this Order, including wearing face coverings when in public or at work:

   i. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

   ii. **For necessary supplies and services.** To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

   iii. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, and biking. Individuals may go to public parks and open outdoor recreation areas, including specific State parks that remain open for certain activities, as designated by the Illinois Department of Natural Resources. Fishing, boating, and golf are permitted only when following the guidelines provided by the Illinois Department of Commerce and Economic Opportunity (DCEO). Playgrounds may increase spread of COVID-19, and therefore shall be closed.

   iv. **For certain types of work.** To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

   v. **To take care of others.** To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

   vi. **To engage in the free exercise of religion.** To engage in the free exercise of religion, provided that such exercise must comply with Social Distancing Requirements and the limit on gatherings of more than ten people in keeping with CDC guidelines for the protection of public health. Religious organizations and houses of worship are encouraged to use online or drive-in services to protect the health and safety of their congregants.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

072

7. <u>Healthcare and Public Health Operations</u>. For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.
Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare and grooming services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. <u>Human Services Operations</u>. For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, and group day care homes; day care centers licensed as specified in Section 2, Paragraph 12(s) of this Executive Order; day programs exempt from licensure under Title 89 of the Illinois Administrative Code, Sections 377.3(a)(1)–(a)(4), (b)(2), and (c); day programs exempt from licensure under Title 89 of the Illinois Administrative Code, Section 377.3(d) (subject to the conditions governing exempt day care homes set forth in Section 1, Paragraph 12(s) of this Executive Order); residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. <u>Essential Infrastructure</u>. For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity

673

operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. <u>Essential Governmental Functions</u>.  For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions.  Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

This Executive Order does not apply to the United States government.  Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. <u>Businesses covered by this Executive Order</u>.  For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. <u>Essential Businesses and Operations</u>.  For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:

   a. <u>Stores that sell groceries and medicine</u>.  Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

   b. <u>Food, beverage, and cannabis production and agriculture</u>. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

   c. <u>Organizations that provide charitable and social services</u>.  Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

   d. <u>Media</u>.  Newspapers, television, radio, and other media services;

   e. <u>Gas stations and businesses needed for transportation</u>. Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

   f. <u>Financial institutions</u>.  Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;

   g. <u>Hardware and supply stores and greenhouses, garden centers, and nurseries</u>.  Hardware stores and businesses that sell electrical, plumbing, and heating material, and greenhouses, garden centers, and nurseries;

   h. <u>Critical trades</u>.  Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and

074

Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services**. Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions**. Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. Educational institutions may allow and establish procedures for pick-up of necessary supplies and/or student belongings and dormitory move-out if conducted in a manner consistent with public health guidelines, including Social Distancing Requirements. This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools have been closed past the April 7, 2020 date reflected in those Orders;

k. **Laundry services**. Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) _except that_ Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home**. Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations**. Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

o. **Transportation**. Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Executive Order;

p. **Home-based care and services**. Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q. **Residential facilities and shelters**. Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r. **Professional services**. Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

s. **Day care centers for employees exempted by this Executive Order**. Day care centers granted an emergency license pursuant to Title 89, Section 407.500 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation;

t. **Manufacture, distribution, and supply chain for critical products and industries**. Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations;

u. **Critical labor union functions**. Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations -- provided that these checks should be done by telephone or remotely where possible;

v. **Hotels and motels**. Hotels and motels, to the extent used for lodging and delivery or carry-out food

075

services; and

    w. <u>Funeral services</u>.  Funeral, mortuary, cremation, burial, cemetery, and related services.

13. <u>Minimum Basic Operations</u>.  For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

    1. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

    2. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

    3. For retail stores, fulfilling online and telephonic orders through pick-up outside the store or delivery.


14. <u>Essential Travel.</u>  For the purposes of this Executive Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

    1. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

    2. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

    3. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

    4. Travel to return to a place of residence from outside the jurisdiction.

    5. Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

    6. Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. <u>Social Distancing, Face Covering, and PPE Requirements</u>.  For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

    1. <u>Required measures.</u>  Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

        1. <u>Designate six-foot distances</u>.  Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

        2. <u>Hand sanitizer and sanitizing products.</u>  Having hand sanitizer and sanitizing products readily available for employees and customers;

        3. <u>Separate operating hours for vulnerable populations</u>.  Implementing separate operating hours for elderly and vulnerable customers; and

        4. <u>Online and remote access</u>.  Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

        5. <u>Face Coverings and PPE</u>. ·Providing employees with appropriate face coverings and requiring that employees wear face coverings where maintaining a six-foot social distance is not possible at all times. When the work circumstances require, providing employees with other PPE in addition to face coverings.

16. <u>Intent of this Executive Order</u>.  The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements. All provisions of this Executive Order should be interpreted to effectuate this intent. Businesses not specifically addressed by this Executive Order generally should cease activities and reduce to Minimum Basic Operations.

17. <u>Enforcement</u>. This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 15, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

18. Businesses must follow guidance provided or published by: the Office of the Governor, the Illinois Department of Commerce and Economic Opportunity, and State and local law enforcement regarding whether they qualify as

076

Essential; and the Illinois Department of Public Health, local public health departments, and the Workplace Rights Bureau of the Office of the Illinois Attorney General with respect to Social Distancing Requirements. Pursuant to Section 25(b) of the Whistleblower Act, 740 ILCS 174, businesses are prohibited from retaliating against an employee for disclosing information where the employee has reasonable cause to believe that the information discloses a violation of this Order

19. <u>No limitation on authority</u>. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State or any county, or local government body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closure of a specific location for a limited period of time, including the duration of this public health emergency. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

**Section 3. Savings clause.**

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable. This Executive Order is meant to be read consistently with any Court order regarding this Executive Order.

**JB Pritzker, Governor**

Issued by the Governor April 30, 2020
Filed by the Secretary of State April 30, 2020

---

Stay Informed

   Emergencies & Disasters
(https://www.illinois.gov/ready)
   Flag Honors (/Pages/News/flag-honors.aspx)
   Road Conditions
(http://www.gettingaroundillinois.com/)
   Traffic Alerts (http://www.iltrafficalert.com/)
   Get Email Updates
(https://www.illinois.gov/gov/Pages/CommunicationsOptIn.aspx)

Helpful Links

   Illinois Privacy Info (/Pages/About/Privacy.aspx)
   Kids Privacy (/Pages/About/Kids-
Privacy.aspx)
   Contact Us (/Pages/About/ContactUs.aspx)
   FOIA Contacts (/Pages/FOIA-Contacts.aspx)
   State Press Contacts
(https://www.illinois.gov/cms/agency/media/relations/Pages/MediaContacts.aspx)

Stay Connected

 (http://twitter.com/GovPritzker)

 (https://www.facebook.com/GovPritzker)

 (http://instagram.com/GovPritzker)

Select Language


Powered by Google Translate (https://translate.google.com)

---

   (/)
 Web Accessibility (http://www.dhs.state.il.us/page.aspx?item=32765)
 Missing & Exploited Children (http://www.missingkids.com/)  Amber Alerts (http://www.amberillinois.org/)
 Illinois Privacy Info (/Pages/About/Privacy.aspx)

Governor JB Pritzker (/sites/gov)
© 2020 State of Illinois (/)

077

**State of Illinois**
Illinois Department of Public Health

# Pandemic Influenza Preparedness and Response Plan

Version 5.1
March 2020





EXHIBIT
5

i

DocuSign Envelope ID: BBD02F77-9434-4914-8301-5A7E173ACB6B

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

# FOREWORD

Influenza is an acute viral infection that spreads easily from person-to-person. It causes illnesses, hospitalizations and deaths every year in Illinois. Intermittently over the centuries, changes in the genetic makeup of influenza virus have resulted in new strains to which people have never been exposed. These new strains have the potential to cause a pandemic or worldwide outbreak of influenza, with potentially catastrophic consequences. In Illinois alone, a pandemic of even modest severity could result in thousands of deaths and the sickening of millions, even among previously healthy persons.

In 2009, a new strain of influenza virus, 2009A(H1N1)pdm, emerged. The U.S. Centers for Disease Control and Prevention (CDC) worked with manufacturers to develop a vaccine; however, the time it took to develop a vaccine caused a severe shortage in available vaccine during the height of the outbreak. Manufacturers have since developed ample amounts of vaccine to the 2009A(H1N1)pdm influenza strain; still, new genetic strains can arise leading to another pandemic influenza.

The *Illinois Pandemic Influenza Preparedness and Response Plan* was developed:

- To identify steps that need to be taken by state government and its partners prior to a pandemic to improve the level of preparedness; and
- To coordinate state government-wide *response* activities in the event a pandemic occurs.

These preparedness and response activities are organized according to the six pandemic phases identified by the World Health Organization (WHO).

This plan was developed through a collaborative process involving Illinois Department of Public Health offices and divisions and partner state agencies that have a pandemic response role.

*Ngozi Ezike*

_____
Ngozi Ezike, MD
Director
Illinois Department of Public Health

i

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020                                                    Version 5.1

## Record of Changes to this Plan[1]

| Version # | Date | Affected Section | Summary of Changes |
|---|---|---|---|
| 1.0 | 11/4/2005 | All | • N/A: First complete version of the plan. |
| | 8/31/2009 | All | • Plan was changed to reflect 2009A(H1N1)pdm response. |
| | 8/31/2010 | All | • Plan was updated to reflect lessons learned from 2009A(H1N1)pdm response. |
| 5.00 | 04/25/2014 | All | • All references to State Emergency Operations Center (SEOC) changed to reflect new title of State Incident Response Center (SIRC) |
| 5.10 | ▆▆▆▆▆ | All | • All references to State Incident Response Center (SIRC) changed to reflect new title of State Emergency Operations Center (SEOC) |
| 2.0 | 11/25/2005 | Executive Summary | • New section |
| | | All | • |
| 2.01 | 2/14/2006 | All | • Modified version of the plan |
| 2.02 | 2/28/2006 | Al | • Modified version of the plan |
| 2.03 | 3/10/2006 | All | • Modified version of the plan |
| 2.04 | 3/17/2006 | All | • Modified version of the plan |
| 3.00 | 8/31/2009 | All | • Modified version of the plan |
| 4.00 | 10/30/2010 | All | • Modified version of the plan |
| 5.00 | 04/25/2014 | Executive Overview | • Title changed to Executive Overview |
| 5.10 | 03/02/2020 | All | • Modified version of the plan |
| 5.10 | 03/02/2020 | Executive Overview | • Director's name and title updated |
| 5.10 | ▆▆▆▆▆ | Basic Plan | • Updated link to CDC Flu Aid 2.0 |
| | | | • Updated link to CDC FluSurge 2.0 |
| 5.00 | 04/24/2014 | Support Annex 1.0 | • Surveillance information revised |
| 5.10 | 03/02/2020 | | • Removed IL Department of Agriculture as a support agency for laboratory testing. |
| 3.00 | 8/31/2009 | Added Annex 2.0 | • Added annex on laboratory testing procedures |
| 4.00 | 10/30/2010 | Revised | • Revised based on 2009A(H1N1)pdm response |
| 5.00 | 04/25/2014 | | • Laboratory testing information revised |
| | | Support Annex3.0 | • Modified to reflect USHHS guidance released 11/05 |
| 3.00 | 8/31/2009 | | • Antiviral priority groups added |
| 3.00 | 8/31/2009 | | • Pandemic vaccine priority groups added |
| | | | • Stockpiling information revised |
| 4.00 | 10/30/2010 | All | • Priority groups were adjusted for 2009A(H1N1)pdm and the goals were revised |
| 5.00 | 04/25/2014 | | • Modified to reflect lessons learned during the 2009A(H1N1)pdm response |
| | | | • Pandemic vaccine priority groups revised to include utility workers |

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

| | | | |
|---|---|---|---|
| | | Support Annex 4.0 | • Modified to reflect USHHS guidance released 11/05<br>• Scope and Key Terms Section added<br>• Assumptions Section revised and expanded<br>• Community containment strategies table added |
| | | Support Annex 4.0 | • Modified to reflect USHHS guidance released 11/05 |

---

[1] For successive plan versions, increments to the left of the decimal point in the plan version number indicate major changes in content or organization while increments to the right of the decimal point indicate less significant modifications.

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

| 3.00 | 8/31/2009 | | Modified to reflect 2009A(H1N1)pdm efforts |
|------|-----------|--------------------|--------------------------------------------|
| | | Support Annex 7.0 | • Modified to reflect USHHS guidance released 11/05 |
| | | | • Sections added to address hospital: planning, communications, education and training, triage, clinical evaluation, admission, access/security, worker safety/occupational health, influenza vaccination and antiviral drug issues, surge capacity, and mortuary issues |
| 3.00 | 8/31/2009 | | • Guidance for non hospital setting added |
| 3.00 | 8/31/2009 | | • Hospital pandemic influenza planning guidance for hospitals added (Attachment1) |
| | | | • Hospital preparedness checklist deleted |
| | | Support Annex 8.0 | • Modified to reflect USHHS guidance released 11/05 |
| | | | • Information from additional sources added including the IDPH Control of Communicable Disease Code |
| 3.00 | 8/31/2009 | | • Added descriptions of infection prevention and control practice classifications |
| 5.00 | 04/25/2014 | | • Modified to reflect current recommendations |
| | | | • Modified to include IEPA |

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

## Contents

Executive Overview ............................................................................................................. 1
Introduction ....................................................................................................................... 8
Basic Plan ......................................................................................................................... 12
   1.0   Purpose ...................................................................................................... 13
   2.0   Goals and Objectives ............................................................................... 13
   3.0   Plan Organization .................................................................................... 14
   4.0   Applicability ............................................................................................. 14
   5.0   Incident Management Activities .............................................................. 14
   6.0   Policies ...................................................................................................... 15
   7.0   Key Concepts ............................................................................................ 15
   8.0   Planning Assumptions and Considerations ............................................ 16
   9.0   Roles and Responsibilities ....................................................................... 19
   10.0 Plan Development and Maintenance ....................................................... 30
Concept of Operations ..................................................................................................... 31
   1.0   Concept of Operations ............................................................................. 32
   2.0   Preparedness ............................................................................................ 36
   3.0   Response ................................................................................................... 39
   4.0   Recovery ................................................................................................... 47
Support Annexes .............................................................................................................. 49
   1.0   Surveillance and Detection ..................................................................... 50
   2.0   Laboratory Testing .................................................................................. 54
   3.0   Antiviral and Vaccine Purchase and Distribution ................................. 55
   4.0   Restriction of Movement or Activities to Control Disease Spread .......... 66
   5.0   Emergency and Risk Communication ..................................................... 75
   6.0   Fatality Management ............................................................................... 81
   7.0   Training and Exercise Schedule and Plan .............................................. 89
   8.0   Surge (Hospitals, Labs, other) ................................................................ 93
   9.0   Infection Control and Personal Protective Equipment (PPE) ................ 101
Appendices ...................................................................................................................... 109
   1.0   Abbreviations and Acronyms ................................................................ 110
   2.0   Glossary of Key Terms ........................................................................... 113
   3.0   Internet Resources on Pandemic Influenza ........................................... 118
   4.0   References ............................................................................................... 120

Case 3:20-cv-00474-GCS   Document 1-1   Filed 05/21/20   Page 49 of 238   Page ID #56

# Executive Overview

Illinois Pandemic Influenza Preparedness and Response Plan

# Executive Overview

## PANDEMIC INFLUENZA

An influenza pandemic can occur when a non-human (novel) influenza virus gains the ability for efficient and sustained human-to-human transmission and then spreads globally. Pandemics are different from seasonal outbreaks or "epidemics" of influenza. Seasonal outbreaks are caused by subtypes of influenza viruses already in existence among people. Past influenza pandemics have led to high levels of illness, death, social disruption and economic loss.

Influenza viruses that have the potential to cause a pandemic are referred to as "influenza viruses with pandemic potential." Examples of influenza viruses with pandemic potential include influenza A, H5N1 and influenza A, H7N9. These are two different types of avian (bird) influenza viruses. These non-human viruses are novel among humans and circulate in birds in parts of the world. There is little to no immunity against these viruses among people. Human infections with these viruses have occurred rarely. If either virus changes in such a way to allow for efficient infections in humans and sustained person-to-person transmission of the virus, an influenza pandemic could result.

Influenza pandemics are different from many of the threats for which public health and the health care system are currently planning:

- The pandemic will last much longer that most other emergency events and may include "waves" of influenza activity separated by months (in 20th century pandemics, a second wave of influenza activity occurred 3-to 12-months after the first wave).
- The number of health care workers and first responders available to work is expected to be reduced, as many will be at high risk of illness through exposure in the community and in health care settings, and others may have to miss work to care for ill family members.
- Resources in many locations could be limited due to the impact of the widespread nature of influenza pandemic.

The severity of the next pandemic cannot be predicted, but it is expected that susceptibility to the pandemic influenza virus will be universal. Approximately half of those who become ill will seek outpatient care. While it depends on the virulence of the virus, a severe pandemic influenza could cause an estimated 2 million deaths in the United States.

### Illinois Pandemic Influenza Preparedness and Response Plan
The purpose of the *Illinois Pandemic Preparedness and Response Plan* is to provide a framework for local, state and federal public health and medical officials to work together to reduce morbidity, mortality and social disruption that would result from a pandemic influenza outbreak.

The *Illinois Pandemic Preparedness and Response Plan* was developed through a collaborative process involving offices and divisions within the Illinois Department of Public Health (IDPH) and state of Illinois partner agencies that have a response role during a pandemic.

The *Illinois Pandemic Preparedness and Response Plan* applies to all state agencies, departments and commissions under the authority of the governor that may be requested to provide assistance or conduct operations in actual or potential incidents. These incidents require a coordinated response by an appropriate combination of federal, state, local and nongovernmental entities.

The *Illinois Pandemic Preparedness and Response Plan* , as with all state emergency response plans, operates within the framework of the *Illinois Emergency Operations Plan*. Moreover, the *Illinois Pandemic Preparedness and Response Plan* is intended to work in concert with several other plans that will be implemented during a pandemic to guide various aspects of the response, including the *IDPH Emergency Operations Plan*, the *Illinois Strategic National Stockpile Plan* and the *Illinois Health and Medical Care Response Plan.*

The overall direction and control authority reside with the Office of the Governor, with coordination and management expertise supplied by the Illinois Emergency Management Agency (IEMA). IDPH serves as the lead state agency and will assume a central response role throughout a pandemic influenza outbreak. Additionally, IDPH will provide the technical expertise and statutory authority over many of the health and medical issues that may arise.

The *Illinois Pandemic Preparedness and Response Plan* is to be implemented within the context of a unified command emergency operating structure involving representation from local, state and federal governments. State government's role in the event is to closely track the spread of the outbreak and to rapidly mobilize and deploy resources to assist local governments in their efforts to mitigate morbidity and mortality and the demand on most essential government services.

The *Illinois Pandemic Preparedness and Response Plan* provides a set of preparedness activities and response functions to be carried out by IDPH and, where appropriate, provide local health departments, health care provider systems and first responder organizations with preparedness and response expectations.

These preparedness and response activities are organized according to the six pandemic phases identified by the World Health Organization (WHO).

Illinois Pandemic Influenza Preparedness and Response Plan                     Version 5.1
March 2020

| Phase | Definition |
|-------|-----------|
| Phase 1 | No new influenza virus subtypes have been detected in humans. However, a circulating animal influenza virus subtype poses a substantial risk of human disease. |
| Phase 2 | No new influenza virus subtypes have been detected in humans. An influenza virus subtype that has caused human infection may be present in animals. If present in animals, the risk of human infection or disease is considered to be low. |
| Phase 3 | Human infection(s) with a new subtype, but no human-to- human spread, or at most rare instances of spread to a close contact. |
| Phase 4 | Small cluster(s) with limited human-to-human transmission, but spread is highly localized, suggesting the virus is not well adapted to humans. |
| Phase 5 | Larger cluster(s), but human-to-human spread still localized, suggesting the virus is becoming increasingly better adapted to humans, but may not yet be fully transmissible (substantial pandemic risk). |
| Phase 6 | Pandemic: increased and sustained transmission in general population. |

The *Illinois Pandemic Preparedness and Response Plan* is organized into three parts: Basic Plan, Concept of Operations and Support Annexes.

The Basic Plan describes the overall *Illinois Pandemic Preparedness and Response Plan* organization, establishes the planning assumptions for a pandemic response, and defines the roles and responsibilities of local, state and federal agencies.

The Concept of Operations provides guidance on conducting activities that aid in all entities being prepared to respond to and to mitigate a pandemic influenza outbreak. The Concept of Operations also details the overall direction and control of the response and further outlines the roles and responsibilities of all involved agencies.

Concept of Operations guidance is broken down into what individual agencies should be doing prior to the outbreak - preparedness, how agencies should coordinate to mitigate the outbreak - response, and finally how individual agencies collaborate to help the public recover after the outbreak- recovery. Preparedness, as defined by the National Incident Management System (NIMS), is a continuous cycle of planning, organizing, training, equipping, exercising, evaluation and taking corrective action in an effort to ensure effective coordination during an incident response. Preparedness activities associated with the *plan* are:

- **Training**—Training will be delivered primarily through presentations and independent study courses. The targeted audiences include decision makers and other key elected and appointed officials, first responders, local health department personnel and health care system personnel. Some of the more important topics to

be covered: plans and procedures familiarization, media relations, and pandemic influenza characteristics and history.

- **Exercises**—Tabletop exercises must be conducted for various audiences, including those who will implement the state's response plans, response partners and other stakeholders, and senior officials from all three branches of government. Once roles and main operational concepts have been established and tested via tabletop exercises, functional and/or full-scale exercises may be needed to test the emergency response organizational structure in "real time" and include the efficacy of the process and communication flow within and outside of this structure.

- **Risk communication**—Timely, accurate, consistent and useful information must be regularly provided to the public, health care providers, local officials and the news media. Misinformation trends must be identified quickly and rectified.

- **Resource stockpiling and the identification of priority groups for receipt of these resources**—A vaccine against the pandemic flu most likely will not be available or in sufficient quantities within the first six months of the outbreak, so national and state stockpiles of antiviral medications will be necessary to support response activities. The U.S. Department of Health and Human Services (USHHS) will establish priority groups for vaccination and for antiviral treatment and prophylaxis.

NIMS defines response as activities that address the short-term, direct effects of an incident. Response includes immediate actions to save lives, to protect property and to meet basic human needs. Response also includes the execution of emergency operations plans and of mitigation activities designed to limit the loss of life, personal injury, property damage and other unfavorable outcomes. In the context of the *Illinois Pandemic Preparedness and Response Plan* , response guidance includes:

- **Emergency Operations-coordination and management**—The main thrust is to keep state partners in the response effort informed through briefings, conference calls, and other updating and shared decision making mechanisms. The frequency and extent of these communications will increase as the pandemic phases escalate.

- **Epidemiological surveillance and laboratory testing**--Laboratory testing and disease reporting requirements will be expanded and adapted as needed to monitor circulating strains, define the magnitude and severity of pandemic activity in Illinois, and help target prevention and control activities.

- **Medical countermeasures dispensing and distribution-vaccines**--Increasing adherence to recommendations for seasonal influenza vaccination and pneumococcal vaccination may lessen the adverse effects of an influenza pandemic. Once vaccine becomes available, major activities will consist of distributing vaccine to public and/or private sector vaccinators, appropriate storage, handling and vaccination, dose tracking, safety monitoring and also using, to the extent possible, available federal assets.

- **Medical countermeasures dispensing and distribution- antivirals**--This is primarily a logistical operation. Security may become an issue and needs to be available. Coordination will be needed with neighboring jurisdictions. Inconsistent distribution policies could lead to certain jurisdictions being overwhelmed if the public perceives their policies to be relatively advantageous. Inventories, delivery schedules and usage must be tracked.

- **Public Information and warning-risk communications**--A sufficient quantity of spokespersons should receive media training, instruction in crisis and risk communications, and guidance on public health measures and messages *prior* to the onset of a pandemic. Technology, including Internet websites, faxes, electronic mass mailing systems, satellite uplinks and telephone hotlines will play key roles in keeping the public and the health care community informed. Those providing information to the public must coordinate pandemic influenza media messages to ensure consistency and build public confidence in the measures being recommended.

- **Emergency Operations-Plans and procedures**-- Plans and procedures must be adjusted to reflect emergency legislation or administrative rule changes. In addition, response partners must review and modify plans and procedures to reflect changing conditions and needs.

- **Community Preparedness-School Closures**--IDPH will provide the Illinois State Board of Education with updates on influenza activity and recommendations regarding school closures.

Recovery is primarily an IEMA role that involves coordinating assistance to organizations that help individuals, communities and commercial enterprises return to pre-pandemic conditions as quickly as possible. State and federal statutes govern many aspects of the recovery phase.

The Support Annexes establish and describe major operational functions, which will serve as the building blocks of an emergency response effort throughout the stages of an influenza pandemic. Certain characteristics of the eight pandemic influenza response functions are displayed in the table on the following page.

The *Illinois Pandemic Preparedness and Response Plan* should be read and understood prior to an influenza pandemic. It is a dynamic document that will be updated to reflect new developments in the understanding of the influenza virus, its spread, treatment and prevention. The *Illinois Pandemic Preparedness and Response Plan* also will incorporate changes in response roles and improvements in response capability development through ongoing planning efforts.

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

**Table of Illinois Pandemic Influenza Preparedness and Response Plan Support Annexes**

| Annex Name | Primary | Support | Description |
|---|---|---|---|
| 1.0 Surveillance and Detection | IDPH | IDCMS, IDHS, IDOA, IEPA, ISBE, IDOC | Describe how health data will be collected and used to understand the characteristics and spread of a pandemic and support decisions about interventions (which ones? how?). |
| 2.0 Laboratory Testing | IDPH | IDOA, IDCMS | Describe the laboratory capacity for testing of influenza viruses |
| 3.0 Antiviral and Vaccine Purchase and Distribution | IDPH | IEMA, AG, IDOC, ISP, IDMA, IDOT, ARC | Describe how these key interventions will be distributed and dispensed under various availability scenarios (limited? adequate?). |
| 4.0 Restriction of Movement or Activities to Control Disease Spread | IDPH | GO, AG, IEMA, ISP, ISBE | Describe the array of legal authorities available to restrict people's movements and/or activities at the individual, group/facility, or communitywide levels. |
| 5.0 Emergency and Risk Communication | GO | IDPH, IEMA, IDCMS | Describe the communication of essential information to the public and key partners. |
| 6.0 Fatality Management | IEMA | IDPH, IDOT, IDMA, IDOC, IDHS, IEPA, ISP, ARC | Describe state government's role in the collection, handling, storage and disposition of human remains. |
| 7.0 Training and Exercise Schedule and Plan | GO | IDPH, IEMA | Test the effectiveness and operational efficiency of plans, procedures, training and facilities through exercises. |
| 8.0 Public Health and Medical Surge | IDPH | IEMA, IDHS, IDCMS, ING, IDOT, ARC, DFPR | Describe strategies for providing patient care and laboratory services when demand is higher than normal. |
| 9.0 PPE and Infection Control | IDPH | IEPA, IDOL | Ensure essential measures are taken to protect front line medical workers, other at-risk response personnel and the general public. |

## APPENDICES

Appendices provide reference information for users of the *Illinois Pandemic Influenza Preparedness and Response Plan.* They are:

- A list of acronyms
- A glossary
- Pertinent Internet links
- A list of reference materials used to develop the plan

# Introduction

## Pandemic: A Worldwide Outbreak of Influenza

An influenza pandemic is a global outbreak of disease that occurs when a new influenza A virus appears or "emerges" in the human population, causes serious illness, and then spreads easily from person-to-person worldwide. Pandemics are different from seasonal outbreaks or "epidemics" of influenza. Seasonal outbreaks are caused by subtypes of influenza viruses already in existence among people, whereas pandemic outbreaks are caused by new subtypes or by subtypes that have never circulated among people or that have not circulated among people for a long time. Past influenza pandemics have led to high levels of illness, death, social disruption and economic loss.

### Phases of a Pandemic

| Phase | Definition |
|---|---|
| Phase 1 | No new influenza virus subtypes have been detected in humans. However, a circulating animal influenza virus subtype poses a substantial risk of human disease. |
| Phase 2 | No new influenza virus subtypes have been detected in humans. An influenza virus subtype that has caused human infection may be present in animals. If present in animals, the risk of human infection or disease is considered to be low. |
| Phase 3 | Human infection(s) with a new subtype, but no human-to-human spread, or at most rare instances of spread to a close contact. |
| Phase 4 | Small cluster(s) with limited human-to-human transmission, but spread is highly localized, suggesting the virus is not well adapted to humans. |
| Phase 5 | Larger cluster(s) but human-to-human spread still localized, suggesting the virus is becoming increasingly better adapted to humans, but may not yet be fully transmissible (substantial pandemic risk). |
| Phase 6 | Pandemic: increased and sustained transmission in general population. |

### Vaccines to Protect Against Pandemic Influenza Viruses

A vaccine may not be available in the early stages of a pandemic. When a new vaccine against an influenza virus is being developed, scientists around the world work together to select the virus strain that will offer the best protection against that

virus, and then manufacturers use the selected strain to develop a vaccine. Once a potential pandemic strain of influenza virus is identified, it takes 6-to-8-months before a vaccine will be widely available. If a pandemic occurs, it is expected that the U.S. government will work with many partner groups to make recommendations to guide the early use of vaccine.

**Antiviral Medications to Prevent and Treat Pandemic Influenza**

Four different influenza antiviral medications (amantadine, rimantadine, oseltamivir and zanamivir) are approved by the U.S. Food and Drug Administration for the treatment and/or prevention of influenza. All four work against influenza A viruses. However, sometimes influenza virus strains can become resistant to one or more of these drugs, and thus the drugs may not always work. The CDC recommendations will be implemented to ensure medications provided will adequately treat the circulating influenza strain.

**Preparing for the Next Pandemic**

Many scientists believe it is only a matter of time until the next influenza pandemic occurs. The severity of the next pandemic cannot be predicted, but modeling studies suggest its effect in the United States could be severe. In the absence of any control measures (vaccination or drugs), it has been estimated that in the United States a "medium–level" pandemic could cause 89,000 to 207,000 deaths, between 314,000 and 734,000 hospitalizations, 18 million to 42 million outpatient visits, and another 20 million to 47 million people being sick. Between 15 percent and 35 percent of the U.S. population could be affected by influenza pandemic, and the economic impact could range between $71.3 billion and $166.5 billion.

| Potential Pandemic Influenza Deaths and Hospitalizations in Illinois from a Pandemic Flu (Assuming a 15% -- 35% attack rate)* | | | |
|---|---|---|---|
| Projected Dead | Projected Hospitalized | Projected Outpatient | Projected Cases |
| 4,000 to 9,000 | 12,000 to 38,000 | 750,000 to 2 million | 2 million to 4.5 million |

*Estimates are based on CDC national projections

Influenza pandemics are different from many of the threats for which public health and the health care system are currently planning:

- The pandemic will last much longer than most other emergency events and may include "waves" of influenza activity separated by months (in 20th century pandemics, a second wave of influenza activity occurred 3- to 12-months after the first wave).

- The numbers of health care workers and first responders available to work can be expected to be reduced; they will be at high risk of illness through exposure

in the community and in health care settings, and some may have to miss work to care
for ill family members.

- Resources in many locations could be limited because of how widespread the
  influenza pandemic would be.

Because of these differences and the expected size of an influenza pandemic, it is important to
have completed planning and preparedness activities to be able to respond promptly and
adequately. The purpose of the *Illinois Pandemic Influenza Preparedness and Response Plan* is
to provide a framework for federal, state and local public health and medical officials to work
together to reduce the influenza morbidity, mortality and social disruption that would result from
a pandemic influenza outbreak.

The *Illinois Pandemic Preparedness and Response Plan* should be read and understood prior to
an influenza pandemic. It is a dynamic document that will be updated to reflect new
developments in the understanding of the influenza virus, its spread, treatment and prevention.
The *Illinois Pandemic Preparedness and Response Plan* also will incorporate changes in
response roles and improvements in response capability development through ongoing planning
efforts.

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

# **Basic Plan**

## 1.0    Purpose

The purpose of the *Illinois Pandemic Influenza Preparedness and Response Plan* is to provide a framework for federal, state, local, private sector and nongovernmental entities to work together to reduce the influenza morbidity, mortality, and social disruption that would result from a pandemic influenza outbreak. The *Illinois Pandemic Preparedness and Response Plan* describes the incident management activities, concepts and structure under which Illinois will operate during a pandemic influenza outbreak and the roles and responsibilities and activities that apply to command and control staff. Other goals and objectives of the *Illinois Pandemic Influenza Preparedness and Response Plan* include:

- Define and recommend preparedness activities that should be undertaken before a pandemic that will enhance the effectiveness of a pandemic response.

- Describe state coordination of a pandemic response and collaboration with local levels, including definition of roles, responsibilities and actions.

- Describe interventions that should be implemented as components of an effective influenza pandemic response.

- Guide local health departments, health care system and first responders in the development of state pandemic influenza preparedness and response procedures.

## 2.0    Goals and Objectives

The primary goal of the *Illinois Pandemic Influenza Preparedness and Response Plan* is to limit morbidity and mortality of influenza and its complications during a pandemic and to decrease social disruption and economic loss.

- Establish an effective and efficient public health information management system to span the federal, state and local levels, as distinct from the public communications objective.
- Conduct laboratory testing and report data. Detect novel influenza strains through clinical and virologic surveillance of human and animal influenza disease.
- Determine eligible providers to give vaccinations. Distribute pharmaceutical interventions. Implement a vaccination program that rapidly administers vaccine to priority groups and monitors vaccine effectiveness and safety.
- Receive and redistribute the Strategic National Stockpile (SNS) antivirals. Deliver antiviral drug therapy and prophylaxis and avoid inappropriate use of these agents, which may result in antiviral resistance.
- Receive and redistribute the Strategic National Stockpile (SNS) Personal Protective Equipment (PPE). Analyze and characterize surveillance data.
- Implement measures to decrease the spread of disease guided by the epidemiology of the pandemic.
- Ensure the maintenance of treatment capacity throughout the state.

- Provide optimal medical care and maintain essential community services.
- Establish a public information management system. Communicate effectively with the public, health care providers, community leaders and the media.
- Ensure the safety of responders, their families and the public.
- Validate and prioritize requests from external sources (e.g., local health departments, other state agencies).

## 3.0    Plan Organization

The *Pandemic Influenza Preparedness and Response Plan* includes an Introduction, Basic Plan, Concept of Operations, Support Annexes and Appendices. The core plan describes coordination and decision making at the state level; provides an overview of key issues for preparedness and response; and outlines action steps to be taken at the state level before, during and after a pandemic.

The Support Annexes describe activities of the primary and support elements needed for effective response. The annexes provide guidance for Illinois government agencies and departments to conduct emergency preparedness, response and recovery. The *Illinois Strategic National Stockpile Plan* and *Health and Medical Care Response Plan* are supplements to the *Illinois Pandemic Influenza Preparedness and Response Plan* that relate to functions specific to requesting, to receiving, to distributing and to dispensing vaccine, antivirals and other medical material; and medical surge and mass care.  The supplemental plans work in conjunction with the *Illinois Pandemic Influenza Preparedness and Response Plan*.

The Appendices provide clarification or additional information to support the Basic Plan, Concept of Operations and Support Annexes.

## 4.0    Applicability

The *Illinois Pandemic Influenza Preparedness and Response Plan* applies to all state agencies, departments and commissions under the governor that may be requested to provide assistance or conduct operations in actual or potential incidents. These incidents require a coordinated response by an appropriate combination of federal, state, local and nongovernmental entities.

## 5.0    Incident Management Activities

The *Illinois Pandemic Influenza Preparedness and Response Plan* addresses the full spectrum of activities related to incident management, including prevention, preparedness, response and recovery actions. This plan focuses on those activities directly related to an evolving incident or potential incident rather than steady-state preparedness or readiness activities conducted in the absence of a specific threat or hazard.

When not specifically prescribed, a Unified Command consisting of local, state and federal senior competent emergency response officials at the site shall be the preferred approach to integrating several levels of government into an Incident Command System (ICS) during pandemic influenza.

## 6.0   Policies

### *Capabilities*

Illinois will establish and maintain an effective preparedness, response and recovery capability for any level of emergency requiring state assistance. The Illinois Emergency Management Agency (IEMA) is the governor's staff agency responsible for management and coordination of the state's disaster response and recovery efforts. Each state agency will maintain its own internal control structure and organization during disasters.

### *Emergency Management Assistance Compact (EMAC)*

Illinois is a member of the Emergency Management Assistance Compact (EMAC), a collaborative network among member states that expedites the delivery of resources in disasters. After a governor declares an emergency, the state emergency management agency assesses the disaster-related needs, the state requests resources through EMAC and other states provide assistance through the EMAC network. IEMA assists the Illinois governor's office with all EMAC requests. Requests made through the Federal Emergency Management Agency mission assignment process also will be addressed in conjunction with EMAC requests.

## 7.0   Key Concepts

This section summarizes key concepts that are reflected throughout the *Illinois Pandemic Influenza Preparedness and Response Plan.*

- Systematic and coordinated incident management, including protocols for incident reporting; coordinated action, alert and notification, mobilization of state resources to augment existing local capabilities, operations under differing threats or threat levels, and integration of crisis and consequence management functions.

- Notification and deployment of state resources in anticipation of or in response to catastrophic events in coordination and collaboration with local governments and private entities, when possible.

- Coordination of incident communication, worker safety and health, private- sector involvement and other activities that are common to the majority of incidents.

- Organization of Support Annexes to facilitate the delivery of critical state resources, assets and assistance. State departments and agencies agree to

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

assist with activities listed in the Support Annexes based on authorities, resources and capabilities.

- Provision of mechanisms for vertical and horizontal coordination, communications and information sharing in response to threats or incidents. These mechanisms facilitate coordination among state and local entities and the federal government, as well as between the public and private sectors.

- Facilitation of state support to departments and agencies acting under the requesting department's or agency's own authorities.

- Provision of the basis for coordination of interagency and intergovernmental planning, training, exercising, assessment, coordination and information exchange.

## 8.0    Planning Assumptions and Considerations

### Command and Control

- Incidents are typically managed at the lowest possible geographic, organizational and jurisdictional level.

- Incident management activities will be initiated and conducted using the principles contained in the National Information Management System (NIMS).

- The combined expertise and capabilities of government at all levels, the private sector and nongovernmental organizations will be required to prevent, to prepare for, to respond to and to recover from the incident.

- Local governments have the primary responsibility to provide public health and emergency medical services within their jurisdictions.

- State government will provide (for counties without a health department) and/or augment public health and emergency medical services that exceed the capabilities of the local government.

### Federal Government

- The federal government has assumed primary responsibility for a number of key elements of the national plan, including:
  - Vaccine research and development.
  - Coordination of national and international surveillance.
  - Assessment and potential enhancement of the coordination of vaccine and antiviral capacity and coordination of public-sector procurement.
  - Assessment of the need for and scope of a suitable liability program for vaccine manufacturers and persons administering the vaccine.
  - Development of a national "clearinghouse" for vaccine availability information, vaccine distribution and redistribution.

### State and Local Governments and Health Care System

- Influenza pandemic will place a substantial burden on inpatient and outpatient health care services. Because of the increased risk of exposure to pandemic virus in health care settings, illness and absenteeism among health care workers in the context of increased demand will further strain the ability to provide quality care.

- In addition to a limited number of hospital beds and staff shortages, equipment and supplies may be in short supply. The disruptions in the health care system that result from a pandemic also may have an impact on blood donation and supply.

- Planning by state and local health departments and the health care system is important to address potential shortages. Strategies to increase hospital bed availability include deferring elective procedures, more stringent triage for admission and earlier discharge with follow-up by home health care personnel. Local coordination can help direct patients to hospitals with available beds and distribute resources to sites where they are needed.

- Health care facilities may need to be established in nontraditional sites to help address temporary surge needs. Specific challenges in these settings such as infection control, staffing and command and control, must be addressed.

- Not all ill persons will require hospital care but many may need other support services. These include home health care, delivery of prescription drugs, and meals. Local planning is needed to address the delivery of these and essential community functions such as police, fire and utility service, including drinking water, waste water and power services.

- The Medical Surge Capacity and Capability (MSCC) handbook (September 2007) includes the planning concepts and doctrine that describe response activities related to meeting increased medical demands, and how responders integrate across the system from the local to federal levels. MSCC planning themes should be employed in order to fully address anticipated problems, especially at the community level where individual providers' decisions greatly impact the local health care systems.

### *Vaccine and Antiviral Supply Levels and Availability*

- When a pandemic first strikes, vaccine will likely not be ready for distribution. Because of this, other measures may include antiviral drug therapy (treatment) and preventive use in those not infected (prophylaxis) as directed by a health care provider, quality medical care and interventions to decrease exposure and/or transmission of infection. These measures will be important approaches to decrease the disease burden and potentially reduce the spread of the pandemic until vaccine becomes available.

- Vaccine will need to be targeted to priority groups that will be defined based on several factors. These may include: the impact of the circulating pandemic virus on various age groups; and heightened risks for persons with specific conditions; the risk of occupational infections/transmission (e.g., health care

workers); and the responsibilities of certain occupations in providing essential public health safety services to include, but not limited to police, fire, power, natural gas, drinking water and waste water. Although the priority groups for annual influenza vaccination will provide some guidance for vaccine for a pandemic, the risk profile for a pandemic strain and the priorities for vaccination may differ substantially and therefore will need to be guided by the epidemiologic pattern of the pandemic as it unfolds.

- Later in the pandemic, vaccine supply will approximate demand, and vaccination of the full at-risk population can occur.

- The objective of antiviral prophylaxis is to prevent influenza illness. Prophylaxis would need to continue throughout the period of exposure in a community. The objective of treatment is to decrease the consequences of infection. For optimal impact, treatment needs to be started as soon as possible and within 48 hours of the onset of illness.

- The available supply of influenza antiviral medications is limited and production cannot be rapidly expanded. There are few manufacturers and these drugs have a long production process. In 2003, oseltamivir was added to the SNS. Analysis is ongoing to define optimal antiviral use strategies, potential health impacts and cost-effectiveness of antiviral drugs in the setting of a pandemic. Results of these analyses will contribute to decisions regarding the appropriate antiviral drugs to maintain in the SNS. Planning by public and private health care organizations is needed to assure effective use of available drugs, whether from a national stockpile, state stockpile or the private sector.

- Developing guidelines and educating physicians, nurses and other health care workers before and during the pandemic will be important to promote effective use of these agents in the private sector.

## *Infection Control and Disease Containment*

- Infection control in hospitals and long-term care facilities mitigates the spread of infection among high-risk populations and health care workers.

- Influenza strains that cause annual outbreaks are effectively transmitted between people and can be transmitted by people who are infected but appear well. Efforts to prevent their introduction into the United States or decrease transmission in the community are likely to have limited effectiveness.

- If a novel influenza strain that is not as efficiently spread between people causes outbreaks in other countries or the United States, measures such as screening travelers from affected areas, limiting public gatherings, closing schools and/or quarantining of exposed persons could slow the spread of disease. Decisions regarding use of these measures will need to be based on their effectiveness and the epidemiology of the pandemic.

## *Emergency and Risk Communication*

- Inform health care providers and the public about influenza disease and the course of the pandemic, the ability to treat mild illness at home, the

availability of vaccine and priority groups for earlier vaccination will be important to ensure appropriate use of medical resources and avoid possible panic or overwhelming of vaccine delivery sites.

- Communicate effectively with community leaders and the media to maintain public awareness, avoid social disruption and provide information on evolving pandemic response activities.

## 9.0   Roles and Responsibilities

### State Government

As the chief executive, the governor is responsible for the public safety and welfare of the people of Illinois. The governor will:

- Coordinate state resources to address the full spectrum of actions to prevent, to prepare for, to respond to and to recover from incidents in an all-hazards context, including terrorism, natural disasters, accidents and other contingencies.
- Use police power, under certain emergency conditions, to make, to amend and to rescind orders and regulations.
- Provide leadership and play a key role in communicating to the public and in helping people, businesses and organizations cope with the consequences of any type of declared emergency within state jurisdiction.
- Encourage participation in mutual aid and implements authorities for the state to enter into mutual aid agreements with other states to facilitate.
- Serve as the commander-in-chief of the Illinois National Guard.
- Request federal assistance when it becomes clear state capabilities will be insufficient or have been exceeded or exhausted.

In support of the state's preparedness, response and recovery from a pandemic influenza, the following agencies and departments have been assigned primary and support roles and responsibilities. The roles and responsibilities listed are consistent with tasks outlined in the IEOP.

| Primary Agency | Role and Responsibilities |
|---|---|
| Illinois Department of Public Health (IDPH) | Coordinate Illinois' health and medical activities in preparedness, response and recovery from pandemic influenza. Identify public and private sector partners needed for public health and medical effective planning and response. Develop key components of pandemic influenza preparedness plan: surveillance, distribution of vaccine and antivirals, disease containment, and training and education. Integrate pandemic influenza planning with other planning activities conducted under CDC's public health and ASPR's hospital |

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

| Primary Agency | Role and Responsibilities |
|---|---|
| | preparedness cooperative agreements with states. |
| | Coordinate with local areas to ensure development of local plans as called for by the state plan and provide resources, such as templates to assist in planning process. |
| | Coordinate health care surge capacity planning. |
| | Develop data management systems needed to implement components of the plan. |
| | Assist local jurisdictions with exercising plans. |
| | Coordinate and make recommendations for disease containment. |
| | Coordinate public health, medical emergency and risk communication messages. |
| | Develop infection control guidelines for fatality management activities. |
| | Evaluate the condition of hospitals and nursing homes to ensure the continued safety of residents during an influenza pandemic (development of a checklist for this purpose is recommended, preferably pre-event). |
| | Determine the availability of health and medical resources and assist in the development of a plan in concert with the SIRC staff to mobilize resources into affected areas. |
| | Coordinate the request, receipt, breakdown, and distribution of the Strategic National Stockpile for Illinois. |
| | Develop a communication protocol for early notification of the IDOA and/or IDNR director(s) of any unusual zoonoses that may represent a threat to agriculture (IDOA) or wildlife (IDNR). |
| | Obtain information from hospitals, public/private entities, and EMS programs about categories and numbers of employees considered essential and therefore eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. For example, to support the efforts of the above hospitals, agencies and programs, it will be necessary to include employees needed to provide essential services, to include, but not limited to fire, police, drinking water, waste water, power and natural gas. |
| | When destruction of livestock or domesticated or exotic animals becomes necessary, provide technical assistance to IDOA to ensure that disposal is safe to human health. |
| | Implement disease control measures necessary to protect the public's health, including, but not limited to, the issuance of orders for isolation, quarantine, closure, the administrations of vaccines and/or medications, medical evaluations and specimen collection. |

Illinois Pandemic Influenza Preparedness and Response Plan     Version 5.1
March 2020

| Primary Agency | Role and Responsibilities |
|---|---|
| | Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA.

Develop electronic systems for rapid registration and licensing of volunteers having qualifications identified as essential to meeting response priorities. |
| **Support Agencies** | **Role and Responsibilities** |
| Illinois Emergency Management Agency (IEMA) | Manage and coordinate the state's disaster response and recovery efforts.

Activate the SIRC, when required.

Coordinate requests for federal assistance with FEMA Region V.

Coordinate the state's disaster communications system.

Maintain a 24-hour communications center for communicating with emergency response personnel from all agencies and organizations.

Coordinate, integrate and manage overall state efforts involving the collection, analysis, planning, reporting and displaying of information.

Provide, direct and coordinate logistical/resource operations with the assistance of the designated support agencies. Allocate state response resources effectively and according to need; monitor their location when in use.

Request a Disaster Mortuary Operational Response Team (DMORT) [2] through FEMA and/or the National Disaster Medical System (NDMS) when local jurisdictions are overwhelmed and have requested state assistance to implement mass fatality management activities.

Develop scripted emergency public information messages for broadcast over Emergency Alert System (EAS) following disaster.

Coordinate state monitoring and enforcement of community-based isolation and quarantine orders.

Maintain critical infrastructure and implement contingency plans in the absence or failure of such critical infrastructure.

Coordinate high volume public information hotlines and a mechanism for tracking call types for rumor control purposes.

Relay key communications to and from the private sector (e.g., private schools, businesses, and public and private utilities) via local emergency management agencies. |

---

[2] DMORTs are composed of funeral directors, medical examiners, coroners, pathologists, forensic anthropologists, medical records technicians and transcribers, finger print specialists, forensic odontologists, dental assistants, X-ray technicians, mental health specialists, computer professionals, administrative support staff, and security and investigative personnel.

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

| Support Agencies | Role and Responsibilities |
|---|---|
| | Request activation of the Illinois Law Enforcement Alarm System (ILEAS) to support missions of local law enforcement agencies. <br><br> Request activation of the Mutual Aid Box Alarm System (MABAS) to support fire service, EMS and related missions of local fire service agencies. <br><br> Collect information from state and local emergency management agencies' officers about categories and numbers of employees considered essential and therefore eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment. <br><br> Coordinate the EMAC requests with the National Emergency Management Association (NEMA). |
| Illinois Department of Transportation (IDOT) | Provide personnel and equipment for the transportation or relocation of resources, which includes supplies and equipment, including essential equipment and supplies for drinking water and waste water utilities, e.g., replacement pumps and water treatment chemicals, such as disinfectants and coagulants. <br><br> Provide space, as available, at IDOT storage yards and other facilities, to serve as transportation resource staging areas. <br><br> Implement intrastate and cross-border travel restrictions as directed by the governor or IEMA. <br><br> Use changeable message signage (IDCMS) capabilities to convey key information to those using the state's highways, as directed by the governor or IEMA. <br><br> Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Department of Corrections (IDOC) | Provide inmate labor to load and unload trucks. <br><br> Provide trucks (with drivers) to haul supplies. <br><br> Provide buses (with drivers) to aid in moving civilian population. <br><br> Assist with the preparation of meals to support disaster relief activities. <br><br> Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Department of Human Services (IDHS) | Assist with locating specialized vehicles for transportation of the disabled. <br><br> Identify those who develop psychosocial disorders as a result of |

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

| Support Agencies | Role and Responsibilities |
|---|---|
|  | pandemic conditions; coordinate the provision of mental health services to disaster victims (living in shelters or at other disaster relief centers). |
|  | Provide medical support personnel to assist with health and medical operations. |
|  | Manage psychosocial issues related to a pandemic, including the needs of first responders and families of fatalities. |
|  | Identify families adversely affected by the pandemic, such as loss of work or the ability to work, or death of a wage-earner; provide social services as needed until self-sufficiency is regained. |
|  | Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Department of Military Affairs (IDMA) | Provide vehicles, aircraft and operators to move personnel, equipment and supplies, including essential equipment and supplies for drinking water and waste water utilities, as requested. |
|  | Provide logistical support and air/ground transportation of disaster relief supplies, personnel and equipment. |
|  | Provide personnel and equipment for triage and emergency medical care and portable medical aid stations. |
|  | Provide space, as available, at National Guard armories and other facilities, to serve as resource staging areas. |
|  | Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Department of Central Management Services (IDCMS) | Provide support for transportation of personnel, equipment and supplies. |
|  | Assist with the development of strategies to address shortfalls in the number of state personnel available to work (for instance, due to illness, the need to care for family members, and concerns about personal and family health). |
|  | Procure equipment and supplies not available through state sources from commercial vendors or suppliers. |
|  | Establish phone banks for disaster hotlines. |
|  | Coordinate/support the establishment of Web pages to communicate disaster information. |
|  | Provide technical assistance in the recruitment and deployment of state employees for temporary assignment as disaster relief workers. |
|  | Coordinate the use of state facilities and property for use as staging |

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

| Support Agencies | Role and Responsibilities |
|---|---|
| | areas, headquarters facilities and service delivery locations. |
| | Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois State Police (ISP) | Provide and/or coordinate traffic control and expedited routing for supply missions or personnel movements. |
| | Provide personnel and equipment to protect life and property and to enforce the laws of Illinois. |
| | Coordinate all public safety with other state and local agencies during a disaster, including the dissemination of information and requests for assistance. |
| | Assist and support other state and local agencies where possible, and coordinate public safety services, as needed. |
| | Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Department of Transportation – Division of Aeronautics (IDOT-A) | Provide aircraft and pilots to move personnel, supplies and equipment into a disaster area, identify all aviation assets already committed to the response. |
| | Arrange for space, as requested, at aviation facilities to serve as equipment and supplies staging areas. |
| Illinois Department of Commerce and Economic Opportunity (IDCEO) | Provide information on the demographics and infrastructure of the municipalities in the affected areas for use in forecasting the economic impact. |
| | Assist with the coordination and communication with private sector organizations assisting with disaster relief operations. |
| American Red Cross (ARC) | Identify shelter and mass care locations that have been established and determine the capacity of such shelters to shelter and care for displaced residents. |
| | Assist with the identification of facilities for use by the medical community to provide care for ill patients. |
| | Provide basic needs supplies (food), bulk distribution of emergency relief items, Disaster Welfare Inquiry services and disaster mental health services to the disaster affected population in coordination with local emergency plans. |
| | Support the management and coordination of sheltering, feeding, bulk distribution of emergency relief items, and Disaster Welfare Inquiry services to the disaster affected population. |
| | Coordinate, in accordance with its agreements with other |

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

| Support Agencies | Role and Responsibilities |
|---|---|
| | organizations, the provision of relief efforts by voluntary agencies actively engaged in providing assistance to disaster victims.<br><br>Continue to respond to disasters of all types and sizes during public health emergency conditions. When a disaster occurs that typically requires mass care sheltering, the Red Cross will apply the most appropriate local health precautions.<br><br>Work to ensure a safe and adequate blood supply. |
| Illinois Department of Agriculture (IDOA) | Develop plans for surveillance, laboratory testing and response regarding influenza illness in poultry and other potentially at-risk livestock, domesticated or exotic animals that may represent a threat to human health and to the animal population.<br><br>Provide laboratory technicians to support clinical analysis operations.<br><br>Develop a communication protocol for early notification of the IDPH and IDNR director(s) of any unusual zoonoses that may represent a threat to humans (IDPH) or wildlife (IDNR).<br><br>Establish memorandums of understandings (MOUs) to exchange confidential information with other agencies when such information is needed for the effective implementation of this plan or for other response-related purposes.<br><br>Oversee and/or implement needed depopulation and safe disposal of livestock, domesticated or exotic animals that may be required to protect human health and the animal population.<br><br>Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Office of the Attorney General (AG) | Provide legal support and representation to state agencies and to state employees on matters related to disease containment, isolation and quarantine, and in seeking related court orders.<br><br>Provide legal support and representation on issues pertaining to insurance, workers compensation, liability and compensation issues for state agency employees.<br><br>When feasible and warranted, provide legal opinions and other support to local jurisdictions/state's attorneys and county governments. |
| Illinois Environmental Protection Agency (IEPA) | Provide toxicological expertise and risk communication expertise in support of health risk communication about chemicals or other health risks.<br><br>Provide technical assistance to waste water and drinking water utilities for emergency operations.<br><br>When destruction of livestock, domesticated or exotic animals |

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

| Support Agencies | Role and Responsibilities |
|---|---|
| | becomes necessary, provide technical assistance to IDOA to ensure disposal is safe to the environment. Determine essential employees eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Department of Children and Family Services (IDCFS) | Disseminate informational and action-required messages to day care centers; obtain absentee information from these institutions. |
| Illinois Department on Aging (IDA) | Disseminate informational and action-required messages to area agencies on aging, senior centers. |
| Illinois Department of Healthcare and Family Services (IDHFS) | Identify, and ensure dissemination of informational and action- required messages to high-risk populations; obtain information about unmet needs of members of these populations. |
| Illinois State Board of Education (ISBE) | Disseminate informational and action-required messages to K-12 schools; obtain absentee information from these institutions. |
| Illinois Board of Higher Education (IBHE) | Provide for the welfare of student populations during a pandemic. Obtain state university laboratory personnel and/or services to support IDPH Division of Laboratories and/or IDOA laboratories. Obtain the services of research, veterinary, epidemiological and other specially trained personnel to assist with disease surveillance, prevention, and control activities, if requested by IDOA or IDPH. Disseminate informational and action-required messages to Illinois universities, community colleges, and independent colleges/ universities; obtain information about unmet needs at these institutions. |
| Illinois Department of Natural Resources (IDNR) | Develop a communication protocol for early notification of the IDPH and/or IDOA director(s) of any unusual zoonoses that may represent a threat to humans (IDPH) or agriculture (IDOA). Develop plans for surveillance, laboratory testing and response regarding influenza illness in animals in the wild that may represent a threat to human health; include procedures for the safe handling of wild birds with special attention given to avian influenza. |
| Illinois Department of Financial and Professional Regulation (IDFPR) | Provide contact information on all active-status health care professionals (including nurses, nurse practitioners, advanced practice nurses, physicians, physician assistants, psychologists, professional counselors, clinical professional counselors and pharmacists) who could be requested to volunteer their medical skills during |

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

| Support Agencies | Role and Responsibilities |
|---|---|
| | emergencies to IDPH to assist in a bioterrorist attack or large-magnitude public health emergency.[3] <br><br> Adjust licensing laws as necessary to modify clinician scopes of practice in order to meet surge needs. |
| Illinois Department of Labor (IDOL) | Provide oversight of state government response operations to ensure compliance with OSHA regulations and other applicable worker safety requirements. |
| Illinois Deaf and Hard of Hearing Commission (IDHHC) | Identify and ensure dissemination of informational and action- required messages to vulnerable deaf and hard of hearing populations ; obtain information about unmet needs of these populations; identify ASL interpreters for use in key response roles and facilities, such as vaccination and dispensing clinics. |
| Illinois Commerce Commission (ICC) | Obtain from utility providers, both regulated and non-regulated by the ICC, the number of employees considered essential and therefore eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment. The ICC may prepare and provide estimates for certain utilities, such as extremely small water or telecom companies to IEMA. |
| Illinois Office of the State Fire Marshals (IOSFM) | Obtain information from local fire departments about categories and numbers of employees considered essential and therefore eligible for preferential treatment with respect to certain medical interventions, such as prophylaxis and treatment; provide this information to IEMA. |
| Illinois Department of Veterans Affairs (IDVA) | Disseminate informational and action-required messages to veterans' homes; obtain information about unmet needs at these facilities. |
| Secretary of State Police (SOSP) | Provide traffic control and expedited routing for supply missions or personnel movements. <br><br> Provide personnel and equipment to protect life and property, and to enforce Illinois laws. <br><br> Assist and support other state and local agencies with law enforcement activities. <br><br> Provide Hazardous Device Unit (HDU) response, also known as "bomb squad," in sweeping critical areas for explosive devices and mitigating same. <br><br> Provide Emergency Response Team (ERT) response; also known as |

---

[3] IDPH, in conjunction with IDFPR, will determine and specify what comprises "contact information" (e.g., e-mail address, telephone number, facsimile number), and ensure such information is in a form conducive to rapid mass dissemination, such as an e-mail distribution list or a blast fax capability.

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

| Support Agencies | Role and Responsibilities |
|---|---|
| | "SWAT," to areas where a critical incident requiring a HDU response has developed.<br><br>Provide staff to support data entry. |

### Local Health Departments and Health Care Providers

Local and municipal health departments are responsible for communitywide influenza preparedness activities. Specific activities of the local and municipal health department staff include:

- Promote vaccinations to prevent diseases.
- Distribute vaccine to public and private providers, communitywide.
- Survey and control outbreak of preventable adult and childhood diseases.
- Investigate outbreaks.
- Provide educational and motivational resources through community partnerships.
- Assess vaccine coverage levels.
- Conduct quality assurance reviews of federally purchased vaccine.

Approximately 66 sentinel physicians around Illinois report each week (October-May; some year round) the total number of patients seen and the number of those patients with influenza-like illness by age group. Through its surveillance systems, CDC develops a national picture of influenza virus activity, the geographic distribution of influenza viruses and the impact of influenza on different age groups.

The Regional Hospital Coordinating Center (RHCC), formerly known as the POD hospital, is the lead hospital in a specific region responsible for coordinating disaster medical response upon the activation of the *Health and Medical Care Response Plan* by the Department. The RHCC serves as the primary point of contact for communication and coordination of disaster response activities with its resource, associate and participating hospital(s), and EMS provider(s).

### Nongovernmental and Volunteer Organizations (NGO)

NGOs collaborate with first responders, state and local government officials, and other agencies and organizations providing relief services to sustain life, reduce physical and emotional distress, and promote recovery of disaster victims when assistance is not available from other sources. In Illinois, the American Red Cross as a member of the State Emergency Operations Center (SEOC) is the coordinating NGO that provides disaster preparedness and relief at the local level and also coordinates the mass care element of the IEOP. Community-based organizations (CBOs) receive government funding to provide essential public health services. Their response elements will be coordinated by the American Red Cross, in accordance with the

American Red Cross agreements with such organizations. NGOs will be identified and assigned response functions to support this plan by state and local officials per the IEOP, as well as direction and coordination from the American Red Cross, in accordance with the American Red Cross agreements with such organizations.

### Private Sector

The roles, responsibilities and participation of the private sector during a pandemic influenza outbreak vary based on the nature of the organization and the type and impact of the incident. In Illinois, a committee to the governor's statewide task force for terrorism, the Illinois Terrorism Task Force, has been formed to coordinate the emergency preparedness, response and recovery activities of private and public agencies. Private-sector organizations support this plan by sharing information with the government, identifying risks, performing vulnerability assessments, developing emergency response and business continuity plans, enhancing their overall readiness, implementing appropriate prevention and protection programs, and donating or otherwise providing goods and services through contractual arrangement or government purchases to assist in response to and recovery from an incident.

Certified local health departments and certified local emergency management agencies are strongly encouraged to reach out to their local private sector partners to identify the critical personnel from each private sector entity in the local health department and/or local emergency management agency jurisdiction. The goal is to ensure private sector critical personnel necessary for the maintenance of jurisdictional critical infrastructure are provided medical prophylaxis, if indicated or required, during a pandemic flu outbreak.

### Citizen Involvement

Strong partnerships with citizen groups and organizations provide support for incident management prevention, preparedness, response, recovery and mitigation.

The U.S. Citizen Corps brings these groups together and focuses efforts of individuals through education, training and volunteer service to help make communities safer, stronger and better prepared to address the threats of terrorism, crime, public health issues and disasters of all kinds.

Local citizen corps councils implement citizen corps programs, which include Community Emergency Response Teams (CERTs), Medical Reserve Corps (MRC), Neighborhood Watch, Volunteers in Police Service and the affiliate programs; to provide opportunities for special skills and interests; develop targeted outreach for special-needs groups; and organize special projects and community events.

Citizen corps affiliate programs expand the resources and materials available to state and local communities through partnerships with programs and organizations that offer resources for public education, outreach and training; represent volunteers interested in helping to make their communities safer; or offer volunteer service

opportunities to support first responders, disaster relief activities and community safety efforts.

Illinois has over 70 MRC units, most of which are housed by local health departments. These units serve primarily health missions, such as mass vaccination or prophylaxis clinics, providing health education or staffing call centers. Some, however, work with the medical community to assist in addressing hospital-centric surge demands that would surface during a pandemic.

There are more than 100 CERT programs in Illinois, and these teams are comprised of laypersons that have received emergency management training and assist in disaster and homeland security operations. These teams should be tapped to assist with pandemic influenza operations at the local level where possible.

Other programs unaffiliated with citizen corps also provide organized citizen involvement opportunities in support of federal response to major disasters and events of national significance. One example is the National Animal Health Emergency Response Corps (NAHERC), which helps protect public health by providing a ready reserve of private and state animal health technicians and veterinarians to combat threats to U.S. livestock and poultry in the event of a large outbreak of a foreign animal disease.

## 10.0 Plan Development and Maintenance

The entire *Illinois Pandemic Influenza Preparedness and Response Plan* will be reviewed and revised annually by the IDPH Office of Preparedness and Response, which will consult with other IDPH offices, divisions and programs to ensure continued applicability of assignments and other information contained in the plan.

IDPH staff will meet as needed with the agencies and organizations listed in the *Illinois Pandemic Influenza Preparedness and Response Plan* to review their roles and responsibilities and revise as needed.

IDPH will produce and distribute changes to holders of controlled copies of the *Illinois Pandemic Influenza Preparedness and Response Plan*. Holders of non controlled copies will receive changes only upon written request.

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

# Concept of Operations

## 1.0   Concept of Operations

### *General*

At a local government's request and during the period immediately following the onset of any large-scale emergency, state agencies may mobilize and deploy resources to the affected area to assist local governments.

A Unified Area Command (UAC) may be established for any level of emergency requiring a state field presence. However, the location, activities and scope will vary according to the parameters of the occurrence. The organizational structure of the UAC will remain basically the same for any emergency. The agencies activated for the UAC will be based on the nature and magnitude of the situation. The IEOP utilizes the Illinois Disaster Management System (IDMS) and the NIMS in all levels of response and recovery.

The affected local government(s) is responsible for identifying and communicating response priorities and state resource requirements to the SEOC, through the UAC if activated.

### *Public Health and Medical*

When the state public health director determines morbidity and mortality from a certain disease warrant study, he may declare such disease to be the subject of a medical study and issue a declaration requiring hospitals, physicians and others to submit such information, data and reports as necessary for the purpose of the specific study. Such data so obtained will be held confidential in accordance with Section 8- 2101 of the Code of Civil Procedure (77 Ill. Adm. Code 690.200(f)).

The Department of Public Health Powers and Duties Law of the Civil Administrative Code of Illinois (20 ILCS 2305) provides IDPH with the authority for the general supervision of the interests of the health and lives of the people of the state. IDPH is statutorily authorized to investigate the causes of dangerously contagious or infectious diseases, especially when existing in epidemic form, and to take measures to restrict and to suppress the same whenever such disease becomes or threatens to become epidemic. This authorization is allowed when a local health authority neglects, refuses, or is unable to perform these duties. Moreover, IDPH is able to issue orders for the administration of vaccines, medications or other treatments to persons as necessary to prevent the probable spread of a dangerously contagious or infectious disease.

Additionally, IDPH, local boards of health and public health authorities have the authority, in order to prevent the spread of a dangerously contagious or infectious disease, to access medical records, health information or records of cases, provided that confidentiality requirements are met.

IDPH has absolute authority in matters of quarantine and isolation, and may declare and enforce quarantine when none exists, and may modify or relax quarantine when it

has been established. In addition, local boards of health, health authorities and officers, police officers, sheriffs and other officers and employees of the state or any locality have the authority to enforce orders issued under Section 2 of the Department of Public Health Act and also shall enforce the rules and regulations so adopted.

IDPH shall investigate the causes of dangerously contagious or infectious diseases, especially when existing in epidemic form, and take means to restrict and suppress the same. Whenever such disease becomes, or threatens to become epidemic in any locality, and the local board of health or local authorities neglect or refuse to enforce efficient measures for its restriction or suppression or to act with sufficient promptness or efficiency, or whenever the local board of health or local authorities neglect or refuse to promptly enforce efficient measures for the restriction or suppression of dangerously contagious or infectious diseases, IDPH may enforce such measures as it deems necessary to protect the public health, and all necessary expenses so incurred shall be paid by the locality for which services are rendered.

### *Authority for Direction of Control*

The overall authority for direction and control within Illinois of the response to a pandemic influenza outbreak rests with the governor. Article V, Section 6 of the Illinois Constitution of 1970 and the Governor Succession Act (15 ILCS 5/1) identify the officers next in line of succession in the following order: the lieutenant governor, the elected attorney general, the elected secretary of state, the elected comptroller, the elected treasurer, the president of the Senate and the speaker of the House of Representatives. The governor is assisted in the exercise of direction and control activities by the staff of the Office of the Governor and the coordination of response activities by IEMA. The State Emergency Operations Center (SEOC) is the strategic direction and control point for Illinois' response to an emergency medical incident.

The overall authority for direction and control for the resources of IDPH that respond to a pandemic influenza outbreak is the state public health director. The line of succession for the state public health director is the assistant director, followed by the chief of staff. The director is assisted in the coordination of pandemic influenza response activities by the deputy director, Office of Health Protection; chief, Division of Infectious Diseases; deputy director, Office of Preparedness and Response; and other designated staff.

### *Statewide Emergency Response Plan Integration*

- **Illinois Emergency Operations Plan**

    The cornerstone to Illinois' response to emergencies and disasters is the *Illinois Emergency Operations Plan (IEOP)*. The purpose of this plan is to outline the mechanism for providing state assistance to local governments dealing with significant disasters.

Outlined within the IEOP are policies, concepts of operations, organizational structures and federal-state-local interfaces. The IEOP contains specific language pertaining to the provision of Health and Medical Services in response to emergencies and disasters.

- **IDPH Emergency Operations Plan**

  The *IDPH Emergency Operations Plan* provides a framework for emergency preparedness activities of the department. IDPH is prepared to respond with assistance in times of actual or threatened natural or manmade disaster and emergencies.

  IDPH has developed policies, plans and procedures, which enable the agency to become aware of, gather additional information on and act upon a potential or real emergency. The *IDPH Emergency Operations Plan* is intended to establish policies to allow the development of appropriate procedures, which will ensure the coordination of emergency response activities.

- **Health and Medical Care Response Plan**

  The overall goal of the *Health and Medical Care Response Plan* is to assist local health department, hospital, emergency medical services, and health care personnel and facilities in working together in a collaborative way and to provide support for health and medical response operations during emergency events.

  The *Health and Medical Care Response Plan* outlines the framework for the communication and coordination of emergency medical services. The plan provides an organizational structure among hospitals and other health care facilities and their personnel, equipment and supplies during a mass casualty event.

- **Illinois Strategic National Stockpile Plan**

  The purpose of the *Illinois Strategic National Stockpile Plan* is to provide operational guidance for Illinois to implement statewide assets and to request, to receive, to organize, to distribute and to repackage medical material pre- positioned by the Department of Homeland Security. The plan outlines Illinois' procedures and framework to aid state/local emergency response authorities during a major event when state and local resources have been depleted or are unavailable.

### *Primary Direction and Control Points*

Overall public health and medical direction and control and the coordination of input of all responding organizations to a pandemic influenza outbreak will be accomplished through the staffing and operation of the following direction and control points.

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

- **State Emergency Operations Center (SEOC)**

  The SEOC, located within the IEMA office in Springfield, serves as the strategic coordination point for a multi-agency state response for disasters and emergencies.

  The SEOC Communications Center is the designated primary 24-hour point of contact for state agencies and departments. The SEOC is responsible for developing protective action recommendations for the governor and notifying the appropriate counties. The SEOC is responsible for notifying representatives of the state agencies and departments designated to report to the SEOC as outlined in the *IEOP*.

  Initial SEOC objectives during an event are to:
  a. Identify staffing and initiate deployment of the UAC and UAC team.
  b. Manage notification and deployment of IEMA and SEOC liaisons and UAC team.
  c. Advise affected jurisdictions of UAC team deployment.
  d. Establish and maintain communications with local EOCs, FEMA and other elements as required.
  e. Provide logistical/ground support to UAC team.
  f. Develop, in conjunction with other state agencies and the affected local government(s), an initial impact assessment.
  g. Coordinate actions of all agencies to ensure efficient and effective support to affected area(s).
  h. Develop state response/recovery priorities.
  i. Identify emergency public information needs.
  j. Provide administrative, security and logistical support to SEOC staff.

  Continuing SEOC operational objectives are to:
  a. Determine need for gubernatorial disaster declaration.
  b. Continue coordination of state resources and deployment of the UAC team.
  c. Maintain communications with FEMA, UAC(s), local EOCs and other elements as required.
  d. Provide special logistical/administrative support.
  e. Facilitate redeployment of UAC team and SEOC staff for the orderly conclusion of field functions.

- **Illinois Department of Public Health Emergency Operations Center (PHEOC)**

  The PHEOC is the designated point of contact for coordination and provision of updates on the status of public health and medical operations with the following entities:
  o SEOC

- o   Joint Information Center (JIC)
- o   CDC
- o   ASPR

The PHEOC will serve as the strategic coordination and policy center for public health and medical operations. The PHEOC will determine the need for appropriate resources; develop an emergency response plan for surveillance, communication and vaccine management; assign actions to be undertaken by the department staff; and collaborate to resolve multi-jurisdictional coordination issues.

The issuance of health and medical guidance and the coordination of news releases and media calls regarding the state's public health response operation to the pandemic influenza outbreak will be the responsibility of the PHEOC.

- **Joint Information Center**

   The purpose of a Joint Information Center (JIC) is to coordinate the flow of information about the incident and related response issues among agencies, and to provide a single information source for the media, business community and general public. The JIC is an element of the SEOC where the emergency response is coordinated. Communication among agencies, to the media and to the public, must be rapid, accurate and effective, and a JIC provides a forum for the necessary information exchange. Public information among and from all responding agencies, emergency operations centers, political jurisdictions and the media are handled through this center, thereby allowing the coordination of information from all sources, and reducing or eliminating conflicting information and rumor.

   The establishment of a JIC may be necessary under one or more of the following circumstances:
   a.   Multiple local, state and federal agencies are involved in the information dissemination about a possible crisis.
   b.   The volume of media inquiries appears to overwhelm the capabilities of the public information officer within the emergency operations center.

## 2.0   Preparedness

Multiple stakeholders have important roles in pandemic influenza preparedness and response. Stakeholders include federal departments and agencies, public health organizations, state and local health departments and laboratories, private health care organizations, influenza vaccine and antiviral manufacturers, and vaccine distributors and vaccinators. Not every section of this plan will be immediately relevant to each of the stakeholders. The guidelines and annexes have been compiled into a single plan with the goals of enhancing understanding and improving coordination between public and private sectors and at different levels of the health care system. This structure also emphasizes that an effective response to an influenza pandemic requires planning, infrastructure and action at many levels, and by many groups.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

*Planning and Coordination*

The directors of IDPH and IEMA have jointly established a multijurisdictional, multi- agency committee responsible for developing recommendations for improving pandemic influenza preparedness and response. At a minimum, the members of the committee represent the governor's office, IDPH, IEMA, local health departments, hospitals, infection control practitioners, first responders, local emergency management, and appropriate nongovernmental and private sector organizations.

The purpose of this group is to:

- Bring together representatives of groups likely to be adversely affected by an influenza pandemic, and/or which, due to legal responsibilities, the fulfillment of their respective stated missions, or the reasonable expectations of the public, are obligated to take part in the response to such an eventuality.

- Foster open discussion and civil debate among these representatives in an effort to address difficult and as-yet-unresolved issues; develop clear, feasible, and consensus-based recommendations on these issues whenever possible; and, deliver such recommendations to the IDPH director for consideration.

- Provide a forum for IEMA and IDPH to update group members on the steps that state government is taking to prepare for an influenza pandemic.

- Provide the IDPH director and other state government executives, as well as planners, with insight into the needs and capabilities of stakeholder groups throughout the state, taking into account geographic differences and a variety of other pertinent social and demographic variables; thereby eliminating, or at least reducing, disparities in the delivery of critical services during a pandemic or other potentially catastrophic public health situation.

- Conduct regular reviews of this plan and supporting documents to ensure relevance and accuracy of information and procedures. Oversee changes to this plan.

- Participate in the development of state pandemic influenza exercises. The group also will review after action reports for these exercises and provide recommendations about future preparedness and response activities.

- Make recommendations to the IDPH director on steps necessary to maintain the safety of workers involved in responding to an influenza pandemic.

**Planning Guide for State and Local Officials (Annex 1 of National Pandemic Influenza Response Plan):** This guide is intended to convey important items to consider in the planning process, with each jurisdiction assuming responsibility for deciding how each item is implemented. It also is recognized that a number of actions taken by state and local agencies will be contingent upon the development of national policies and procedures, many of which are presently under development.

### *Event Modeling Planning Tools*

<u>Flu Aid 2.0</u> is designed to help state and local-level public health officials plan, prepare and practice for the next influenza pandemic by modeling the impact a pandemic might have on their community. The software is designed to provide a range of estimates of impact in terms of deaths, hospitalizations and outpatient visits due to pandemic influenza (before interventions are applied). The software does not provide any description of how the pandemic will spread, i.e., when a specific community will be affected.

<u>FluSurge</u> is a spreadsheet-based model, which provides hospital administrators and public health officials' estimates of the surge in demand for hospital-based services during the next influenza pandemic. FluSurge estimates the number of hospitalizations and deaths of an influenza pandemic and compares the number of persons hospitalized, the number of persons requiring ICU care, and the number of persons requiring ventilator support during a pandemic with existing hospital capacity.

**Training and Education:** IDPH will be the lead agency for the development of a training and education plan. The plan developed by IDPH will outline a mixture of presentations and independent studies to increase the knowledge of key officials, first responders, emergency managers, local health officials and health care systems on Illinois' plan to respond to pandemic influenza. Minimum training and education activities will:

☐ Provide relevant information to organizations with preparedness and response duties in this plan.

☐ Update the IDPH Web page to include information for governmental and nongovernmental staff and the general public on pandemic influenza.

☐ Regularly present pandemic preparedness overviews at statewide conferences of key officials, first responders, and public health and health care providers.

☐ Develop a speaker's bureau of subject matter experts capable of providing current, factual information on pandemic influenza and the state's response plan for community-based organizations and the general public.

☐ Conduct media briefings, as appropriate, on the state's pandemic influenza preparedness activities.

### *Risk and Emergency Communications*

Effective response to pandemic influenza will require the general public to make proper and informed actions. Preparedness activities conducted by the governor's office, supported by IDPH and IEMA, include:

☐ Develop clear, accessible and understandable information sheets on pandemic influenza and related threats. The information should be posted on state and local websites and distributed in hard copy to the general public.

☐ Develop initiatives by the governor to educate the public on personal and family protective measures.

☐ Develop emergency alert system messages and media fact sheets prior to pandemic influenza.

☐ Identify and train key state government spokespersons on pandemic influenza and activities the state will perform during pandemic influenza.

☐ Establish an informational hotline for the general public with capacity adequate to meet anticipated peak call volume (CDC recommends enough lines to simultaneously handle 1 percent of a jurisdictions population); develop a means of tracking and categorizing types of calls to identify trends, rumors and misinformation

### *Other Key Activities for Pandemic Preparedness*

When it becomes available, pandemic influenza vaccine will be a federal asset. Updated information regarding vaccine purchase and distribution is available on the USHHS website.

☐ Influenza antiviral medication stockpiling – Influenza-specific antiviral medications, when administered as prophylaxis, can be effective at preventing influenza and, as treatment, in reducing complications, hospitalization and death. Factors that will be considered include feasibility of public sector distribution during a pandemic; potential impacts, costs, and cost-effectiveness of a larger stockpile; the shelf life of stockpiled drugs; and other logistical issues.

☐ Priority groups for vaccine and antivirals when supply is limited relative to potential demand – An initial list of suggested priority groups consistent with achieving the public health goals outlined above will be developed by USHHS. Prioritization schemes should have some flexibility to accommodate local needs.

In addition, there are decisions that cannot be made until a pandemic is imminent and surveillance and epidemiological data are available to determine transmission patterns, the geographic spread of disease, and segments of the population at highest risk of infection and complications. Nevertheless, knowledge of the types of decisions that will be needed can promote planning, facilitate development of options, and guide infrastructure development and data collection to support decision-making.

## 3.0   Response

### *Command, Control and Management Procedures*

- **Phases 1 and 2—Interpandemic phase**
  a. Conduct meetings of the Pandemic Influenza Preparedness Committee. The committee should review identified crucial gaps in state and/or

local infrastructure, resources and laws. If not corrected in advance, these gaps may interfere with an effective response.

b. Regularly review state operational capacity for each priority.

c. Revise *Illinois Pandemic Influenza Preparedness and Response* Plan on an annual basis (minimum).

d. Revise lists, including contact information, of partners, resources and facilities.

e. Conduct regular updates to inform SEOC staff, key officials, legislator, and various stakeholders on the status of pandemic influenza preparedness.

f. Conduct conference calls, as indicated, with bordering jurisdictions to coordinate pandemic influenza preparedness activities.

g. Review, exercise and modify the plan, as needed, on a periodic basis.

- **Phase 3—Novel influenza virus identified; no human-to-human spread**

  a. Conduct meetings of the Pandemic Influenza Preparedness Committee, meet with appropriate partners and stakeholders, review major elements of the plan and evaluate level of preparedness.

  b. Modify the plan, as needed, on an urgent basis.

  c. Coordinate with other states, federal agencies and bordering jurisdictions.

  d. Confirm availability of facilities.

  e. Document expenses of pandemic response.

- **Phases 4 and 5—Some level of human-to-human transmission confirmed but not widespread**

  a. Convene the Pandemic Influenza Preparedness Committee and meet with partners and stakeholders to review plan.

  b. Activate enhanced surveillance and communications procedures.

  c. Begin vaccine and antiviral distribution.

  d. Notify key government officials and legislators of the need for additional monetary resources (if not already available).

  e. Get gubernatorial declaration of a public health emergency as soon as possible (if not already completed).

  f. Activate enhanced plans for operational priorities.

  g. Arrange for appropriate facilities use.

  h. Notify key officials of need for additional resources, if necessary.

  i. Document expenses of pandemic response.

- **Phase 6—Confirmation of onset of a pandemic**

  a. Activate the SEOC and PHOEC, meet with partners and stakeholders, and review and fully activate plan.

  b. Get a gubernatorial declaration of a public health emergency as soon as possible (if not already completed).

c.    Monitor staffing needs.
d.    Coordinate activities with neighboring jurisdictions.
e.    Interface with appropriate counterparts at the national level.
f.    Document expenses of pandemic response.

*Surveillance System and Laboratory Analysis*

- **Phases 1 and 2—Interpandemic phase**
  Illinois will ensure a well-functioning interpandemic surveillance system that adheres to national standards, as defined by CDC.

  IDPH will continue the seasonal influenza surveillance system using the CDC ILI- Net, I-NEDSS, Illinois Vital Records System (IVRS) and IDPH Outbreak Reporting System (ORS). The system also utilizes sentinel providers throughout the state who report levels of influenza-like illness (ILI) and/or specimens from ILI patients for additional testing at the IDPH laboratories. ILI reporters provide information through the CDC ILINet system on a weekly basis. I-NEDSS, the state communicable disease surveillance reporting system, is used to receive reports of reportable influenza cases (intensive care unit admissions of influenza cases and pediatric influenza deaths). IVRS is used to identify deaths due to influenza, while ORS is a system developed for outbreak reporting, including for influenza outbreaks.

  Revisions to the Illinois contingency plan for enhancing virologic and disease- based surveillance systems in the event of a novel virus or pandemic will address several issues including:
  a.    Laboratory surge capacity
  b.    Laboratory safety issues
  c.    Increased frequency of reporting
  d.    Assess means to count or estimate numbers of influenza-related deaths
  e.    Monitor hospital bed capacity through the IDPH Hospital Bypass System
  f.    Monitor surveillance data and investigate cases with potential exposures to the new strain
  g.    Increase laboratory surveillance for specimens that are not the current circulating strain(s)

- **Phase 3—Novel influenza virus identified; no human-to-human spread**
  Illinois will continue surveillance activities as described in previous phases.

  Illinois will enhance interpandemic influenza surveillance activities by:
  a.    Increasing case detection among persons who recently traveled to the outbreak area and present with clinical illness possibly caused by influenza, including pneumonia, acute respiratory distress syndrome or other severe respiratory illness. Appropriate specimens should be collected to diagnose influenza infection. In some situations, if the novel influenza virus is a highly pathogenic avian strain, such as with the

2004 H5N1 influenza virus in Asia, local hospital laboratories should not attempt viral isolation because of the potential risk the strain could spread. Specimens should be sent to the state public health laboratory or to CDC where isolation and sub typing can be done under more stringent biocontainment conditions. Influenza infection can be diagnosed locally using antigen detection, immunofluorescence or PCR. Guidance will be provided by CDC appropriate to each specific novel virus alert.

b.   Ensuring interpandemic influenza surveillance activities are underway regardless of the time of year and participating laboratories and sentinel providers are reporting data to CDC each week.

c.   Subtyping influenza A viruses identified in high-risk clinical specimens and report any influenza A viruses that cannot be subtyped to CDC immediately.

d.   Obtaining reagents from CDC (when they become available) to detect and identify the novel strain.

e.   Recruiting and enrolling additional sentinel providers, if necessary, to reach the minimum of one regularly reporting provider for every 250,000 persons.

f.   Monitoring and instituting recommendations from CDC for any additional surveillance activities that should be undertaken given the specific circumstances. Reviewing contingency plans for further enhancing influenza surveillance if efficient person-to-person transmission of the novel virus is confirmed.

- **Phases 4 and 5—Some level of human-to-human transmission confirmed but not widespread**
Illinois will continue surveillance activities as described in previous phases. If efficient person-to-person transmission of a novel influenza virus is confirmed, the following additional surveillance enhancements will be considered:

a.   Assess the need to screen travelers arriving in the United States from affected countries.

b.   Investigate the epidemiology of all early cases either originating in the United States or imported into the country.

c.   At hospitals and emergency departments, increase laboratory diagnosis of influenza, including through use of rapid antigen detection tests, for persons with compatible clinical syndromes, particularly among those who may have had recent exposure at the site of an outbreak. Laboratories should institute plans for testing substantially more specimens than usual. CDC will provide guidelines to assist with triage of specimens for testing and for choosing which isolates to send to CDC.

d.   U.S./WHO collaborating laboratories report test results daily to CDC.

e.  Assess the completeness and timeliness of reports from participating laboratories and sentinel providers, and contact non-reporters to improve their performance as necessary.

f.  Investigate outbreaks reported through IDPH's Outbreak Reporting System (ORS) and increases in ILI detected through the influenza sentinel provider surveillance system.

g.  Recruit additional U.S./WHO collaborating laboratories to report results to CDC.

- **Phase 6—Confirmation of onset of a pandemic**
  Illinois will maintain the surveillance system as described in previous phases as necessary for assessing and tracking the pandemic.

  a.  Enhance monitoring for antiviral resistance.

  b.  Assist CDC with studies to monitor vaccine effectiveness.

  c.  Monitor health impacts, including deaths and hospitalizations. Community impacts could be assessed by measuring absenteeism in key industries or sectors.

  d.  Assess the quality and effectiveness of surveillance, make recommendations for improvement and implement recommendations during the period between pandemic waves (Phase 3) and after the pandemic (Phase 5).

## *Vaccine Delivery and Targeted High-Risk Population*

- **Phases 1 and 2—Interpandemic phase**

  a.  Enhance influenza vaccination coverage levels in traditional high-risk groups, particularly subgroups in which coverage levels are low (e.g., minorities and persons younger than 65 years of age with chronic underlying medical conditions). Increasing routine, annual vaccination coverage levels in these groups will further reduce the annual toll of influenza and will facilitate access to these populations when the pandemic occurs.

  b.  Use Advisory Committee on Immunization Practices (ACIP) recommendations to enhance pneumococcal vaccination coverage levels in traditional high-risk groups to reduce the incidence and severity of secondary bacterial pneumonia.

  c.  Define the process by which review and modification of the national recommendations for vaccine priority groups will occur.

  d.  Consider state-specific modifications or refinements in priority groups, depending on local circumstances. For example, there may be specific groups of persons in selected states whose absence, due to influenza illness, could affect public safety, security or result in the disruption of essential community services. Examples of such unique, special-skill groups might include nuclear power plant operators, air traffic controllers at major airports, workers who operate drinking water and

waste water plants and workers who operate major telecommunications or electrical grids.

e.  Determine size of priority groups and develop a plan for vaccinating them.

f.  Develop a plan for providing influenza vaccine to priority groups in the event of severe or moderately severe vaccine shortages. Consider the potential need to prioritize within priority groups. Frontline health care workers will need to be defined.

g.  Develop a plan for mass vaccination of the general public once sufficient amounts of vaccine are available, including identification of vaccine administration personnel. Elicit written commitments from agencies and institutions that plan to provide vaccinators. Security issues should be taken into consideration.

h.  Ensure that appropriate legal authorities are in place that will allow for implementation of major elements of the proposed administration plan. This includes working with the Illinois Department of Financial and Professional Regulation to extend the scope of practice to authorize certain licensed health care givers to administer the vaccines.

i.  Ensure contingency plans have been considered for emergency distribution of unlicensed vaccines using emergency investigational new drug (IND) provisions. Such provisions call for strict inventory control and recordkeeping, along with completion of a signed consent form.

j.  Coordinate the proposed vaccine distribution plan, as recommended by CDC, with bordering jurisdictions, including counties, states and unique populations.

k.  Engage state health coordinator (and/or state adverse events coordinator) in planning for the monitoring and investigation of adverse events.

l.  Identify a data management system to track vaccine supply, distribution, and use and to track administration of two doses of vaccine (if recommended). States with vaccine distribution systems and immunization registries may be able to modify their systems for these purposes. Other options include adapting other state-specific systems or the pre-event vaccination system. Key pieces of information to collect to facilitate reminder notification for second doses include name, date of birth, address and telephone number.

m.  Review, exercise and modify vaccine distribution plans as needed on a periodic basis. This is applicable if the state performs its own centralized distribution. During 2009A(H1N1)A response activities, the CDC contracted with McKesson Specialty to provide centralized distribution on behalf of the United States.

**Phase 3—Novel influenza virus identified; no human-to-human spread**

a.  Meet with appropriate partners and stakeholders and review major elements of the vaccine distribution plan.

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

    b.    Modify the plan, as needed, to account for updates, if any, on recommended target groups, projected vaccine supply and human resources available.

**Phases 4 and 5—Some level of human-to-human transmission confirmed but not widespread**

    a.    Ensure human resources and logistics are in place to begin vaccination, taking into account need for additional staff due to illness.

    b.    Coordinate planned activities with bordering jurisdictions.

    c.    Conduct training for relevant agencies and partner groups regarding vaccine delivery protocols and procedures.

**Phase 6—Confirmation of onset of a pandemic**

    a.    Fully activate the vaccination program, including distribution, administration, monitoring of vaccine distribution and administration; and tracking of dose, appropriate storage and handling and safety monitoring. During the 2009A(H1N1)pdm response activities, the federal government established a nationwide distribution system for vaccine, as well as required elements, for reporting data related to doses administered and vaccine adverse events.

    b.    Coordinate activities with bordering jurisdictions.

*Antiviral Prophylaxis Distribution*

**Phases 1 and 2—Interpandemic phase**

    a.    Define process through which national recommendations for priority groups will be reviewed.

    b.    Quantify high priority populations for prophylaxis, and develop antiviral distribution contingency plans for the different possible scenarios.

    c.    Quantify high priority populations for therapy, and develop antiviral distribution contingency plans for the different possible scenarios.

    d.    Plan for education and notification of the medical community and of the public around appropriate prescribing information.

    e.    Coordinate with bordering jurisdictions.

    f.    Review workman's compensation laws as they apply to health care workers and other essential workers who have taken antivirals for prophylaxis.

    g.    Develop data management system to track antiviral supplies, distribution and use.

**Phase 3—Novel influenza virus identified; no human-to-human spread**

    a.    Meet with appropriate partners and stakeholders and review major elements of the antivirals plan.

    b.    Modify plan as needed to account for updates, if any, on recommended target groups and projected antiviral supply.

    c.     Notify the medical community of the status of the plan and antiviral availability.

    d.     Disseminate antiviral use guidelines to the medical community and conduct training for public health staff involved in antiviral distribution protocols and procedures.

- **Phases 4 and 5—Some level of human-to-human transmission confirmed but not widespread**
  a.     Ensure human resources and logistics are in place to begin antiviral distribution and administration, taking into account the need for added staff due to illness.
  b.     Coordinate with bordering jurisdictions.

- **Phase 6—Confirmation of onset of a pandemic**
  a.     Fully activate antiviral distribution plan.
  b.     Continue coordination with bordering jurisdictions.
  c.     Implement data management system for antiviral distribution, use and supply (if applicable).

### *Emergency and Risk Communications*

- **Phases 1 and 2—Interpandemic phase**
  a.     Identify and train spokesperson (and backup) to the media and to the public.
  b.     Develop materials and messages, including a review of CDC materials; adapt and revise as needed.
  c.     Identify most effective communication channels for reaching different communities.
  d.     IEMA will ensure telephone hotlines and a website have been established to respond to pandemic inquiries (for instance, regarding the location of immunization clinics), and assure that systems are in place to deal with anticipated surge capacity; IDPH will establish website content as needed/requested and assist with planning responses to anticipated questions.
  e.     State and local public health officials and all response partners will coordinate content of media messages.
  f.     Educate public health officials, political leaders, community leaders and the media about what information will and will not be available during a pandemic; disseminate information to public and partners on ongoing basis.
  g.     Coordinate with bordering jurisdictions.

- **Phases 3, 4 and 5— Novel influenza virus identified; human-to-human transmission may or may not be confirmed, but in any case is not widespread**
  a.     Review major elements of the plan with partners and stakeholders.

    b.     Disseminate information to the public, partners and the news media on an
          ongoing basis.

    c.     Monitor media coverage and address misinformation.

    d.     Coordinate with bordering jurisdictions.

- **Phase 6—Confirmation of onset of a pandemic**
    a. Review and modify messages and materials, as needed.
    b. Continue to monitor media coverage and address misinformation.
    c. Continue to disseminate credible information as it becomes available to the
       public and partners.
    d. Coordinate with bordering jurisdictions.

*Emergency Response Plans and Procedures*

- **Phases 1 and 2—Interpandemic phase**
    a. Identify emergency response issues specific to pandemic influenza.
    b. Ensure specific challenges posed to emergency response plans by an
       influenza pandemic are addressed in emergency response plans.
    c. Review pertinent legal authorities, including quarantine laws and how they apply
       in a public health emergency, laws and procedures for closing businesses or
       schools and suspending public meetings, and medical volunteer licensure,
       liability and compensation laws for in-state, out-of- state and returning retired and
       non-medical volunteers, and whether a disaster declaration is warranted.

- **Phases 3, 4 and 5— Novel influenza virus identified; human-to-human
  transmission may or may not be confirmed, but in any case is not
  widespread**
    Meet with appropriate partners to review major elements of the health sector
    and essential non health-sector response plan.

- **Phase 6—Confirmation of onset of a pandemic**
    Implement generic elements of response plans and the specific plans for
    identified pandemic influenza issues, including continuous collection of data
    concerning medical and material supplies and their allocation to rapidly identify
    changing patterns of need and modify or redirect policy.

## 4.0 Recovery

Recovery is the development, coordination and execution of service- and site- restoration plans
and the reconstitution of government operations and services through individual, private-sector,
nongovernmental and public assistance programs. This is primarily an IEMA role. Recovery
involves actions needed to help individuals and communities return to normal when feasible.
The Joint Field Office is the central

coordination point among federal, state, local, and tribal agencies, and voluntary organizations for delivering recovery assistance programs.

State agency responsibilities relating to short-term recovery are included in the IEOP. Disaster assistance programs made available after gubernatorial proclamations and presidential disaster declarations are implemented in accordance with provisions of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 93-288 as amended, the Disaster Mitigation Act of 2000, FEMA regulations, the National Response Framework and state administrative plans for the Individual and Family Grant Program, the Public Assistance Program, and the Hazard Mitigation Grant Program.

Long-term recovery is dealt with through state and federal agencies in accordance with their statutory authorities or through special task forces established by state and federal officials. Some agencies' responsibilities relating to disasters are limited to disaster assistance and long-term recovery. These agencies are not specifically identified in the IEOP. Their activities are governed by statute.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

# Support Annexes

Illinois Pandemic Influenza Preparedness and Response Plan                 Version 5.1
March 2020

# 1.0   Surveillance and Detection

**Primary Agency:**          IDPH
**Support Agencies:**        IDCMS, IDHS, IDOA, IEPA, ISBE, IBHE and IDOC

*Purpose*

The purpose of the Surveillance and Detection Annex is to outline the procedures that will be
utilized by the state to:

- Determine when, where and which influenza viruses are circulating in Illinois
- Determine the intensity and impact of influenza activity on defined health
  outcomes, and identify unusual or severe outbreaks

**Planning Assumptions and Considerations**

Although the current influenza surveillance system achieves the objectives of monitoring
influenza viral strains and identifying outbreaks, interpreting surveillance data poses several
challenges. Because most cases of influenza are not identified etiologically (i.e., not confirmed as
influenza by a laboratory test) it is impossible to specifically count all influenza cases,
hospitalizations and deaths. Laboratory testing of all influenza-like illness (ILI) cases would be
prohibitively expensive and time consuming given the large number of such cases that occur
each year. Since infections other than influenza can cause ILI, accurate counts of influenza cases
cannot be determined based on the frequency of a clinical syndrome. Finally, many persons
infected with influenza do not seek medical care and therefore remain unidentified.

For these reasons, statewide influenza activity is measured indirectly by (1) the number of
specimens tested that are positive for influenza, (2) health care provider visits for ILI
compared to baseline level and (3) outbreaks in congregate settings.

These indicators are measured on a regional basis to determine the overall statewide activity
level. Deaths in pediatric cases and ICU admissions also is tracked as part of the surveillance
system.

An additional challenge for monitoring the effect of influenza viruses on hospitalization or
mortality is that many severe influenza-related illnesses or deaths are due to secondary bacterial
infections (most commonly bacterial pneumonia) or worsening of chronic diseases. Because
surveillance data have not been able to capture all influenza-related hospitalizations and deaths,
and because the pneumonia and influenza category also includes many persons who do not have
influenza, estimating the burden of influenza requires conducting specific studies and using
mathematical modeling. These studies evaluate differences in health outcomes, death or
hospitalization during the influenza season and time periods before and after influenza season for
defined diagnostic codes. Excess pneumonia and influenza mortality or hospitalizations typically
have been evaluated but underestimate the impact of influenza by omitting deaths related to
worsening of a chronic condition, such as congestive heart failure following an influenza
infection. By contrast, analyzing seasonal differences in all causes of mortality would likely
overestimate the role of influenza in excess winter mortality. For these reasons, developing a
means to

count or estimate numbers of influenza-related deaths is challenging and can only be achieved if time and resources allow.

The severity of the influenza outbreak may strike as many as 25 percent to 40 percent of state employees. State agencies must be prepared to implement their respective Continuity of Operations Plans to ensure uninterrupted essential services to the public. During a pandemic, surveillance and epidemiology staff will need to surge from other areas of the IDPH Division of Infectious Diseases and, therefore, surveillance activities for other diseases may have to cease or be scaled back.

*Concept of Operations*

Public health surveillance is the ongoing systematic collection, analysis, interpretation and dissemination of health data essential to the planning, implementation and evaluation of public health practice. Surveillance supports disease control interventions, estimates the burden of a disease or injury, provides information on the natural history of conditions, determines the distribution and spread of illness, generates hypotheses and stimulates research, and aids in the evaluation of prevention and control measures. Syndrome surveillance is an investigational approach to surveillance typically using electronic databases, which may assist in both early identification of an outbreak, and defining the size and scope of a recognized health event.

**Seasonal Influenza Surveillance**

IDPH conducts a seasonal influenza surveillance system using the CDC ILI-Net, Illinois National Electronic Disease Surveillance System (I-NEDSS), Illinois Vital Records System (IVRS) and IDPH Outbreak Reporting System (ORS). The system also utilizes sentinel providers throughout the state who report levels of influenza-like illness (ILI) and/or specimens from ILI patients for additional testing at the IDPH laboratories. ILI reporters provide information through the CDC ILI-Net system on a weekly basis. For specimen submission, IDPH has been working to achieve specimen submission goals established by CDC. I-NEDSS, the state's communicable disease surveillance reporting system, is used to receive reports of reportable influenza cases (intensive care unit admissions of influenza cases and pediatric influenza deaths). IVRS is used to identify deaths due to influenza, while ORS is a system developed for outbreak reporting, including influenza outbreaks throughout the state. The ILI-Net and laboratory sentinel system is most robust during the influenza season with only a few participating during the summer, but efforts continue to be made to increase year- round reporting.

**Illinois National Electronic Disease Surveillance System**

The Illinois National Electronic Disease Surveillance System (I-NEDSS) will be used for hospitals, doctors and other health care providers to electronically report infectious diseases to the state and to local health departments. The system was initially launched in March 2004 so the state's 96 local health departments could be efficiently and securely linked through a Web-based computer connection to IDPH.                                        I-NEDSS provides reporting entities with uniform data collection standards and a secure data

entry portal. Through browser-based data entry, the majority of Illinois hospitals utilize I-NEDSS to report confirmed and suspect cases to their local health department (state health department staff members also are able to view these reports).
Electronic laboratory reporting is currently in place with 31 hospital labs and eight reference labs along with the IDPH state laboratory. Imports into I-NEDSS are received from the state's vital records system when an infectious disease is indicated as a cause of death.

I-NEDSS is part of a national electronic disease reporting system that links health providers and state and local public health agencies within Illinois, as well as providing data to CDC. Reporting of data relevant to monitoring influenza and its complications is developed by IDPH and will be modified as necessary according to guidance from the CDC. Surveillance data shall be summarized and that information shall be disseminated to stakeholders in the surveillance system.

The "on-the-fly" I-NEDSS functionality is a unique Web feature and was specifically designed to handle outbreak situations, such as a novel influenza or pandemic event. IDPH will modify the I-NEDSS Novel Influenza module as needed to conduct case-based surveillance to determine 1) if the patient meets the defined case definition, 2) to track the spread of the novel influenza strain, 3) to understand and document exposure routes, 4) to understand the severity of the illness in terms of morbidity and mortality and 5) to implement control measures where needed.

Another unique feature of I-NEDSS is its Analysis, Visualization and Reporting (AVR). The AVR refreshes every 60 seconds from data added into the I-NEDSS database.
State and local epidemiologists are able to report and review case data in "real time" throughout an outbreak. Important data monitor via the AVR included case distribution by city, county and ZIP code; pregnancy status; hospitalization and emergency department admissions; deaths due to influenza; age, sex and race breakdowns; sensitive occupations, including health care workers; out-of-country travel histories; and laboratory confirmation by either CDC or IDPH.

**IDPH Syndromic Surveillance Activities**

IDPH launched its syndromic surveillance system in 2013 utilizing the BioSense 2.0 application. Hospitals onboard emergency department chief complaint data through the state's Health Information Exchange (HIE) where files are routed to the Public Health Node for aggregation and on boarding onto the state's BioSense locker.
Syndromic Surveillance data will be available to provide situational awareness on the number of emergency department visits due to influenza like illness. By October 2014, hospitals in Illinois will be required to send syndromic surveillance data to IDPH. The aggregation tool used to summarize these syndromic data is evolving. As an alternative until the BioSense aggregation tool matures, the Essence tool, employed by health departments in the metro Chicago and St. Louis areas (providing data for 42 hospitals), will be used to provide situational awareness during a pandemic.

*Role and Responsibilities*

Illinois Pandemic Influenza Preparedness and Response Plan                     Version 5.1
March 2020

| Primary Agency | Role and Responsibilities |
|---|---|
| IDPH | Coordinate and establish statewide surveillance activities and recommendations.<br><br>Determine when, where and which influenza viruses are circulating in Illinois through laboratory testing and surveillance.<br><br>Determine the intensity and impact of influenza activity on defined health outcomes, identify unusual or severe outbreaks, and disseminate information.<br><br>Coordinate surveillance activities with CDC and border states.<br><br>Coordinate with local areas to ensure development of local plans as called for by the state plan and provide resources, such as templates to assist in planning process.<br><br>Develop data management systems needed to implement components of the plan.<br><br>Assist local jurisdictions with exercising plans. |

| Support Agencies | Role and Responsibilities |
|---|---|
| IDCMS | Provide technical assistance in the recruitment and deployment of state employees for temporary assignment to assist with surveillance activities. |
| IDHS | Provide medical support personnel to assist with health and medical surveillance. |
| ISBE and IBHE | Assist in dissemination of information from IDPH to school, to colleges and to universities, and to encourage these facilities to report, as necessary, to IDPH. |
| IEPA | Assist in dissemination of information to drinking water and waste water utilities. |

*Authorities*

77 Ill Adm Code 690.100 et. Seq

*References*

Epidemiology and prevention of vaccine-preventable diseases, 11th Edition, May 2009, pp. 135-155.

Federal Guidance to Assist States In Improving State-Level Pandemic Influenza Operating Plans, March 2008.

State and Local Pandemic Influenza Checklist, December 2005.

Illinois Pandemic Influenza Preparedness and Response Plan                   Version 5.1
March 2020

## 2.0    Laboratory Testing

**Primary Agency:**          IDPH
**Support Agencies:**

### Purpose

The purpose of the Laboratory Testing Annex is to outline the procedures and
capabilities of the IDPH state laboratory.

### *Planning Assumptions and Considerations*

It is assumed that the IDPH Division of Laboratories will be involved in routine influenza
surveillance throughout the development of an influenza pandemic. Laboratory staff is routinely
requested to work overtime hours to provide epidemiologic information to characterize the
spread of an illness. It's further understood that the Division of Laboratories may have the
capability to test up to 700 specimens per day, but it will require a shift in personnel resources to
reach this level of testing capacity. It's likely that some other testing areas (e.g., sexually
transmitted disease, enteric outbreak, vaccine preventable disease) would need to be
discontinued or postponed to reach this goal. Testing this quantity of specimens will need to be
carefully considered and the plan to utilize local health departments as gatekeepers should be
used to ensure specimens are properly authorized for testing. If this quantity of testing is needed,
additional clerical support will be necessary in the laboratory for both data entry and answering
phone calls from submitters.

### Concept of Operations

IDPH laboratory personnel have been trained and are assessed to perform the CDC real time
polymerase chain reaction assay that is approved by the Federal Drug Administration (FDA) to
detect the presence of the in influenza virus. As such, IDPH continues in its role as the
"reference laboratory" for the state's hospital and private laboratories, testing patient samples.
IDPH laboratories will be testing Influenza types A and B; type A subtypes H1, H3 avian H5,
H7; and 2009A(H1N1)pdm.                                    Each of
the IDPH three laboratories (Carbondale, Springfield and Chicago) has the capability to perform
these tests. Current maximum capacity is approximately 700 specimens per day for the three
laboratories during an influenza outbreak, assuming staff is working overtime and other testing
areas have been discontinued or delayed. The laboratories are maintaining supplies to rapidly
gear up if an outbreak occurs.

The objectives of the IDPH Division of Laboratories are (1) to provide maximum useful
epidemiological data to assist in guiding the application of control efforts, (2) to detect any
significant shift in the virus type, and (3) to assist CDC in the detection of antiviral resistant
strains of influenza by forwarding positive influenza samples from Illinois to CDC. Currently, a
shift in virus or antiviral resistance must be determined by CDC.

It is important to note that once a pandemic strain has been identified, testing every individual with compatible symptoms may not be necessary. Instead, the IDPH Division of Laboratories may be more useful in the early stages of a pandemic testing a relatively smaller number of specimens to help epidemiologists determine the spread of disease. Authorization for testing of individual specimens will follow the procedure currently employed by the IDPH divisions of Infectious Diseases and Laboratories. All specimens must be authorized for testing by the Division of Infectious Disease or applicable local health department. Samples or specimens submitted to the laboratory without proper authorization will not be tested.

Laboratory staff will contact the submitter and determine if the sample/specimen will be returned or destroyed. For more information on laboratory testing and authorization, refer to the IDPH Division of Laboratories manual of services at http://www.idph.state.il.us/about/laboratories/manual/Manual_of_Services_OHP_LA BS.pdf.

| Primary Agency | Role and Responsibilities |
|---|---|
| IDPH | Conduct laboratory testing of submitted specimens. |
| Support Agencies | Role and Responsibilities |
| | |

## 3.0 Antiviral and Vaccine Purchase and Distribution

**Primary Agency:**  IDPH
**Support Agencies:**  IEMA, AG, IDOC, ISP, IDMA, IDOT, IDCMS and ARC

*Purpose*

The purpose of the Antiviral and Vaccine Purchase and Distribution Annex is to outline Illinois' plan to distribute and to dispense antiviral prophylaxis and therapy and vaccine during an influenza pandemic. In the annex, considerations for stockpiling of these pharmaceuticals will be established. The primary goals of antiviral and vaccine use and therapy would be to decrease adverse health impact (morbidity and mortality), maintain a functioning health care system, and reduce social and economic disruption, supporting overall pandemic response goals.

*Planning Assumptions and Considerations*

It is important to note that antiviral agents are an adjunct and not a substitute for vaccine. Vaccine remains the principal means for preventing influenza-related morbidity and mortality. Appropriately used, antiviral agents are assumed (but not proven) to prevent or treat infection in the recipient, but their effect on the spread of an established pandemic remains undefined.

When a pandemic first strikes, vaccine will likely not be ready for distribution. Currently, vaccine requires 6-to-8-months to produce. Once the first lots of vaccine are available, there is likely to be much greater demand than supply. Vaccine will be

administered to persons in priority groups, in accordance with existing recommendations as listed in the USHHS Pandemic Influenza Plan and issued by the ACIP. The current prioritization has been developed with the primary goal to decrease health impacts, including severe morbidity and death. During a pandemic, the specific composition of some of the priority groups may differ according to the state and/or community needs to preserve societal functions. In addition, priority groups should be reconsidered when a pandemic occurs and information is obtained regarding the epidemiology of the virus and vaccine effectiveness.

Later in the pandemic, vaccine supply will approximate demand, and vaccination of the full at-risk population can occur.

Although the effectiveness of currently available antivirals against a pandemic influenza strain remains undefined, stockpiling of such drugs is considered prudent. Stockpiling of large quantities of antiviral drugs is most likely best performed at the federal level, in order to avoid a scenario where state and local jurisdictions, as well as hospitals, corporations and individuals, are competing for what is currently a scarce resource.

The USHHS is stockpiling antivirals (oseltamivir and zanamivir) and is allocating them to states based on population. The current public sector stockpile target is 81 million regimens: 6 million regimens for containment and for slowing the entry of pandemic disease in the United States, and 75 million regimens for treatment.

Illinois' allocation is as follows:

| Jurisdiction | Population | Federal Stockpile Allocation (81 Million) | State Stockpile Allocations (31 Million) | Total Purchased As of August 2009 |
|---|---|---|---|---|
| Illinois | 9,779,966 | 1,457,434 | 1,026,829 | 516,018* |
| City of Chicago | 2,869,121 | 427,563 | 301,238 | 301,238 |

*Illinois has ordered approximately 50 percent of pro rata available.

Analysis is ongoing to define optimal antiviral stockpiles, use strategies, potential health impacts and cost-effectiveness of antiviral drugs in the setting of the 2009 pandemic based on real time analysis of illness severity, oseltamivir resistance and expected delay in the receipt of vaccine. Along with additional USHHS guidance, results of these analyses will contribute to decisions regarding the appropriate quantity of antiviral drugs to maintain in the Illinois Pharmaceutical Stockpile.

Decisions regarding purchasing antivirals should be re-examined frequently based on critical research, updated information regarding pandemic strain resistance patterns, updated information regarding safety considerations, increases in manufacturing capacity for oseltamivir and zanamivir, availability of alternative drugs to oseltamivir and zanamivir and availability of a pandemic vaccine. The establishment of state, local or institutional stockpiles should take into account the expiration dates of the purchased drug.

Illinois Pandemic Influenza Preparedness and Response Plan    Version 5.1
March 2020

*Concept of Operations*

## Strategies for Antiviral Drug Use

The guidance is not a requirement, but is designed to define a strategy for antiviral drug stockpiling and use. The working group recommends the following strategies and settings for antiviral use to meet these goals:

1. Contain or suppress initial pandemic outbreaks overseas and in the United States with treatment and post-exposure prophylaxis (PEP) among individuals identified as exposed to pandemic influenza and/or geographically targeted prophylaxis in areas where exposure may occur.

2. Reduce introduction of infection into the United States early in an influenza pandemic as part of a risk-based policy at U.S. borders.

    a. Treatment of persons with pandemic illness who present for care early in their illness and would benefit for such treatment.

    b. Prophylaxis of high-risk health care workers and emergency services personnel (e.g., fire, police, employees providing critical services at utilities, such as waste water and drinking water, power, gas), for the duration of community pandemic outbreaks.

    c. Post-exposure prophylaxis of workers in the health care and emergency services sectors who are not at high risk, persons with compromised immune systems who are less likely to be protected by vaccination, and persons living in group settings, such as nursing homes and prisons, if a pandemic outbreak occurs at that facility.

The National Vaccine Advisory Committee unanimously adopted a series of recommendations for priority use of antiviral medications. The recommendations considered pandemic response goals, impacts of a pandemic, annual influenza disease, data on impact of antiviral drugs and the existing recommendations for pandemic vaccine use. The following listing outlines the prioritization with the primary goal of the response to decrease severe morbidity and death. Minimizing social or economic impacts were considered secondary and tertiary goals.

### Antiviral Drug Priority Recommendations

| Tier | Population |
|------|-----------|
| 1 | Patients admitted to the hospital (T)* |
| 2 | Health care workers (HCW) with direct patient contact and emergency medical services (EMS) providers (T) |
| 3 | Highest risk outpatients – immunocompromised persons and pregnant women (T) |

Illinois Pandemic Influenza Preparedness and Response Plan        Version 5.1
March 2020

| 4 | Pandemic health responders (public health, vaccinators, vaccine and antiviral manufacturers), public safety (police, fire, corrections, waste water and drinking water utilities), power and gas utilities), and government decision-makers (T) |
|---|---|
| 5 | Increased risk outpatients – young children 12-23 months old, persons ≥ 65 yrs old, and persons with underlying medical conditions (T) |
| 6 | Outbreak response in nursing homes and other residential settings (PEP) |
| 7 | HCWs in emergency departments, intensive care units, dialysis centers, and EMS providers (P) |
| 8 | Pandemic societal responders (e.g., nonessential critical infrastructure groups as defined in the vaccine priorities) and HCW without direct patient contact (T) |
| 9 | Other outpatients (T) |
| 10 | Highest risk outpatients (P) |
| 11 | Other HCWs with direct patient contact (P) |

\*T=Treatment; PEP=Post-exposure prophylaxis; P=Prophylaxis

Illinois recognizes the national plan points out a number of unresolved issues that also will need to be defined within the state; guidance for health care workers on when and when not to treat, use of antivirals in infants (risk/benefit), specific definitions and estimated population size of each group, and ability to stratify the populations.

## Pandemic Vaccine Supply

Influenza vaccine availability will change during the course of a pandemic. Pandemic response strategies will vary with vaccine supply. Four vaccine supply levels can be defined.

### Stage 1: No Vaccine Available

At the beginning of a pandemic, it is likely that no vaccine will be available. Interventions to decrease the burden of influenza illness will be limited to measures taken to decrease the spread of infection (such as quarantine, closing schools, canceling public events, infection control in hospitals and long-term care facilities); to prevent infection by using antiviral chemoprophylaxis; and to effectively treat those who become ill. The duration of this period will depend on several factors:

a.    Time of year when the pandemic strain is identified.

b.    Time required for vaccine development and licensure.

### Stage 2: Limited Vaccine Supply

When first available, the pandemic influenza vaccine supply will be less than that required to protect the susceptible population. The duration of this shortage stage cannot be predicted but could include the entire first pandemic season. Several planning issues are of particular importance for this phase of vaccine shortage:

a.    Vaccinate persons in identified priority groups, in accordance with existing recommendations.

b.    Plan for rapid, efficient, and equitable distribution of vaccine will need to be formulated. Provide a second dose of vaccine, if required for immunity.

c.  Develop approach to inform priority groups about the availability of vaccine and where to receive it; and to educate the public regarding vaccine priorities and their rationale will be needed.

d.  Develop systems to monitor vaccine supply, distribution and use.

e.  Develop systems to monitor and investigate adverse events.

## Stage 3: Adequate Vaccine Supply

During this period, pandemic vaccine supply will match the need and ability to distribute and administer vaccine. This will allow a shift from targeted vaccination of priority groups to widespread vaccination, possibly of the entire population.

Strategies for widespread vaccination could include public sector vaccination clinics and/or administration of vaccine by private sector providers. Despite increased vaccine supply, efforts to ensure fair, equitable and orderly distribution remain important goals. USHHS will issue national recommendations to aid in this process. Plans for widespread vaccination during a pandemic should identify potential barriers to vaccination of racial and ethnic minority populations and develop strategies to overcome them. These may include holding vaccination clinics in disadvantaged areas, vaccinating at community sites such as places of worship, involvement of local opinion leaders to promote vaccination, and development of focused educational messages and materials.

## Stage 4: Vaccine Excess

In this stage, vaccine supply will exceed that needed to protect the U.S. population, which may occur if pandemic influenza vaccine production levels remain high after much of the population already has been vaccinated. This stage is unlikely to occur before the second or third wave of pandemic disease.

## Pandemic Vaccine Priorities

Identifying priority groups for vaccination is important because vaccine supply, when initially available, will be less than demand. The National Vaccine Advisory Committee and the Advisory Committee on Immunization Practices (ACIP) unanimously support a series of recommendations that were based on the following assumptions: morbidity and mortality, impact on health care system, workforce, critical infrastructure and vaccine production capacity. The following listing summarizes the priority populations. Illinois recognizes that state and local needs may require some modification to the existing recommendations upon assessment of the epidemiology of the virus and its impact on communities. In addition, priority groups will have to be specifically defined as to which functions are indeed critical to infrastructure and defined by their size within the state.

## Goal 1: Protect persons at highest risk for influenza mortality

Direct protection of high-risk persons is the strategy on which annual influenza vaccination is based. Historically, older adults and those who have underlying diseases have been at highest risk of death for seasonal influenza. However, the 2009A (H1N1)pdm virus affected a younger population. Recommendations for administration of 2009A(H1N1)pdm vaccine were based on several factors, including current disease patterns, populations most at-risk for severe illness based on the

Illinois Pandemic Influenza Preparedness and Response Plan                Version 5.1
March 2020

trends seen in illness, hospitalizations and deaths, how much vaccine was expected to be available, and the timing of vaccine availability. The groups recommended to receive the novel 2009A(H1N1)pdm influenza vaccine included

- **Pregnant women** because they were at higher risk of complications and could potentially provide protection to infants who cannot be vaccinated.
- **Household contacts and caregivers for children younger than 6 months of age** because younger infants are at higher risk of influenza-related complications and cannot be vaccinated. Vaccination of those in close contact with infants less than 6 months old might help protect infants by "cocooning" them from the virus.
- **Health care and emergency medical services personnel** because infections among health care workers have been reported and this can be a potential source of infection for vulnerable patients. Also, increased absenteeism in this population could reduce health care system capacity.
- **Children from 6 months through 18 years of age** because many cases of novel 2009A(H1N1)pdm influenza have occurred in children and they are in close contact with each other in school and day care settings, which increases the likelihood of disease spread.
- **Young adults 19 through 24 years of age** because many cases of novel 2009A(H1N1_pdm influenza have occurred in these healthy young adults and they often live, work and study in close proximity, and they are a frequently mobile population.
- **Persons aged 25 through 64 years who have conditions associated with higher risk of medical complications from influenza.**

In February 2010, the ACIP voted to expand the recommendations for seasonal influenza vaccination. The following summarizes current ACIP recommendations for vaccination against influenza:

- All persons older than 6 months of age should be vaccinated annually.
- Protection of persons at higher risk for influenza-related complications should continue to be a focus of vaccination efforts as providers and programs transition to routine vaccination of all persons 6 months of age or older.

When vaccine supply is limited, vaccination efforts should focus on delivering vaccination to persons who

- Are aged 6 months to 4 years (59 months)
- Are 50 years of age or older
- Have chronic pulmonary (including asthma), cardiovascular (except hypertension), renal, hepatic, neurologic, hematologic or metabolic disorders (including diabetes mellitus)
- Are immunosuppressed (including immunosuppression caused by medications or by human immunodeficiency virus)
- Are or will be pregnant during the influenza season
- Are aged 6 months to 18 years and receiving long-term aspirin therapy and who therefore might be at risk for experiencing Reye syndrome after influenza virus infection
- Are residents of nursing homes and other chronic-care facilities
- Are American Indians/Alaska natives

- Are morbidly obese (body-mass index greater than 40)
- Are health care personnel
- Are household contacts and caregivers of children 5 years of age or younger and adults 50 years of age or older, with particular emphasis on vaccinating contacts       of children younger than 6 months of age
- Are household contacts and caregivers of persons with medical conditions that put them at higher risk for severe complications from influenza

In addition, promotion and support of pneumococcal polysaccharide vaccination among high-risk populations should be considered during the interpandemic period. Increased use of pneumococcal polysaccharide vaccine may decrease rates of secondary bacterial infections during a pandemic. The Illinois Department of Public Health will provide annual notification to the Illinois Department on Aging of the importance of pneumococcal vaccination.

**Goal 2: Decrease transmission of infection to those at highest risk for influenza mortality (provide indirect protection)**
Indirect protection is achieved by decreasing the spread of infection to those at high risk. Family members of older adults and persons with chronic illnesses are recommended for annual influenza vaccination in order to decrease disease in their high-risk contacts. Vaccinating health care providers and staff in institutional settings also can decrease transmission to persons at high risk. Vaccination of school-aged children has been recommended by the Advisory Committee on Immunization Practices as part of the routine pediatric schedule as a strategy to decrease transmission within a community. Collaboration within the community with schools, day cares and higher education institutions is critical to decrease transmission. The decision to dismiss students should be made locally and should balance the goal of reducing the number of people who become seriously ill or die from influenza with the goal of minimizing social disruption and safety risks to children sometimes associated with school dismissal.

**Goal 3: Maintain the ability to provide quality health care, implement pandemic response activities and maintain vital community services**
Protecting the health care workforce is essential to providing the quality of care that will decrease morbidity and mortality. This is particularly important at times of vaccine shortage when good clinical care will be the most important intervention to reduce influenza health impacts. Maintaining the capacity to implement pandemic response activities, for example, by protecting those in public health, vaccine production and administration; and preserving public safety (e.g., police and fire department services) also are high priorities.

**Goal 4: Maintain other important community services**
Achieving the pandemic influenza preparedness and response plan goals of decreasing social and economic impacts requires maintenance of important community services, such as utilities and transportation. Such decisions can best be made at state and local levels.

In order to maintain effective community services, the following prioritization schedule will be followed within Illinois, upon completed vaccine administration to those groups previously identified:

- Agencies involved in the Strategic National Stockpile Plan
- Agencies involved in this Pandemic Influenza Response Plan
- Agencies and sectors that fall within identified critical infrastructure/key resources central to maintaining continuity of operations

## Goal 5: Protect the susceptible population at large

Investigational New Drug (IND) Use: State and local health departments should be prepared to implement use of unlicensed vaccines under the FDA's IND provisions in a timely, effective manner. In the event of rapid pandemic spread and standard safety and efficacy testing is not complete, IND vaccine may be needed. Illinois would follow the provisions as stated by FDA.

Once the demand for vaccine for the prioritized groups has been met at the local level, programs and providers also should begin vaccinating everyone from 25 through 64 years of age. Current studies indicate that the risk for infection among persons age 65 or older is less than the risk for younger age groups. However, once vaccine demand among younger age groups has been met, programs and providers should offer vaccination to people 65 years of age or older.

## Vaccine Delivery Process for Illinois

The U.S. Centers for Disease Control and Prevention (CDC) will provide guidance to states and certain major U.S. cities (project areas) regarding procurement and delivery processes of pandemic vaccines and ancillary supplies. During 2009A(H1N1)pdm the federal government provided 2009A(H1N1)pdm vaccine and ancillary supplies at no cost to the states. In Illinois, IDPH, the Chicago Department of Public Health (CDPH), and other health care providers directed the distribution of pandemic vaccine and supplies. The CDC allocated the 2009A(H1N1)pdm vaccine and supplies utilizing a population-based formula. Illinois represents about 4.3 percent of the U.S. population. Chicago is about 1 percent with the rest of the state making up
3.3 percent. CDPH determined distribution within the city limits of Chicago. IDPH determined distribution for all areas of the state outside of Chicago.

A tiered approach will be used for the delivery of vaccine in Illinois, excluding Chicago. This approach is based on the 2009A(H1N1)pdm response activity. The following are the tiers to be used.

## Tier 1    Centralized Distribution

CDC will utilize a centralized distribution method much like that used for the Vaccines for Children (VFC) program and existing seasonal influenza vaccine distribution. CDC utilizes McKesson Specialty (one of the three largest pharmaceutical companies in the United States) for centralized distribution of vaccine through the VFC program.
During the 2009A(H1N1)pdm response, 2009A(H1N1)pdm vaccine and supplies were also distributed via this method to an estimated 90,000 delivery sites nationwide.

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020

Version 5.1

## Tier 2    Distribution via the IDPH Immunization Promotional Center (IPC)

IDPH will maintain its capacity to redistribute vaccine and supplies to providers in order to supplement any identified federal centralized system. The IDPH Immunization Promotional Center (IPC) has been in operation since 1994, and serves as a customer service and accountability center for the Illinois VFC program. The IPC served as an off-site warehouse and distribution center prior to 2008 and continues to maintain resources to re-establish distribution and support to vaccine providers on an ad hoc or emergency basis. The IPC also maintains cargo vans that can be used to transport vaccines and supplies to providers as needed.

## Tier 3    Distribution via the Strategic National Stockpile Plan

If Tier 3 is needed, the Strategic National Stockpile (SNS) Plan will be implemented. This plan consists of utilizing identified state partners. Under the SNS Plan and distribution mechanism, the Illinois Department of Transportation is the lead agency for transportation and the Illinois State Police provides security for delivery vehicles. The Illinois Department of Corrections and the Illinois National Guard provide back-up transportation and security. Illinois has identified three receiving, staging and shipping (RSS) sites strategically located within the state to receive federal assets, and a fourth to receive vaccines. The CDC has validated these sites. From one RSS site in the state, the designated state agencies will transport the medical materials to pre-identified Regional Distribution Centers (RDCs). At the RDCs, the material will be transferred to smaller vehicles, if needed, and deployed to the affected area. Each certified local health department and every participating hospital in the state has identified a primary and secondary "drop site" to receive emergency medical material.

## *Role and Responsibilities*

| Primary Agency | Role and Responsibilities |
|---|---|
| IDPH | Activate the PHEOC.

Coordinate Illinois' health and medical activities in preparedness, response and recovery from pandemic influenza.

Coordinate vaccine/antiviral delivery and analysis.

Coordinate the request, receipt, breakdown, and distribution of the SNS for Illinois. |
| **Support Agencies** | **Role and Responsibilities** |
| IEMA | Manage and coordinate the state's disaster response and recovery efforts.

Activate the SEOC, when required.

Coordinate requests for federal assistance with FEMA Region V. |

|  | Provide, direct and coordinate logistical/resource operations with the assistance of the designated support agencies. Allocate state response resources effectively and according to need; monitor their location when in use. |
| --- | --- |
| **Support Agencies** | **• Role and Responsibilities** |
| IEMA | Request activation of the Illinois Law Enforcement Alarm System (ILEAS) to support law enforcement missions of local law enforcement agencies.<br><br>Request activation of the Mutual Aid Box Alarm System (MABAS) to support fire service missions of local fire service agencies. |
| AG | Provide legal support and representation to state employees regarding compensation and liability issues; provide legal opinions and other support to local jurisdictions/state's attorneys and county governments. |
| IDOC | Provide inmate labor to load and unload trucks.<br><br>Provide trucks (with drivers) to haul supplies. |
| ISP | Provide and/or coordinate traffic control and expedited routing for supply missions or personnel movements.<br><br>Provide personnel and equipment to protect life and property and to enforce the laws of Illinois.<br><br>Coordinate public safety with other state and local agencies during a disaster, including the dissemination of information and requests for assistance.<br><br>Assist and support other state and local agencies, where possible, and coordinate public safety services, as needed. |
| IDMA | Assist with the provision of vehicles, aircraft and operators to move personnel, equipment and supplies, as requested.<br><br>Provide logistical support for distribution of disaster relief supplies and equipment. |
| IDOT | Provide personnel and equipment for the transportation or relocation of resources, which includes personnel, supplies and equipment.<br><br>Provide space, as available, at IDOT storage yards and other facilities, to serve as transportation resource staging areas. |
| IDCMS | Assist with procurement of antivirals, PPE or other equipment needed for the SNS mission. |
| ARC | Identify shelter and mass care locations that have been established and determine the capacity of such shelters to shelter and care for displaced residents.<br><br>Support the management and coordination of sheltering, feeding, bulk distribution of emergency relief items, and Disaster Welfare |

Illinois Pandemic Influenza Preparedness and Response Plan
March 2020                                                      Version 5.1

| | Inquiry services to the disaster affected population. |
|---|---|
| | Coordinate, in accordance with its agreements with other organizations, the provision of relief efforts by all voluntary agencies actively engaged in providing assistance to disaster victims. |

## Authorities

Illinois Emergency Management Agency Act, 20 ILCS 5/3305

Robert T. Stafford Disaster and Emergency Assistance Act, as amended. Illinois

Public Readiness and Emergency Preparedness Act

## References

Illinois Emergency Operations Plan

IDPH Emergency Response Plan

Illinois Strategic National Stockpile Plan

USHHS Pandemic Influenza Plan

## 4.0   Restriction of Movement or Activities to Control Disease Spread

**Primary Agency:**      IDPH
**Support Agencies:**    Governor's Office, AG, IEMA, ISP and IDCMS

### *Purpose*

This annex outlines the state's authorities and capabilities to impose restrictions on the movements or activities of persons for the purpose of preventing or controlling the spread of a dangerous infectious disease.

### *Scope*

The restriction of movement and/or activities involves the ability of state and local jurisdictions to be prepared *legally, procedurally* and *materially* to contain and monitor: exposed individuals or those suspected of being exposed (term: quarantine); infected individuals (term: isolation); defined groups or locations, such as individual schools, workplaces, malls and public transit systems, as determined on a case by case basis (term: focused measures to increase social distance); and entire communities, ranging from voluntary widespread cancellation of most activities (term: snow days), eliminating large gatherings of people, such as sporting events, shutting down other places where people congregate, such as schools and places of employment, or enforced restriction of movement into and out of defined areas.

### *Key Terms*

**Isolation:** Isolation is the separation of a person or a group of persons infected or believed to be infected with a contagious disease to prevent the spread of infection. Ill persons are usually isolated in a hospital, but they also may be isolated at home or in a designated community-based facility, depending on their medical needs.

**Quarantine:** Quarantine is the separation and restriction of movement or activities of persons who are not ill, but who are believed to have been exposed to infection, for the purpose of preventing transmission of diseases. Modes of application include:

- Persons are usually quarantined in their homes, but they also may be quarantined in community-based facilities.

- Quarantine can be applied to an individual or to a group of persons who are exposed at a large public gathering or to persons believed exposed on a conveyance during international travel.

- Quarantine also can be applied on a wider population or geographic-level basis (e.g., snow days) with the voluntary or enforced prohibition of movements or activities. This measure is usually not *technically* considered quarantine because it is not *directly* linked to a known or highly suspect exposure (at best, the basis might be some degree of likelihood of exposure due to circumstantial or indirect evidence, such as high disease prevalence in a particular town or neighborhood ). These options are described and compared in the attachment following this annex (Attachment 8-1).

- Quarantine (a period of isolation to prevent disease spread) is *not* effective in controlling multiple influenza outbreaks in large, immunologically naïve populations, because the disease spreads too rapidly to identify and to control chains of transmission. Even if quarantine were *somewhat* effective in controlling influenza in large populations, it would not be feasible to implement and enforce with available resources, and would damage the economy by reducing the workforce. Most people will voluntarily quarantine themselves in their home.

- Quarantine may be of limited use in slowing the spread of disease during the *earliest* stages of influenza outbreaks, *only if special circumstances apply*. For example, were a case of influenza-like illness to be identified in an isolated group, such as the passengers and crew of an airplane, public health officials could prevent or slow the spread of disease to other groups by:

  - Quarantining all passengers and crew members for several days
  - Transferring all who become ill to isolation wards for treatment
  - Treating all influenza-like illness in the wider community with suspicion

The probability of this scenario is low in all circumstances, but diminishes over time as an influenza pandemic spreads. Quarantine should not be confused with methods used to prevent outbreaks of illness in health care facilities, such as patient segregation, or with methods used to slow disease spread in large populations, such as school closures.

## *Planning Assumptions and Considerations Part 1: Preparedness*

**Legal preparedness** for movement restriction measures includes:

a. Adequate statutory authority for all movement restrictions and monitoring measures countenanced in response plans along with the full support of this authority via administrative rules, when appropriate.

b. Statutory provisions addressing compensation and job security risks and issues that those subjected to movement restriction measures could potentially face.

c. An understanding of what the federal government can do under sections 361 (impose and enforce measures) and 311 (cooperate with and aid state and local jurisdictions that impose and enforce measures) of the Public Health Service Act (42 USC 264).

**Procedural preparedness** for movement restriction measures includes:

a. Protocols for imposing, maintaining (including enforcing when applicable), monitoring and terminating each type of movement control provided for by law and countenanced in response plans; drafts of written orders, notices, letters, checklists and other documents supporting these activities, when applicable.

b. Protocols for coordinating state government-imposed movement restriction measures with those either currently in force or being contemplated by local subdivisions.

c. Procedures for providing medical care, food needs and other essential services for those affected by state-government imposed movement restriction measures; supporting local governments efforts to provide these things.

d. Pre-scripted messages explaining the criteria, purpose, justification, methods, and expected duration of movement restriction measures countenanced in response plans.

e. Protocols and/or agreements supporting statutory provisions addressing compensation and job security risks and issues.

**Material preparedness** for movement restriction measures includes:

a. Isolation and quarantine facilities may range from identification of owned/leased facilities to written agreements for the use of others' facilities to specifications for what types of facilities would be most appropriate.

b. Food and other basic necessities (state or local government may not necessarily directly supply these things, but whichever entity is imposing the restriction has a responsibility to ensure necessities are provided, and they are safe, are available in sufficient quantities and are timely.

c. Quantities of medical supplies adequate to support those in home or facility isolation or quarantine, including antibiotics, masks and other medical consumables, antivirals, thermometers and other symptom monitoring supplies/equipment.

d. Personal protective and communication equipment for workers placed at risk because their job duties require them to impose, maintain/enforce, monitor and/or terminate movement restriction measures.

e. Phone lines, facilities and adequate paid and/or volunteer staff to operate influenza hotlines to provide advice on whether to stay home or to seek medical care, to answer questions about pandemic influenza and to monitor trends, such as rumors and common misperceptions.

f. Basic internal infrastructure components necessary to support the selection and imposition of restrictions on activities and/or movements include:

   o Response thresholds for implementation of different containment measures;
   o communication strategies;
   o logistics (supplies, security, staffing, essential services for persons in isolation and quarantine);
   o protocols for case and contact management; and
   o databases for case and contact management.

## *Planning Assumptions and Considerations Part 2: Response*

Decisions to invoke quarantine should be made only after careful consideration of three major questions examined within the specific context of a particular outbreak:

*Do public health and medical analyses warrant the imposition of large-scale quarantine?*

*Are the implementation and maintenance of large-scale quarantine feasible?*

Illinois Pandemic Influenza Preparedness and Response Plan                Version 5.1
March 2020

*Do the potential benefits of large-scale quarantine outweigh the possible adverse consequences?*

Each of these considerations is examined in more depth below.

- Decision makers must consider whether implementing movement and/or activity restrictions at the time of discovery of disease outbreak has a reasonable scientific chance of substantially diminishing the spread of disease.

  Questions officials should answer when evaluating movement and activity restriction options include:
  a.    What is the cause? (infectious agent)
  b.    How communicable is it? (transmissibility)
  c.    How is it transmitted? (mode of transmission)
  d.    When and for how long is it transmitted? (infectious period)
  e.    How long is its incubation period?
  f.    Who is susceptible?
  g.    Who is especially at risk of severe illness?

- Decision makers must consider whether movement and activity restrictions with a reasonable scientific basis are logistically feasible (this consideration applies to local, state and federal decision makers).
  a.    Is there a plausible way to determine who should be subjected to movement and/or activity restrictions?
  b.    Are resources available to enforce the restrictions?
  c.    Can the restricted group be confined for the duration during which they could transmit the disease?

- Even when the imposition of movement or activity restrictions is scientifically appropriate and logistically feasible, decision makers must consider whether the potential benefits of quarantine outweigh the possible adverse consequences. The following is by no means an exhaustive list of things to be considered:
  a.    What are the health risks to those quarantined?
  b.    What are the consequences if the public declines to obey quarantine orders?
  c.    What are the consequences of restricting commerce and transportation to and from the quarantine area?

## *Concept of Operations*

The movement and activity restriction options available to decision makers leading the response to an influenza pandemic depend upon: 1) the legal authority to take certain actions; and 2) the capabilities to support the taking of those actions.

Pertinent legal authorities are identified and described below. The capabilities to carry out various courses of action based on these authorities are established throughout this plan and the other IDPH and Illinois emergency response plans listed in the concept of operations section of this plan.

- **Track and contain disease through case investigation and implementation of control measures**

  Section 2 of the Illinois Department of Public Health Act (20 ILCS 2305/2) provides that IDPH is required to investigate the causes of and take means to restrict and suppress dangerously contagious or infectious diseases, especially when existing in epidemic form (20 ILCS 2305/2(a)). Whenever a dangerously contagious or infectious disease becomes, or threatens to become epidemic, in any locality, and the local board of health or local authorities neglect or refuse to act with sufficient promptness or efficiency, IDPH may enforce such measures as it deems necessary to protect the public health. IDPH has broad rulemaking authority for the preservation and improvement of the public health (20 ILCS 2305/2(a)), and all local boards of health, health authorities and officer, police officers, sheriffs, and other officers or employees of the state or any locality are required to enforce such rules and regulations so adopted (20 ILCS 2305/2(a)).

  IDPH has adopted the Control of Communicable Diseases Code (77 Ill. Adm. Code 690.100 et seq.), which requires that reporting entities report diseases and conditions to the local health departments who, in turn, report the same to IDPH. The Control of Communicable Diseases Code additionally sets out the appropriate control measures to be taken with respect to controlling cases and contacts of dangerously contagious or infectious diseases listed therein. Subpart H of the Control of Communicable Diseases Code outlines the procedures for ordering and implementation of public health measures, including, but not limited to, isolation, quarantine and closure.

  With regard to local public health agencies, the authority to control communicable diseases is stated broadly in their respective enabling statutes. (See 55 ILCS 5/5- 20001 et seq.; 55 ILCS 5/5-25001 et seq.; 65 ILCS 5/11-20-5; 65 ILCS 5/11-16-1; 65 ILCS 5/11-17-1 et seq.; 70 ILCS 905/0.01 et seq.).

- **Gain access to and utilize facilities and property**

  Upon the declaration of a disaster pursuant to Section 7 of the IEMA Act (20 ILCS 3305/7), the governor may exercise, among other things, the following emergency powers: recommend the evacuation of all or part of the population from any stricken or threatened area within the state if the governor deems this action necessary (20 ILCS 3305/7(a)(6)); prescribe routes, modes of transportation, and destinations in connection with evacuation (20 ILCS 3305/7(a)(7)); and control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein (20 ILCS 3305/7(a)(8)).

- **Appropriate private property for public use**

  Upon the declaration of a disaster pursuant to Section 7 of the IEMA Act (20 ILCS 3305/7), the governor may, on behalf of the state, take possession of, and acquire full title or a lesser specified interest in, any personal property as may be necessary to accomplish the objectives set forth in Section 2 of the act, including airplanes, automobiles, trucks, trailers, buses and other vehicles; coal, oils, gasoline and other fuels and means of propulsion; explosives, materials,

equipment and supplies; animals and livestock; feed and seed; food and provisions for humans and animals; clothing and bedding; and medicines and medical and surgical supplies; and to take possession of and, for a limited period of time, occupy and use any real estate necessary to accomplish those objectives; but only upon the undertaking by the state to pay just compensation as provided in the act. (20 ILCS 3305/7(a)(4)). Subsection 7(a)(4) sets forth a procedure for providing for just compensation.

Additionally, IDPH is authorized to order a person to be quarantined or isolated or a place to be closed and made off limits to the public to prevent the probable spread of a dangerously contagious or infectious disease until such time as the condition may be corrected or the danger to the public health eliminated or reduced in such a manner that no substantial danger to the public's health any longer exists (20 ILCS 2305/2(b)).

- **Impose isolation, quarantine, and closure**
  IDPH has supreme authority in matters of quarantine, and may declare and enforce quarantine when none exists, and may modify or relax quarantine when it has been established (20 ILCS 2305/2). IDPH can issue immediate orders, without prior consent or court order, for isolation, quarantine and closure of facilities when necessary to protect the public from a dangerously contagious or infectious disease. Within 48 hours, IDPH must gain consent of the person or owner of the place or request a court order.

IDPH is authorized to order a person to be quarantined or isolated or a place to be closed and made off limits to the public to prevent the probable spread of a dangerously contagious or infectious disease until such time as the condition may be corrected or the danger to the public health eliminated or reduced in such a manner that no substantial danger to the public's health any longer exists (20 ILCS 2305/2(b)). No person may be ordered to be quarantined or isolated and no place may be ordered to be closed and made off limits to the public, however, except with the consent of the person or the owner of the place or upon the order of a court of competent jurisdiction (20 ILCS 2305/2(c)). In order to obtain a court order, IDPH must prove, by clear and convincing evidence, that the public's health and welfare are significantly endangered and all other reasonable means of correcting the problem have been exhausted and no less restrictive alternative exists (20 ILCS 2305/2(c)). Subpart H of the Control of Communicable Diseases Code outlines the procedures for ordering and implementation of public health measures including, but not limited to, isolation, quarantine and closure.  IDPH has explicitly delegated its authority to order isolation, quarantine and closure to certified local health departments.

As previously noted, with regard to local public health agencies, the authority to control communicable diseases is stated broadly in their respective enabling statutes. (See 55 ILCS 5/5-20001 et seq.; 55 ILCS 5/5-25001 et seq.; 65 ILCS 5/11- 20-5; 65 ILCS 5/11-16-1; 65 ILCS 5/11-17-1 et seq.; 70 ILCS 905/0.01 et seq.). The following statutes specifically reference quarantine at the local level: 65 ILCS 5/7- 4-1; 55 ILCS 5/5-20001).

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

- **Use other means to restrict movement or activities**

  Upon the declaration of a disaster pursuant to Section 7 of the IEMA Act (20 ILCS 3305/7), the governor may, among other things: recommend the evacuation of all or part of the population from any stricken or threatened area within the state if the governor deems this action necessary (20 ILCS 3305/7(a)(6)); prescribe routes, modes of transportation, and destinations in connection with evacuation (20 ILCS 3305/7(a)(7)); and control ingress and egress to and from a disaster area, the movement of persons within the area and the occupancy of premises therein (20 ILCS 3305/7(a)(8)).

## Role and Responsibilities

| Primary Agency | Role and Responsibilities |
|---|---|
| IDPH | Coordinate and make recommendations for disease containment.<br><br>Coordinate public health and medical emergency and risk communication messages.<br><br>Implement disease control measures necessary to protect the public's health, including but not limited to the issuance of orders for isolation, quarantine, closure, the administrations of vaccines and/or medications, medical evaluations, and specimen collection. |
| **Support Agencies** | **Role and Responsibilities** |
| Office of the Governor | Exercise police powers to make, amend, and rescind orders and regulations under certain emergency conditions. |
| AG | Provide legal support and representation to state agencies and to state employees on matters related to disease containment, isolation and quarantine, and in seeking related court orders.<br><br>Provide legal support and representation on issues pertaining to insurance, workers compensation, liability and compensation issues for state agency employees.<br><br>Provide legal opinions and other support to local jurisdictions/ state's attorneys county governments, when feasible and warranted. |
| IEMA | Coordinate, integrate, and manage overall state efforts involving the collection, analysis, planning, reporting, and displaying of information.<br><br>Provide, direct and coordinate logistical/resource operations with the assistance of the designated support agencies. Allocate state response resources effectively and according to need; monitor their location when in use.<br><br>Develop scripted emergency public information messages for broadcast over Emergency Alert System (EAS) following disaster.<br><br>Coordinate state monitoring and enforcement of community-based |

| Support Agencies | Role and Responsibilities |
|---|---|
| | isolation and quarantine orders. |
| | Maintain critical infrastructure and develop and implement contingency plans in the absence or failure of such critical infrastructure. |
| | Coordinate high volume public information hotlines and a mechanism for tracking call types for rumor control purposes. |
| | Coordinate the provision of basic needs (e.g., food, laundry, medical care, heat/cooling) for those sheltered, homebound, and/or quarantined/isolated. |
| | Request activation of the Illinois Law Enforcement Alarm System (ILEAS) to support missions of local law enforcement agencies. |
| | Request activation of the Mutual Aid Box Alarm System (MABAS) to support fire service missions of local fire service agencies. |
| ISP | Provide personnel and equipment to protect life and property and to enforce the laws of the state. |
| | Coordinate all public safety with other state and local agencies during a disaster, including the dissemination of information and requests for assistance. |
| | Assist and support other state and local agencies where possible, and coordinate public safety services, as needed. |
| IDCMS | Involve/consult the director of IDCMS before closure of a state facility. |
| | Provide security guards for many state facilities to enforce quarantine. |
| IDMA | Provide back-up support to the ISP for security operations. |

## References

20ILCS 2305/2 IDPH Act.

77 Ill. Adm Code 690.100 et seq. Control of Communicable Disease Code. ILCS

330517 IEMA Act.

Barbera, J.; Macintyre, A.; Gostin, L.; Inglesby, T.; O'Toole, T.; DeAtley, C.; Tonat, K.; and Layton, M. Large-scale quarantine following biological terrorism in the United States: scientific examination, logistic and legal limits, and possible consequences. JAMA. 2001 Dec 5;286(21):2711-7.

Woodfill, C.; Cahill, C.; and Rosenberg, J. Infection control in healthcare settings and in the community (presentation).   California   Department   of   Health   Services.   Accessed   11/17/05   at www.idready.org/webcast/sum04_cider/phinfctrl/phinfctrl_woodfill_cahill_rosenberg.ppt

Illinois Public Readiness and Emergency Preparedness Act

Illinois Pandemic Influenza Preparedness and Response Plan
May 2014

Version 5.00

# Community Containment Strategies when Individual Contact Management Restrictions are Insufficient to Prevent Further Spread

| | Focused Measures to Increase Social Distance | Community-Wide Measures to Increase Social Distance | Widespread Community Quarantine |
|---|---|---|---|
| Definition | Applied to specific groups (e.g., closure of schools or office buildings, suspension of public markets) | Applied to entire community or region (e.g. snowday, closure of schools and worksites, scaling back of public transport) | Legally enforceable order that restricts movement into or out of the area of quarantine of a large group of people or community |
| Application (groups/settings) | 1 Transmission is believed to have occurred 2 Linkage between cases is unclear | 1 Extensive ongoing transmission 2 High numbers of cases without established epi-links | 1 Extensive ongoing transmission 2 High numbers of cases without established epi-links |
| Benefits | Less resources needed for individual contact management May reduce transmission without community-wide quarantine | Less resources needed for individual contact management May reduce transmission without community-wide quarantine | Less resources needed for individual contact management |
| Challenges | Implementation Relies on self assessment and self-reporting | Implementation Relies on self assessment and self-reporting | Implementation Relies on self assessment and self-reporting |

Adapted from CDC Public Health Guidance for Community-Level Preparedness and Response to SARS

Illinois Pandemic Influenza Preparedness and Response Plan                Version 5.1
March 2020

## 5.0 Emergency and Risk Communication

**Primary Agency:**     Governor's Office
**Support Agencies:** Department of Central Management Services (IDCMS) (Office of
                    Communication and Information),
                    IDCMS (Internet and Graphic Arts) IEMA, IDPH and ARC

### *Purpose*

Effective emergency and risk communications is essential to supporting the public health
response and to help build public trust, confidence and cooperation.
This is accomplished by providing timely, accurate, consistent and appropriate information to
the general public, news media, health care providers and other key partners during a
pandemic influenza outbreak.

### *Planning Assumptions and Considerations*

- An influenza pandemic will generate intense and sustained demand for information from
  the public, health care providers, policy makers and the news media.

- Informing health care providers and the public about influenza disease and the course of
  the pandemic, the ability to treat mild illness at home and the availability of vaccine will
  be important to ensure appropriate use of medical resources and avoid possible panic or
  overwhelming of vaccine delivery sites.

- Effective communication with community leaders and the news media also is
  important to maintain public awareness, avoid social disruption and provide
  information on evolving pandemic response activities. State spokespersons need to
  acknowledge the anxiety, distress and grief people will experience during a major
  public health crisis, such as a pandemic.

- Communication efforts will be directed to rapid sharing of appropriate, up-to- date
  information on the progression of the outbreak, the possible disruptions to routines and
  events, and contingency measures.

- The public must be provided as much information as possible to help them understand
  uncertainty is part of the process and answers may change as new information and
  science becomes available.

- Emergency communication is approved by the governor or his designee.

- In the event of an emergency, emergency communication systems will be used as
  described in the Emergency Operations Plan.

- All government and non-government resources will utilize a single source of
  information on the state's position regarding the emergency.

- Federal partners at CDC and USHHS will provide regular updates regarding the
  pandemic.

- Local information will be provided to IDPH through existing reporting systems from
  local sources, such as local health departments, hospitals, physician's

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

offices and schools.

- Coordination of release of information among federal, state and local health officials is critical to help avoid confusion that can undermine public trust, raise fear and anxiety, and impede response measures. The state will utilize a Joint Information Center that will communicate directly with the state's Joint Operation Center.

### *Concept of Operations*

### **Preparedness**

The state will provide needed health/risk information to the public and key partners for use during a pandemic influenza event to provide the basis for a well-coordinated and consistent communication strategy. This objective will be achieved by conducting the following activities:

a.   Complete a plan for crisis and emergency risk communication (CERC) and information dissemination to educate the news media, public, partners and stakeholders regarding risks associated with the real or apparent threat and an effective response.

b.   Conduct trainings, drills, exercises and other collaborative preparations to assess communications capacity, needs and readiness. Ensure channels of communication are in place to rapidly share appropriate information with the public, partners and stakeholders.

c.   Complete a plan for activities to meet the specific needs of functional needs populations that include, but are not limited to, people with disabilities, people with serious mental illness, minority groups, the non-English speaking, homeless people, children and the elderly.

Other preparedness activities conducted by the Office of the Governor, supported by IDPH, IEMA and IDCMS, include:

a.   Develop clear, accessible and understandable communication resources on pandemic influenza, using existing CDC materials as a starting point. Ensure the CDC or WHO information is accurate before preparing the resources. The information would be posted on state and local websites and be available to the general public in hard copy.

b.   Provide public education campaigns and materials about pandemic flu and ways people can protect themselves, their families and others, including information on self-care and psychological well-being.

c.   Develop emergency alert system messages and basic news media materials to serve as background documents prior to a pandemic influenza outbreak.

d.   Identify and train state government spokespersons on public health crisis response and risk communication principles to effectively communicate helpful, informative messages in a timely manner during a pandemic influenza outbreak.

e.   Implement and maintain a general informational hotline with capacity to meet

anticipated peak call volume (CDC recommends enough lines to simultaneously handle 1 percent of a jurisdictions population), in collaboration with the CDC- INFO telephone line and other information lines (e.g., Illinois Poison Center); and develop a means of tracking and categorizing types of calls to identify trends, rumors, misconceptions and inaccurate information.

## Response

### Flow of Public Information

The Office of the Governor maintains a staff experienced in news dissemination and media relations, and works in collaboration with the IDCMS Office of Communications and Information. The governor's office will receive information from many state agencies regarding their response activities through the SEOC.

Media briefings will be conducted regularly at the Joint Information Center (JIC) to provide updates and to offer reporters opportunities to ask questions. The governor may choose to hold media briefings in other locations, such as the state Capitol, SEOC or areas particularly hard hit by the pandemic. In addition, either accompanying the governor or at additional briefings, other state pandemic subject-matter experts (e.g., the state public health director, the IDPH infectious diseases physician or the IDPH state epidemiologist) will be made available to the media.

The governor's communications staff will oversee the issuance of news releases, whether from the SEOC or the JIC, and they will be distributed by IDCMS (Illinois Information Services).                IEMA staff at the JIC will ensure that the news releases are shared with the other organizations at the JIC, with the county EOCs and local health departments.

Coordination of the release of information by the state, health care providers, contiguous states, volunteer agencies providing disaster relief, the federal government, and affected local governments will be critical to building public trust and confidence.

The state will disseminate timely, accurate and consistent information to local health departments and health care providers on treatment and care of patients, vaccine prioritization and use, use of antiviral medications, infection control practices, isolation and quarantine procedures, clinical and laboratory diagnostics, travel control authority, stigmatization management and legal issues related to the pandemic.

### Rumor Control

When widespread rumors, inaccuracies or misperceptions are identified, the JIC will be consulted so correct information can be promptly communicated to the public through the media. These miscommunications may be identified in media broadcasts, in print media or through public inquiries.

If it is determined to be necessary, IEMA will establish a rumor control hotline telephone system in collaboration with IDCMS. The hotline staff will be prepared to answer questions from the public dealing with basic facts regarding health and medical considerations during a pandemic influenza event. The hotline staff also

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

will be able to provide numbers or connections to other telephone lines that have been established. Questions that cannot be answered by hotline staff will be recorded and provided to appropriate organizations or subject matter experts.

Special public information needs may be identified through the hotline calls.

The state will utilize state websites to provide updates on the pandemic outbreak, frequently asked questions, disease control and other public statements.

Communication between federal, state and local response agencies will be conducted through appropriate and available secure data communication exchange systems.

### *Role and Responsibilities*

| Primary Agency | Role and Responsibility |
|---|---|
| Office of the Governor | Coordinate the dissemination of news releases and public information to ensure consistency; oversee scheduling and conducting of news conferences/media briefings to provide regular updates on the pandemic influenza threat/outbreak, and to address rumors and false reports. Coordinate with state agencies to ensure media messages are consistent. Establish procedures to expedite the review and approval of pandemic influenza materials. |
| Support Agencies | Roles and Responsibilities |

Illinois Pandemic Influenza Preparedness and Response Plan           Version 5.1
March 2020

| Support Agencies | Roles and Responsibilities |
|---|---|
| IEMA | Assess and monitor readiness to meet communications needs.<br><br>Coordinate the state's disaster communications system.<br><br>Maintain a 24-hour communications center for communicating with emergency response personnel from all agencies and organizations.<br><br>Coordinate, integrate and manage overall state efforts involving the collection, analysis, planning, reporting and displaying of information.<br><br>Activate the SEOC, when required.<br><br>Develop scripted emergency public information messages for broadcast over Emergency Alert System (EAS) following disaster.<br><br>Coordinate a high volume public information hotline and create a mechanism for tracking call types for rumor control purposes. Train hotline staff in advance.<br><br>Relay key communications to and from the private sector (e.g., private schools; businesses; nonprofit partners; local and regional police, fire and emergency offices; city public affairs offices; and communication staff at congressional and other government offices) via local emergency management agencies.<br><br>Collaborate with professional and civic organizations to raise awareness.<br><br>Ensure the availability of communication products in multiple languages. This could be accomplished through existing state translation resources at other agencies (e.g., IDHS), translation resources via the state's university system or through the use or adaptation of translated materials available through the CDC Office of Communications. |

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

| Support Agencies | Roles and Responsibilities |
|---|---|
| IDCMS | Assist the governor's office in handling news media inquiries and distributing news releases. |
| | Review and enhance media lists for rapid dissemination of information. |
| | Identify and train lead subject-specific spokespersons and media spokespersons in crisis and risk communication techniques to effectively communicate helpful, informative messages. |
| | Provide graphic artists to deal with pandemic influenza graphic needs (e.g., fact sheets, brochures, pamphlets and other education materials). |
| | Establish phone banks for disaster hotlines. |
| | Coordinate/support the establishment and maintenance of Web pages to communicate disaster information. |
| Other State Agencies | Develop key messages and materials, news releases, strategies and guidelines for communication through all pandemic phases, including communication with community-based providers, the public and the news media. |
| ARC | Educate the public and disseminate information from appropriate government sources about the nature and impact of the event, including preparedness measures, safety precautions, recommended actions and sources of assistance. |

**Authorities**

National Response Framework National

Incident Management System

**References**

CDC Risk Communication documentation CDC

Medical and Public Health Information CDC

and other federal resources

Illinois Pandemic Influenza Preparedness and Response Plan                Version 5.1
March 2020

## 6.0   Fatality Management

**Primary Agency:**   IDPH
**Support Agency:**   IEMA, IDOT, IDCMS, IDMA, IDOC, IDHS, IEPA, ISP, American
Red Cross (ARC)

### *Purpose*

This annex presents recommended planning guidelines for response to mass fatalities incidents. A mass fatalities incident is any situation in which there are more fatalities than can be handled in a timely and professional fashion using regularly available local resources to address a single incident or multiple incidents. This section outlines the procedures state will implement to address the collection, handling, storage, and the disposal of mass fatalities.

### *Planning Assumptions and Considerations*

- The 1918 Spanish flu pandemic killed approximately 40 million people. It is estimated that in the United States a "medium-level" pandemic could cause 89,000 to 207,000 deaths. Based on current modeling from CDC's FluAid 2.0, projections of statewide fatalities range from 7,907 to 47,462 based on low-to- high severity flu deaths.

- The establishment of a unified command structure during the initial stages of the incident will coordinate all responding organizations and promote a more expedient and efficient conclusion to the incident.

- All agencies or individuals involved in responding to an incident should be NIMS compliant.

- The success or failure to provide adequate response to a mass fatality incident is dependent upon recognition of the needs and effective incident command. The sheer magnitude of a major incident necessitates establishment of effective command systems, including delegating authority for management functions at the site(s). The concept of operations should provide for implementation of incident management functions and personnel to be employed during the response phase of the plan.

- Initially, in the event of an influenza outbreak, the responsibility of fatality management will reside at the local level. Planning and response may require the participation and cooperation of local agencies, such as, but not limited to:
    1. County coroners/medical examiners
    2. Funeral directors
    3. Municipal officials
    4. Emergency management agencies
    5. Fire departments
    6. Emergency medical services
    7. Rescue services
    8. Hospitals

9.  Municipal and state law enforcement agencies
10. Ancillary volunteer agencies (e.g., American Red Cross)

- As the outbreak escalates to the pandemic level, local officials will call upon the state agencies to provide resources and assistance.

- At such time that the number of fatalities exceeds the capabilities and capacity of state agency response, Illinois will request federal mortuary response assistance.

- Agencies assigned primary and support roles and responsibilities for fatality management will develop agency-specific policies and procedures to fulfill the objectives identified in this plan.

- The state will utilize the Illinois Disaster Management System for preparedness, response and recovery operations related to fatality management.

- The governor will exercise all authorities available under the Illinois Emergency Management Agency Act [20 ILCS 3305] related to fatality management.

- The state public health director will exercise all authorities available under the Department of Public Health Powers and Duties Law of the Civil Administrative Code of Illinois [20 ILCS 2305] with regard to fatality management.

## *Concept of Operations*

## **Preparedness**

A mass fatalities incident involves many tasks and normally will become very complex. No single response agency can handle the breadth and depth of tasks to be accomplished. The need for planning teamwork and an appreciation of the roles of other agencies is crucial to effective working relationships, both during the planning before the incident occurs and during the incident itself. The establishment of a unified command structure during the initial stages of the incident will coordinate all responding organizations and promote a more expedient and efficient conclusion to the incident.

In a disaster situation, identification of the dead is a critical issue. The ultimate responsibility for the collection, identification, storage and release of deceased victims will lie with the coroner (or medical examiner), as per the regulations and rules of the state.

Each response organization should have its own specific standard operating procedures or guidelines for dealing with a mass fatalities incident that are an annex to the county Emergency Operations Plan (EOP). This part of the EOP should be coordinated with other agencies likely to have a role in a mass fatality incident to facilitate the response and avoid duplication or omission of functions. All response organizations' plans should be integrated into the county EOP.

Mutual aid agreements should be completed in advance so all parties concerned are fully aware of the authorities, responsibilities, resources and limitations of other

responding organizations. It is highly recommended that such agreements be developed in writing for providing additional resources. The Illinois Emergency Management Agency (IEMA) may be referenced in the county EOP and other planning documents as the point of coordination for state and federal resources.

The planning process and the plan itself are not static, but dynamic. No plan is ever final because personnel changes, exercising, operations and re-evaluation should result in appropriate revisions.

An essential part of the county EOP should be a resource listing. The list will contain all the resources that may be needed for a mass casualty event, location of the resource, method of delivery to the scene, a point of contact and a 24-hour phone number, if available. This list should be reviewed on an annual basis to assure accuracy and currency.

To keep mass fatality plans practical and efficient, drills and exercises should be conducted routinely. Individual response units should conduct operational drills within their response area, while functional and full-scale exercises should be conducted to assure plans, agencies and individuals are briefed, exercised and reviewed in a timely manner. Changes to the plans are based on drill and exercise comments. All hazard scenarios can include these elements.

## Response

### Communications
Redundant communications links between the incident command post, the incident site and the staging areas, media area, and the county and/or municipal emergency operations center (EOC) should be established and maintained throughout the incident. Cellular phones, high frequency (HF) radios and "hard wire" phones installed by a phone company have all been used in mass fatality incidents.

### Temporary Morgues
In a pandemic influenza outbreak, once local capabilities are exceeded, the state will assist local government in securing resources and assist with the establishment of temporary morgues.

A temporary morgue should be established after determining that the expected number of cases will exceed the capacity of normal operations. Upon assessment by IEMA, and in consultation with DMORT, the coroner/medical examiner will determine the possible need for a temporary morgue. A recommendation will be made to the coroner or medical examiner to seek approval for receiving federal assistance in the identification and mortuary service effort, including site location for a temporary morgue.

The temporary morgue should be located close to the area where large numbers of deceased are located and should have:

    a.    Showers
    b.    Hot and cold water

    c.      Heat or air conditioning (depending on climate)
    d.      Electricity - adequate outlets for computers, faxes, printers
    e.      Floor drainage
    f.      Ventilation
    g.      Restrooms
    h.      Parking areas
    i.      Communication capabilities
    j.      Rest areas

The morgue site should be guarded during use and fenced in or locked for security of remains and personal property. It should be removed from public view, not be a school or other sites of local potential for long-term sensitivity and have sufficient space for body identification procedures. It also should be capable of being partitioned for separation of functions, such as body handling, property inspection, X-ray, autopsy, records maintenance and interviewing. Access to multiple telephones is a vital consideration for permitting temporary morgue personnel to acquire victim information.

Potential temporary morgue sites can be in existing mortuaries, hangers, large garages, National Guard armories or other areas without wooden floors. After a morgue site is established, coordinators should obtain refrigerated trailers, as necessary. The trailers can be moved to whatever location is directed by the coroner. If refrigerated trailers are not available, the coroner should arrange for railroad refrigeration cars, vans or other cold storage to aid in the preservation of bodies. The functions carried out at each morgue site will be determined by the circumstance. (In the planning process, it should be understood whether the coroner or the county is responsible to obtain this type of equipment.) Careful consideration should be given to the selection of a morgue site. The quality of the facility is more important than having it located in close proximity to the incident site.

Consideration should be given to assigning a person to each body or body part. This person will become the tracker for that body, accompanying the body through the identification process and being accountable for appropriate paperwork. This technique has been successfully used in several recent mass fatality incidents.
However, exceptional care should be exercised in selecting those to perform this task. Relatively few people have been exposed to dramatically mutilated bodies (e.g., at an airplane crash) and many will be unable to handle the psychological aspect of the problem. Funeral directors who have expertise in handling family members or others who would not be overly stressed by this task should be considered. No one person should have a prolonged assignment at this task.

**Documentation**

Documentation refers to maintaining timely and accurate records concerning personnel involved and expenditures of time and money.

Record all incoming personnel, equipment and time of arrival. Issue identification and a task description to people reporting to the staging area(s). As noted, preparing a method of identification before an incident will save time and help reduce confusion at the scene. Document all expenditures, ordered goods, services or equipment, to include the requestor, arrival and departure times.

Illinois Pandemic Influenza Preparedness and Response Plan                   Version 5.1
March 2020

Documentation is essential for:

    a.    Management of the crime scene
    b.    Effective handling of tasks during the incident
    c.    Reconstruction of incident events
    d.    Protection against lawsuits
    e.    Lessons Learned for future events and modification of existing plans
    f.    Financial reimbursement

*Precautionary note:* While it is important to document events and actions, consider that over-documentation can hinder the operations.

## DMORT Activation

Upon notification of a mass fatalities incident, IEMA may request that the U. S. Public Health Service (USPHS) provide a team of experts to assist the coroner/medical examiner in assessing the situation to determine if federal government assistance is required. If the joint assessment so indicates, a recommendation will be made to the coroner/medical examiner by IEMA and USHHS, and seek approval for receiving federal assistance. Upon concurrence, all or a portion of a disaster mortuary team (DMORT) may be provided to assist in victim identification, forensic and medical services, as well as mortuary services. If appropriate and requested, a portable morgue facility with necessary equipment and supplies to augment the local medical examiner's capabilities also may be made available.

## Dignity of the Deceased

While every effort to assist survivors should be attempted, the dignity of the deceased should be respected. All responding personnel should be informed on the proper procedures for marking the location of and removing the deceased, a legal responsibility of the coroner or medical examiner. After removal from the site, the deceased should be moved to the morgue, or to an intermediate area isolated from the public and media and guarded by law enforcement. The deceased must be treated with respect and dignity in all thoughts and actions. A bioethics committee will be consulted before any decisions are made on the mass burial or disposal of victims.

## Safety Precautions

OSHA Standard - Occupational Exposure to Bloodborne Pathogens: Precautions for Emergency Responders, Title 29 Code of Federal Regulations, Part 1910.1030, provides a good planning and training standard protection level.

The assumption behind the universal precautions for infectious disease control is that every direct contact with body fluids is infectious. Therefore, every person exposed to direct contact must take the precautions prescribed by the above standard. At a mass fatalities incident, this includes volunteers involved in search and recovery, transportation, body identification and disposition.

In addition, monitoring should be conducted throughout the incident site for flammable or toxic vapors and radiation exposure.

## Recovery

The physical removal of the dead is part of the total recovery process. An evacuation area or morgue must be set up and staffed to receive the remains. The coroner or medical examiner is in charge of the recovery of both the bodies and their possessions, and could be assisted by some or all of the following agencies and organizations:

1. Coroner/medical examiner of neighboring jurisdictions
2. Fire departments
3. Police departments
4. Funeral directors
5. Local health departments
6. Forensic dentists
7. Federal Bureau of Investigation, as requested
8. Military agencies (including Armed Forces Institute of Pathology)
9. Public works agencies

## Roles and Responsibilities

| Primary Agencies | Roles and Responsibilities |
|---|---|
| **IDPH** | Develop infection control guidelines for fatality management activities and provide technical assistance on infection control to local authorities.<br><br>Coordinate with the Illinois Coroner's/Medical Examiners Association (ICMEA) and Illinois Funeral Directors Association (IFDA), if necessary, to fill requests from locals.<br><br>Communicate and coordinate with hospitals and physicians. |
| **Support Agencies** | **Roles and Responsibilities** |
| IEMA | Coordinate state agency response to a mass fatality incident.<br><br>When local jurisdictions are overwhelmed and have requested state assistance: implement mass fatality management activities, including establishment of one or more large-scale temporary morgues, auxiliary storage, victim identification, security; and request a Disaster Mortuary Assistance Team through FEMA or the National Disaster Medical System (NDMS). |
| IDOT | Provide personnel and equipment for the transportation or relocation of resources, which includes supplies and equipment. |

Illinois Pandemic Influenza Preparedness and Response Plan      Version 5.1
March 2020

| Support Agencies | Roles and Responsibilities |
|---|---|
| IDMA | Assist with the provision of personnel and equipment for the transportation or relocation of resources, which includes personnel, supplies and equipment.<br><br>Provide back-up support to the ISP for security operations. |
| IDOC | Provide inmate labor to load and unload trucks.<br><br>Provide trucks (with drivers) for transportation needs. |
| IDCMS | Provide support for transportation of personnel, equipment and supplies.<br><br>Procures equipment and supplies not available through state sources from commercial vendors or suppliers. |
| IDHS | Manage psychosocial issues related to mass fatalities, including the needs of first responders and families of deceased. |
| IEPA | Provide technical advice regarding disinfection and decontamination.<br><br>Provide technical assistance regarding graves and disposal options. |
| ISP | Provide and/or coordinate traffic control and expedited routing.<br><br>Request activation of the Illinois Law Enforcement Alarm System (ILEAS) to support law enforcement missions of local law enforcement agencies.<br><br>Assist and support other state and local agencies where possible; and coordinate public safety services, as needed. |
| ARC | Provide mental health support to those affected. |

*Authorities*

Department of Public Health Powers and Duties Law of the Civil Administrative Code of Illinois [20 ILCS 2305]

Illinois Emergency Management Agency Act [20 ILCS 5/3305]

Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 93-288, as amended (42 U.S.C. 5121 et seq.).

Illinois Public Health Act [20 ILCS 2305/2]

Control of Communicable Diseases Code (77 Ill. Adm. Code 690.100)

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

*References*

National Response Framework [NRF] (October 28, 2019)

Illinois Emergency Operations Plan (August 2004)

Illinois Emergency Management Agency and Illinois Coroner's Association Memorandum of Understanding

Illinois Pandemic Influenza Preparedness and Response Plan
Version 5.1
March 2020

## 7.0    Training and Exercise Schedule and Plan

**Primary Agency:**     Governor's office
**Support Agencies:** IDPH and IEMA

*Purpose*

To develop a strategy for preparing state and local workforce, through training and exercises, to deal with a pandemic. Test the operational efficiency of the training through exercises and drills to assure staff are aware of their role in the event of a pandemic.

*Planning Assumptions and Considerations*

- All exercises will be designed and conducted in compliance with state exercise standards, as defined by the Illinois Terrorism Task Force.

- Local health departments are funded to prepare and respond to all hazardous events including a pandemic in local communities.

- Training and exercise requirements are outlined in annual preparedness grants to local health departments.

- All public information is coordinated by the Office of the Governor's communications staff.

- All agencies and staff will be NIMS compliant, as required by executive order.

- Staff need to be trained and exercises conducted in advance so staff are aware of the NIMS and ICS structure and roles.

*Concept of Operations*

An exercise is a focused practice activity that places participants in a situation simulating an emergency, disaster or other event that is catastrophic in nature, and requires them to function in the capacity that would be expected of them should such an event actually occur. As part of a comprehensive program, exercises are generally most effective when they build upon one another in a manner that helps participants identify and ultimately meet specific operational goals. The overarching aim is to develop and to maintain competence in all pertinent emergency functions.

### Orientation Seminar
The intent of an orientation seminar is to give participants an overview or introduction to an identified risk, along with the current or proposed approach to addressing that risk. Its scope is limited to familiarizing participants with roles, plans, procedures or equipment, although it sometimes is used to resolve some of the more elementary questions about communication, coordination and assignment of responsibilities. The format is typically a facilitated, informal discussion in a group setting.

## Drill

A drill is a coordinated, supervised exercise activity, normally used to test a single specific operation or function. With a drill, there is no attempt to coordinate organizations or fully activate an emergency response plan and operating structure. Its role in a comprehensive exercise program is to practice and to perfect one small part of the response plan and to help prepare for more extensive exercises designed to coordinate and to test several functions and involve a wider spectrum of participants. Drills also are used to provide training with new equipment, to develop new policies or procedures, or to practice and to maintain current skills. The utility of a drill is its focus on a single, relatively limited portion of the overall emergency management system, thereby permitting a targeted, highly intensive look at a potential problem area.

## Tabletop Exercise

A tabletop exercise is a facilitated analysis of an emergency situation in an informal, stress-free environment. It is designed to elicit constructive discussion as participants examine and resolve problems based on existing operational plans and identify where those plans need to be refined. The success of the exercise is largely determined by group participation in the identification of problem areas. There is minimal attempt at simulation in a tabletop exercise. Equipment is not used, resources are only deployed on paper, and time pressures are not introduced.

## Functional Exercise

A functional exercise is an interactive, fully-simulated test of an organization's ability to affect a coordinated response to a stressful situation under time-pressured and more-or-less realistic circumstances. This type of exercise gets its name from the fact it tests one or more functions of an organization's operations plan. The range of suitable objectives for this type of undertaking is broad, and encompasses the coordination, integration and interaction of an organization's policies, procedures, roles and responsibilities before, during or after an event.

The intended audience for a functional exercise consists of policy, coordination and operations personnel who will practice responding in a realistic way to carefully planned and sequenced messages given to them by "simulators." Because these messages should reflect ongoing events and problems that might occur in a real emergency, they must be scripted in a manner likely to cause participants to make decisions and then act on them. This complexity makes the functional exercise more difficult and time-consuming to design than drills and tabletop exercises.

Participants will be required to make on-the-spot decisions and then act on them. These actions can generate a variety of actual consequences, such as responses from other players and resource shortages. These secondary consequences can, in turn, further stimulate activity within the realm of the exercise environment.

Functional exercises make it possible to test several functions and to include several agencies or departments within an agency without incurring the cost of a full-scale exercise (described below). Thus, in almost all cases, a functional exercise is a prerequisite to a full-scale exercise. In some instances, taking part in a functional exercise also may serve as a full-scale exercise for a participating organization (e.g., a hospital may conduct its own full-scale exercise as part of a community-wide

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

functional exercise).

## Full-scale Exercise

A full-scale exercise simulates a real event as closely as possible. It is designed to evaluate the operational capabilities of emergency management systems in a highly stressful environment, and attempts to simulate the full spectrum of conditions that those with a response role might face. To accomplish these things, a full-scale exercise must include the actual mobilization and movement of emergency personnel, equipment and resources. Ideally, a full-scale exercise should test and evaluate most of the functions provided for in the applicable emergency operations plan(s).

A full-scale exercise differs from a drill in that it coordinates the actions of several entities, tests several emergency functions and puts participants in actual v. simulated operating environments (e.g., state, state agency and/or local emergency operations centers; dispensing and vaccination centers; "on-scene" command posts).

The requisite level of realism is achieved through a variety of techniques, including:

- "On-scene" actions and decisions
- Simulated victims
- Search and rescue requirements
- Use of actual emergency communication protocols, channels and devices
- Actual v. "on paper only" allocation and deployment of personnel, equipment, supplies and other critical resources

Full-scale exercises are regarded as the ultimate in the test of response effectiveness "trial by fire" that is as close as practicable to an actual event. Because they are expensive and time consuming, it is advisable this form of exercise be reserved for the highest priority hazards and functions, and they be conducted only after the applicable emergency response plans and operational structure are well developed, widely understood and tested through one or more of the four less resource-intensive processes described elsewhere in this document.

### *Role and Responsibilities*

| Primary Agency | Role and Responsibility |
|---|---|
| IDPH | Develop curricula, develop schedule and implement training and exercises for local and state workforce. |
| **Support Agencies** | **Role and Responsibility** |
| IEMA | Assist IDPH with NIMS compliance issues related to training. |
| Other State Agencies and NGOs | Participate in exercises and training. |
| Local Health Departments | Participate in exercises and training. |

Illinois Pandemic Influenza Preparedness and Response Plan                        Version 5.1
March 2020

*Authorities*

National Response Framework (October 28, 2019)

National Incident Management System

CDC Public Health Preparedness Grant Guidance

*References*

CDC Medical and Public Health Information

NIMS Training and Exercises Models

# 8.0 Public Health and Medical Surge

**Primary Agency:**    IDPH
**Support Agencies:** IEMA, IDCMS, ING, IDOT, IDHS, IEPA and ARC

## *Purpose*

The purpose of the Public Health and Medical Surge Annex is to provide basic patient care and laboratory services to a greater volume during a pandemic influenza incident.

## *Planning Assumptions and Considerations*

It is assumed that during an influenza pandemic, health care systems may be overwhelmed and laboratories will be unable to keep pace with testing demands.

Although planning has occurred, it is assumed health care, emergency medical and laboratory staff may be ill and will subsequently reduce the available workforce.

It also is assumed there may be shortages of equipment and resources available to keep pace with increased demand for patient care and testing. It should be considered that there also might be shortages of items, such as gloves, respirators, ventilators and laboratory testing supplies.

There have been mutual-aid systems established and tested, both intrastate and interstate, but it should be considered that these mutual aid resources might be overwhelmed due to the pandemic influenza situation. The costs associated with stockpiling of supplies that may have limited shelf lives must be considered.

It is assumed citizens will seek medical care once signs and symptoms are experienced. It is also assumed the news media will impact the decisions of citizens to seek medical care versus staying at home.

Because it cannot be assumed citizens will follow directions during a perceived crisis situation, local officials will be responsible for developing local plans and procedures to provide appropriate security to enable the jurisdiction to conduct response operations. It must be considered that all levels of government must have a strong public information program that will provide a level of confidence to the citizens.

It is assumed the local surge plans will be inadequate during a pandemic situation due to depending on other facilities or receiving assistance from a common vendor. It is assumed local health care facilities are creating and exercising surge plans.

It should be considered that routine laboratory testing statutory requirements be suspended in order to redirect staff and resources to pandemic influenza specimen testing.

It is assumed that once the pandemic influenza strain has been identified there will be a continued laboratory surge in order to identify patients with that particular

influenza strain in order to better direct limited therapeutic resources. It is

assumed health care and laboratory facilities will remain secure.

*Concept of Operations*

- Collect information from local units of government, hospitals, laboratories, first responders and other state agencies regarding the actual or the anticipated demand for services.

- Communicate with federal agencies to determine the feasibility of acquiring resources through the Emergency Management Assistance Compact (EMAC).

- Confirm availability of alternate facilities, such as long-term care, outpatient surgical centers and non-traditional health care settings (e.g., school gymnasiums).

- Issue public notice advising affected populations and local medical providers of appropriate actions to be followed to reduce or to limit the impact of surge on health care facilities.

- Activate various medical response teams, such as the Illinois Medical Emergency Response Teams (IMERT) and Medical Reserve Corps (MRC) units, where possible and appropriate, to assist with the surge situation.

- Provide guidance to health care and laboratory facilities on appropriate actions.

- Communicate with federal agencies to determine the appropriate guidance to be distributed.

- Utilize the Web-based hospital bed and resource availability system.

- After identification of the pandemic flu type during the initial stage of the pandemic, the medical necessity of continued, rapid testing of all suspected flu cases must be determined. This decision would be based, at least in part, on the availability and efficacy of antiviral drugs and the etiology of infection with the pandemic strain. At one extreme, virtually all laboratory resources would be devoted to influenza testing, at the expense of routine and even mandated testing in other areas (e.g., newborn screening). At the other extreme, the laboratory would likely be able to maintain essential services (i.e., business continuity) by providing at least mandated testing.

- In preparation for a possible surge in demand for laboratory testing, a coalition between the IDPH Division of Laboratories and private clinical laboratories should be made. Implementation of a dramatic surge in laboratory testing would still be dependent upon the availability of adequate supplies and staff to take advantage of the increased capacity that would be provided by such a coalition. The IDPH labs also are working to confirm methods health care lab systems will be employing.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

The following is recommended before an influenza pandemic:

- Given the potential of greatly increased demand for influenza testing at the IDPH laboratory, enhancement of the laboratory information management system (LIMS) is required in this area. Ideally, optical character recognition (OCR) forms will be used to enter patient information, and results will be sent electronically by fax from the LIMS to the submitters. Currently, the latter capability is in place, but other priorities have prevented Information Technology (IT) from developing the OCR component. This component should be developed as soon as possible, since there will most likely not be an opportunity for IT to make major LIMS changes during a rapid onset of pandemic influenza. In addition, the uncertainty of staffing during a pandemic would make manual data entry a major bottleneck in testing.

## Hospital Planning

Hospitals should be equipped and prepared to surge to maximum capacity to prepare for 1) a limited number of patients infected with a pandemic influenza virus, and 2) a large number of patients in the event of escalating transmission of pandemic influenza.

- Outline administrative measures.
- Build on existing preparedness and response plans.
- Incorporate planning suggestions from state and local health departments.
- Identify criteria and methods for measuring compliance with response measures.
- Review and update supply inventories.
- Establish and/or review procedures for receipt, storage and distribution of assets from federal stockpiles.
- Establish mechanisms for periodic reviews and updates.
- Incorporate communicable disease control into the "All-hazards" incident command structure.

## Hospital Planning Process

- Internal, multidisciplinary planning committee
- Response coordinator/incident commander
- Pandemic influenza response team

## Hospital Planning Elements

- Procedures to facilitate laboratory testing on site.
- Predetermined thresholds for activating pandemic influenza surveillance plans.
- Mechanisms for conducting surveillance in emergency departments.
- Mechanisms for monitoring employee absenteeism for increases.
- Mechanisms for tracking emergency department visits and hospital admission/discharges for suspected/confirmed pandemic influenza patients.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

- Types of data reportable to state and local health departments.
- Criteria for distinguishing pandemic influenza.

### Hospital Communications

- Determine how communications between local and regional health care facilities will be handled.
- Use guidance from state or local health departments for external communications.
- Identify key topics for ongoing communications.
- Determine the type of hospital specific communications.
- Determine how public inquiries would be handled.
- Determine how to keep hospital personnel and patients informed.

### Hospital Education and Training

- Identify educational resources for hospital personnel.
- Develop policies and procedures for the care of pandemic influenza patients.
- Develop pandemic staffing contingency plans.
- Establish policies for restricting visitors.
- Report requirements to state and local health departments.
- Cross-train clinical personnel.
- Train intake and triage staff to detect influenza patients.
- Provide psychological support.
- Develop a strategy for "just-in-time" training of non-clinical staff.
- Develop educational materials for patients and family members.
- Create a distribution plan for educational materials.

### Hospital Triage, Clinical Evaluation and Admission Procedures

- Establish phone triage.
- Establish separate triage and waiting areas for persons with respiratory symptoms.
- Employ a Triage Coordinator to manage patient flow.
- Develop procedures for clinical evaluation.
- Develop admission procedures with streamlining techniques.
- Identify "trigger" points for triage.

### Hospital Facility Access

- Define essential and nonessential visitors.
- Identify "triggers" for temporary closing hospital to new admissions and transfers (Similar to Illinois' Hospital Bypass).
- Involve hospital security services to enforce access controls.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

## Occupational Health

- Develop a plan for detecting signs and symptoms of influenza.
- Establish policies for managing health care workers with respiratory symptoms.
- Develop time-off policies/procedures.
- Create a plan to protect personnel at high risk for complications from influenza exposure.
- Identify mental health and faith-based resources for counseling personnel.
- Develop a strategy to support health care workers' needs for rest and recuperation.
- Create a strategy for housing and feeding personnel.
- Develop a strategy for supporting personnel family needs.

## Influenza vaccination and Use of Antiviral Drugs Within Hospitals

- Promote annual and 2009A(H1N1)pdm influenza vaccination.
- Ensure documenting influenza vaccination for personnel.
- Develop a strategy for rapidly vaccinating or providing antiviral prophylaxis to personnel.
- Provide estimates of the quantities of vaccine needed for hospital staff and patients (a system is in place for Illinois through the SNS planning).
- Develop a strategy for prioritizing vaccinations to critical personnel.
- Develop a pandemic influenza vaccination plan.

## Hospital Surge Capacity

- Assess and coordinate staffing.
- Estimate minimum number and categories of personnel needed.
- Recruit retired health care personnel.
- Use trainees.
- Use patients' family members.
- Collaborate with local and regional health care planning groups.
- Increase cross-training of personnel.
- Create a list of essential and nonessential personnel titles.
- Plan for rapidly credentialing health care professionals.
- Identify insurance and liability issues.
- Identify opportunities for recruiting health care personnel from other settings (e.g., medical offices and same day surgery centers).
- Establish admissions criteria for when bed capacity is limited.
- Develop policies/procedures for expediting patient discharge.
- Collaborate with home health care agencies.
- Identify "triggers" for canceling elective procedures.

Illinois Pandemic Influenza Preparedness and Response Plan                     Version 5.1
March 2020

- Develop transfer agreements.
- Track bed availability.
- Expand bed capacity during times of crisis.
- Establish policies/procedures for shifting patients between nursing units.
- Establish mutual aid with other health care facilities.
- Identify areas of facility that can be dedicated to influenza patients.
- Create a system for tracking available supplies.
- Stockpile consumable resources.
- Identify "triggers" for ordering extra supplies.
- Establish contingency plans for situations where medical supplies become limited.
- Develop a strategy for ensuring uninterrupted provision of medications.

## Hospital Security
- Employ additional security.

## Hospital Mortuary Issues
- Assess current refrigeration capacity for deceased persons.
- Develop a mass fatality plan.
- Identify temporary morgue sites.
- Determine scope and volume of supplies needed for deceased persons.
- Ensure fatality management plans include a partnership with the local coroner's office in the event the hospital morgue capacity is exceeded.

## Care in non-hospital settings
- Develop a strategy for triage of potential influenza patients to nonhospital settings.
- Collaborate with home health care agencies for follow-up.
- Establish and staff telephone hotlines.
- Train hotline staff.
- Determine how nonhospital facilities, such as alternate care sites, will participate in the community plan.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

*Role and Responsibilities*

| Primary Agency | Role and Responsibilities |
|---|---|
| IDPH | Coordinate medical and laboratory activities in preparedness, response and recovery from pandemic influenza.<br><br>Coordinate EMS and trauma system activities in preparedness, response and recovery from pandemic influenza.<br><br>Coordinate and communicate with the CDC and WHO, local health departments, and hospitals and emergency medical systems.<br><br>Coordinate health care surge capacity planning. |
| **Support Agencies** | **Role and Responsibilities** |
| IEMA | Manage and coordinate the state's disaster response and recovery efforts.<br><br>Activate the SEOC, when required.<br><br>Coordinate requests for federal assistance with FEMA Region V.<br><br>Maintain a 24-hour communications center for communicating with emergency response personnel from all agencies and organizations.<br><br>Coordinate, integrate and manage overall state efforts involving the collection, analysis, planning, reporting and displaying of information. |
| IDCMS | Assist with the development of strategies to address shortfalls in the number of state personnel available to work (for instance, due to illness, the need to care for family members or concerns about personal and family health).<br><br>Procure equipment and supplies not available through state sources from commercial vendors or suppliers. |
| IDMA | Assist with the provision of vehicles, aircraft and operators to move personnel, equipment and supplies, as requested.<br><br>Provide logistical support for distribution of disaster relief supplies and equipment.<br><br>Provide back-up support to the ISP for security operations. |
| IDOT | Provide personnel and equipment for the transportation or relocation of resources which includes supplies and equipment. |
| IDHS | Provide medical support personnel to assist with health and medical operations.<br><br>Assist with locating specialized vehicles for transportation of the disabled. |

| Support Agencies | Role and Responsibilities |
|---|---|
| ARC | Assist government or other qualified health providers in recruiting medically qualified volunteers to work under the direction, supervision and authority of other agencies. American Red Cross will provide referrals to these agencies and will not be responsible for verifying certifications and licensure. |
| IEPA | Provide technical assistance for emergency drinking water and waste water operations. |

*Authorities*

EMS Act

IEMA

Act

Public Health Emergency Powers Act

Illinois Public Readiness and Emergency Preparedness Act

Stafford Act

Local Ordinances

CLIA

*References*

Illinois EOP

Local EOP

IDPH EOP

Illinois Health and Medical Care Response Plan

*Mutual Aid Agreements*

Emergency Management Assistance Compacts

Mutual Aid Box Alarm System (MABAS)

Illinois Law Enforcement Alarm System (ILEAS)

Illinois Public Health Mutual Aid System (IPHMAS)

USHHS Pandemic Influenza Plan

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

## 9.0 Infection Control and Personal Protective Equipment (PPE)

**Primary Agency:**     IDPH

**Support Agencies:** IDCMS, IEPA

*Purpose*

Provide guidance on infection control measures (e.g., isolation precautions, PPE) to be implemented in order to limit the spread of pandemic influenza.

*Planning Assumptions and Considerations*

During an influenza pandemic, vaccine may not be available and antiviral agents may be in short supply. The ability to limit transmission of influenza in health care settings will, therefore, rely heavily on the appropriate and thorough application of infection control measures.

Infection control practices for pandemic influenza are the same as for other human influenza viruses and primarily involve the application of standard and droplet precautions during patient care in health care settings (e.g., hospitals, nursing homes, outpatient offices, emergency transport vehicles).

IDPH has general supervision of the interests of the health and lives of the people of the state. IDPH is the lead state agency for issuing infection control guidelines and policies, including recommendations for isolation precautions and type(s) of PPE to be worn. Guidelines issued by IDPH are based upon recommendations from the U.S. Centers for Disease Control and Prevention (CDC) and/or the World Health Organization (WHO).

CDC issues national infection control guidelines, which include recommendations for isolation precautions to prevent transmission of microorganisms and the type(s) of PPE to be worn to reduce the risk of exposure to microorganisms.

During a pandemic, conditions that could affect infection control may include shortages of antiviral drugs, decreased efficacy of the vaccine, increased virulence of the influenza strain, shortages of single-patient rooms and shortages of PPE. These issues may necessitate changes in the recommended infection control practices for influenza. CDC and WHO will provide updated infection control guidance as circumstances dictate.

Local governments have primary responsibility to provide emergency medical and health services within their jurisdiction.

Local health departments have primary authority to implement and to enforce infection control measures for their citizens. Whenever a dangerously contagious or infectious disease becomes or threatens to become epidemic, IDPH may enforce

additional measures as it deems necessary to protect the public health.

*Concept of Operations*

IDPH will provide primary coordination for the state's health and medical operations including issuance of recommended infection control measures (e.g., isolation precautions and type(s) of PPE to be utilized).

The USHHS Pandemic Influenza Plan will provide the framework for IDPH-issued guidance on infection control measures for health care settings, including:

- Isolation of infectious patients in private rooms or cohort units

- Selection and use of PPE

- Hand hygiene and safe work practices

- Cleaning and disinfection of environmental surfaces

- Handling of laboratory specimens

- Post-mortem-care

- Restricting visitors

- Educating patients and health care staff

- Cohorting health care workers assigned to an outbreak unit

- Screening of persons entering the health care facility who may be infected with pandemic influenza

- Detection and control of nosocomial transmission of pandemic influenza

Settings where persons with pandemic influenza might seek and receive health care services (e.g., hospitals, emergency departments, outpatient facilities, residential care facilities and homes) should implement basic infection control principles to prevent the spread of pandemic influenza. Basic infection control principles include:

1) Limit contact between infected and non infected persons through:
   a) Isolation precautions (i.e., standard precautions, droplet precautions, contact precautions and airborne precautions, as indicated).
   b) Measures which promote spatial separation in common areas (e.g., sit or stand as far away as possible – at least 6 feet -- from potentially infectious persons).

2) Exposure control by reducing the potential for exposure to the pandemic influenza virus by persons caring for influenza patients in health care settings. Persons caring for infectious patients should:
   a) Wear a mask for close contact with infectious patients.
   b) Use contact and airborne precautions, including the use of fit-tested N95 respirators (or greater respiratory protection) and eye protection, when

appropriate.
c) Wear gloves (gown if necessary) for contact with respiratory secretions.
d) Perform hand hygiene after contact with infectious patients.

3) Control source by containing respiratory secretions:
a) Instruct persons who have "flu-like" symptoms to use respiratory hygiene/cough etiquette ("Cover Your Cough").
b) Promote use of masks by symptomatic persons in common areas (e.g., waiting rooms in physician offices or hospital emergency departments) or when being transported (e.g., in emergency vehicles).

IDPH will provide guidance on adapting infection control practices to specific health care settings, including:

- Nursing homes and other residential facilities

- Prehospital care (emergency medical services [EMS])

- Medical offices and other ambulatory care settings

- During the provision of professional home health care services

- During the care of pandemic influenza patients in the home or in alternative care sites (e.g., schools, auditoriums, conference centers, hotels)

IDPH will provide recommendations for infection control in schools, work places and community settings.

All support agencies will provide services as indicated in other plans developed under referenced authorities in support of this annex.

### *Definition of Infection Control-related Terms*

#### Standard Precautions

Standard precautions are infection prevention and control practices that apply to all patients regardless of diagnosis or presumed infection status. Standard precautions are based on the principle that all blood, body fluids, secretions and excretions, except sweat, regardless of whether they contain visible blood, non-intact skin and mucous membranes may contain transmissible infectious agents. Standard precautions include: respiratory hygiene/cough etiquette; hand hygiene before and after caring for a patient; use of gloves (clean, non-sterile gloves are adequate); use of masks, eye protection, face shields and gowns (a clean, non-sterile gown is adequate) when splashes or sprays of blood, body fluids, secretions or excretions are possible; cleaning of patient-care equipment, the patient's physical environment and soiled linen; and precautions to reduce the possibility of health care worker exposure to bloodborne pathogens. Private rooms are generally not necessary but may be considered for patients who contaminate the environment or cannot maintain appropriate hygiene. Reusable dishes and eating utensils are washed and sanitized in a manner that renders them safe for reuse (e.g., in a dishwasher with recommended

water temperature). Linen and laundry are washed and dried according to routine standards and procedures.

## Hand Hygiene

Hand hygiene is a general term that applies to any of the following: 1) handwashing with plain (non-antimicrobial) soap and water; 2) antiseptic handwash (washing hands with water and soap containing an antiseptic agent); or 3) antiseptic hand rub (waterless antiseptic product, most often alcohol-based, rubbed on all surfaces of hands). Hand hygiene is to be performed before and after contact with patients, after contact with contaminated items and immediately after removing gloves. Hands are to be washed with soap and water when visibly dirty or soiled with blood or other body fluids, contaminated with proteinaceous material, exposed to spores (e.g., Bacillus species or Clostridium difficile), suspected or proven, before eating and after using a restroom. It is essential health care personnel always perform hand hygiene between patient contacts and after removing personal protective equipment (PPE).

Hand hygiene has frequently been cited as the single most important practice to reduce the transmission of infectious agents and is an essential element of standard precautions.

## Respiratory Hygiene/Cough Etiquette

Respiratory hygiene/cough etiquette is a combination of measures designed to minimize the transmission of respiratory pathogens via droplet or airborne routes in health care settings. The components of respiratory hygiene/cough etiquette are: 1) covering the mouth and nose when coughing or sneezing; 2) using tissues to contain respiratory secretions with prompt disposal into the nearest waste receptacle after use; 3) performing hand hygiene (e.g., handwashing with non-antimicrobial soap and water, alcohol-based hand rub, or antiseptic handwash) after having contact with respiratory secretions and contaminated objects/materials; 4) offering a mask to persons who are coughing to decrease contamination of the surrounding environment; and 5) turning the head away from others and maintaining spatial separation, ideally greater than 3 feet, when coughing. Respiratory hygiene/cough etiquette should be used with any person (e.g., patients and accompanying family members or friends) with signs of a cold or other respiratory infection (e.g., cough, congestion, rhinorrhea and increased production of respiratory secretions) who enters any health care facility. Health care facilities should post visual alerts (in appropriate languages) at the entrance to outpatient treatment areas (e.g., emergency departments, physician offices, outpatient clinics) instructing patients and persons who accompany them (e.g., family, friends) to inform health care personnel of symptoms of a respiratory infection when they first register for care and to practice respiratory hygiene/cough etiquette. When space and chair availability permit, coughing persons should be encouraged to sit at least 3 feet away from others in common waiting areas.

## Droplet Precautions

In addition to standard precautions, droplet precautions are intended to reduce the risk of droplet transmission of infectious agents from close respiratory or mucous membrane contact (e.g., less than 3 feet) with large-particle respiratory droplets

(larger than 5 μm in size). Respiratory droplets can be generated by the patient during coughing, sneezing, talking or the performance of cough-inducing procedures. Because droplets do not remain suspended in the air, special air handling and ventilation are not required to prevent droplet transmission; single-patient rooms are preferred. Health care personnel and visitors wear gloves and masks (respirators are not necessary) when entering a patient's room. A mask should be worn once, changed when moist and then discarded. Upon touching or discarding a used mask, hand hygiene is to be performed. During procedures that may generate small particles of respiratory secretions (e.g., endotracheal intubation, bronchoscopy, nebulizer treatment, suctioning), health care personnel should wear gloves, gown, face/eye protection, and a fit-tested N95 or other appropriate particulate respirator. When a single-patient room is not available, pandemic influenza patients may be cohorted (e.g., place the patient in a room with other patients who have active pandemic influenza infection but no other infection) with spatial separation of patients (e.g., greater than 3 feet between beds in multi-patient rooms). In general, wearing eye protection (e.g., goggles) or a face shield for routine contact with pandemic influenza patients is not necessary, but should be worn as recommended for standard precautions. If transport or movement of the patient from the room is necessary, the patient is to wear a surgical mask that covers the mouth and nose, if possible.

### Contact Precautions

In addition to standard precautions, contact precautions are intended to reduce the risk of epidemiologically important microorganisms by direct (e.g., hand or skin-to- skin contact) or indirect (e.g., touching environmental surfaces or patient-care items) contact. Single-patient rooms are preferred and health care personnel and visitors wear gown and gloves for all interactions that may involve contact with the patient or the patient's environment. Gowns should be worn only once and then placed in a waste or laundry receptacle, as appropriate. If gowns are in short supply (i.e., the demand during a pandemic could exceed the supply), priorities for their use may need to be established. When a single-patient room is not available, pandemic influenza patients may be cohorted (e.g., place the patient in a room with other patients who have active pandemic influenza infection but no other infection) with spatial separation of patients (e.g., greater than 3 feet between beds in multi-patient rooms). When possible, dedicate the use of noncritical patient-care equipment to a single patient or cohort of patients to avoid sharing between patients. If use of common equipment or items is unavoidable, they must be adequately cleaned and disinfected before use for another patient. Rooms of patients on contact precautions are given cleaning priority with a focus on frequent cleaning (e.g., at least daily) and disinfection of high touch surfaces (e.g., bed rails, bedside commodes, faucet handles, doorknobs, carts, charts) and equipment in the immediate vicinity of the patient.

### Airborne Precautions[4]

---

[4] Also known as Airborne Infection Isolation [AII] Precautions.

In addition to standard precautions, airborne precautions are used for the care of patients known or suspected to be infected with pathogens transmitted by airborne droplet nuclei (small-particle residue [5 μm or smaller in size] of evaporated droplets containing microorganisms that remain suspended in the air and can be dispersed widely by air currents within a room or over a long distance). Use of an airborne infection isolation (AII) room with the door closed is required to prevent airborne transmission. An AII room is a single-patient room equipped with special air handling and ventilation capacity (e.g., negative air pressure) that meet the American Institute of Architects/Facility Guidelines Institute (AIA/FGI) standards for AII rooms.
Respiratory protection (e.g., NIOSH-approved N95 or higher respirators) is worn by susceptible persons when entering the room. Respirators should be used within the context of a respiratory protection program that includes fit-testing, medical clearance and training. If transport or movement of the patient from the room is necessary, the patient is to wear a surgical mask that covers the mouth and nose, if possible.

In the event of an outbreak or exposure where large numbers of patients require Airborne Precautions, consult IDPH Division of Infectious Diseases to determine the safety of cohorting patients together based on clinical diagnosis in areas with the lowest risk of airborne transmission.

## Personal Protective Equipment (PPE)

Personal protective equipment is a variety of barriers used alone or in combination to protect mucous membranes, skin, and clothing from contact with infectious agents.
PPE includes gloves, masks, respirators, goggles, face shields and gowns. Respirators (e.g., N95 or other appropriate particulate respirator) should be used within the context of a respiratory protection program that includes fit-testing, medical clearance and training.

### *Role and Responsibilities*

| Primary Agency | Role and Responsibilities |
|---|---|
| IDPH | Provide primary coordination for technical guidance and health and medical operations. Coordinate health and medical activities in preparedness, response and recovery from pandemic influenza. Coordinate with local areas to ensure development of local plans as called for by the state plan and provide resources, such as templates to assist in planning process. |
| Support Agencies | Role and Responsibilities |
| IDCMS | Procure equipment and supplies not available through state sources from commercial vendors or suppliers. |
| IEMA | Manage and coordinate the state's disaster response and recovery efforts. |

Illinois Pandemic Influenza Preparedness and Response Plan          Version 5.1
March 2020

| IEPA | Provide toxicological expertise and risk communication expertise in support of health risk communication about chemicals or other health risks. Provide technical advice regarding disinfection and decontamination. |
|------|------|
| IDOL | Ensure compliance with OSHA regulations and other applicable worker safety requirements. |

*Authorities*

29 CFR 1910, Occupational Safety and Health Standards, Subpart I, Personal Protective Equipment

20 ILCS 2305, The Department of Public Health Powers and Duties Law

Illinois Administrative Code - Title 77: Public Health, Part 690 Control of Communicable Diseases Code

Potentially Infectious Medical Waste (PIMW) regulations, 35 Illinois Administrative Code: Subtitle M

*References*

Homeland Security Presidential Directive #7 Critical Infrastructure Identification, Prioritization, and Protection, which designates USEPA as the sector specific agency for the water sector:
http://www.dhs.gov/homeland-security-presidential-directive-7

OSHA Respiratory Protection Standard found at
http://www.osha.gov/SLTC/respiratoryprotection/index.html

CDC Guideline for Isolation Precautions in Hospitals found at
http://www.cdc.gov/ncidod/dhqp/gl_isolation.html

CDC Severe Acute Respiratory Syndrome (SARS) infection control guidance found at
http://www.cdc.gov/ncidod/sars/ic.htm

CDC Sequence for Donning (and Removing) Personal Protective Equipment (PPE) poster found at
http://www.cdc.gov/ncidod/sars/pdf/ppeposter148.pdf

CDC Influenza Infection Control in Health-Care Facilities found at
http://www.cdc.gov/flu/professionals/infectioncontrol/

CDC Workplace Safety and Health references found at
http://www.cdc.gov/node.do/id/0900f3ec8000ec09

CDC Guideline for Hand Hygiene in Health-Care Settings found at

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

http://www.cdc.gov/handhygiene

CDC guidance on Respiratory Hygiene/Cough Etiquette for Healthcare Settings found at
http://www.cdc.gov/flu/professionals/infectioncontrol/resphygiene.htm

CDC Guidelines for Environmental Infection Control in Health-Care Facilities found at
http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5210a1.htm

CDC National Institute for Occupational Safety and Health information about
respirator selection and use found at
Hhttp://www.cdc.gov/niosh/npptl/topics/respirators/ and
http://www.pandemicflu.gov/plan/healthcare/maskguidancehc.html#appB

Case 3:20-cv-00474-GCS   Document 1-1   Filed 05/21/20   Page 157 of 238   Page ID #164

# Appendices

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

## 1.0   Abbreviations and Acronyms

- AC – Area Command
- ACIP – Advisory Committee on Immunization Practices, CDC
- AERO – Illinois Department of Transportation, Division of Aeronautics
- ARC – American Red Cross
- ASPR – United States Department of Health and Human Services, Assistant Secretary for Preparedness and Response
- ASTHO – Association of State and Territorial Health Officials
- CDC – United States Centers for Disease Control and Prevention
- CERT – Community Emergency Response Teams
- CISD – Critical Incident Stress Debriefing
- CBO – Community-based organizations
- IDCMS – Illinois Department of Central Management Services
- DFO – Disaster Field Office
- DHS – Department of Homeland Security
- DMORT – Disaster Mortuary Operational Response Team
- DOD – U.S. Department of Defense
- EAS – Emergency Alert System
- ED – Emergency Department
- EMS – Emergency Medical Services
- FDA – Food and Drug Administration
- FEMA – Federal Emergency Management Administration
- OG – Office of the Governor
- USHHS – U.S. Department of Health and Human Services
- HRSA – Health Resources and Services Administration
- HSPD – Homeland Security Presidential Directive
- IAP – Incident Action Plan
- IBHE- Illinois Board of Higher Education
- IC – Incident Commander
- ICC – Illinois Commerce Commission
- ICS – Incident Command System
- IDCEO – Illinois Department of Commerce and Economic Opportunity
- IDHS – Illinois Department of Human Services
- IDMA – Illinois Department of Military Affairs

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

- IDNR – Illinois Department of Natural Resources

Illinois Pandemic Influenza Preparedness and Response Plan                Version 5.1
March 2020

- IDOA – Illinois Department of Agriculture
- IDOC – Illinois Department of Corrections
- IDOL – Illinois Department of Labor
- IDOT – Illinois Department of Transportation
- IDOT-A – Illinois Department of Transportation – Division of Aeronautics
- IDFPR – Illinois Department of Professional and Financial Regulation
- IDPH – Illinois Department of Public Health
- IEMA – Illinois Emergency Management Agency
- IEOP – Illinois Emergency Operations Plan
- IEPA – Illinois Environmental Protection Agency
- ILI – influenza-like-illness
- IND – Investigational New Drug
- ING – Illinois National Guard
- IOAG – Illinois Office of the Attorney General
- IOM – Institute of Medicine
- ISBE – Illinois State Board of Education
- IOSFM – Office of the Illinois State Fire Marshall
- ISP – Illinois State Police
- JIC – Joint Information Center
- JOC – Joint Operations Center
- MCI/MS – Mass Casualty Incident/Medical Surge Annex
- MRC – Medical Reserve Corps
- MSCC – Medical Surge Capacity and Capability
- NAHERC – National Animal Health Emergency Response Corps
- NDMS – National Disaster Medical System
- NIC – National Influenza Center
- NIH – National Institutes of Health
- NIMS – National Incident Management System
- NDMS – National Disaster Medical System
- NGO – Nongovernmental and Volunteer Organizations
- NRF – National Response Framework
- NVOAD – National Voluntary Organizations Active in Disaster
- NVPO/USHHS – USHHS, National Vaccine Program Office

Illinois Pandemic Influenza Preparedness and Response Plan                          Version 5.1
March 2020

- OPHEP/USHHS -- USHHS, Office of Public Health Emergency Preparedness
- OGA/USHHS – USHHS, Office of Global Affairs
- PDD – Presidential Decision Directive
- PHEOC – Public Health Emergency Operations Center
- PHS – Public Health Service
- PIO -- Public Information Officer
- PPE – Personal Protective Equipment
- RHCC – Regional Hospital Coordination Center
- ROC – Regional Operations Center
- SARS – Severe Acute Respiratory Syndrome
- SEOC – State Emergency Operations Center
- SOSP – Secretary of State Police
- SNS -- Strategic National Stockpile
- UAC – Unified Area Command
- WHO – World Health Organization

## 2.0     Glossary of Key Terms

**Area Command (Unified Area Command).** An organization established (1) to oversee the management of multiple incidents being handled by an ICS organization or (2) to oversee the management of large or multiple incidents to which several Incident Management Teams have been assigned. Area Command has the responsibility to set overall strategy and priorities, to allocate critical resources according to priorities, to ensure incidents are properly managed, and to ensure that objectives are met and strategies followed. Area Command becomes Unified Area Command when incidents are multijurisdictional. Area Command may be established at an Emergency Operations Center facility or at some location other than an Incident Command Post (ICP).

**Casualty.** Any person declared dead or missing, ill or injured.

**Consequence Management.** Predominantly an emergency management function and included measures to protect public health and safety, to restore essential government services and to provide emergency relief to governments, businesses and individuals affected by the consequences of terrorism. The requirements of consequence management and crisis management are combined in the National Response Framework (NRF). See also **Crisis Management.**

**Crisis Management.** Predominantly a law enforcement function and included measures to identify, to acquire and to plan the use of resources needed to anticipate, to prevent, and/or to resolve a threat or act of terrorism. The requirements of consequence management and crisis management are combined in the National Response Framework (NRF). See also **Consequence Management.**

**Emergency.** As defined by the Stafford Act, an emergency is "any occasion or instance for which, in the determination of the president, federal assistance is needed to supplement State and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States."

**Emergency Operations Center (EOC).** The physical location at which the coordination of information and resources to support domestic incident management activities normally takes place. An EOC may be a temporary facility or may be located in a more central or permanently established facility, perhaps at a higher level of organization within a jurisdiction. EOCs may be organized by major functional disciplines (e.g., fire, law enforcement and medical services), by jurisdiction (e.g., federal, state, regional, county, city, tribal), or by some combination thereof.

**Emergency Operations Plan (EOP).** The "steady-state" plan maintained by various jurisdictional levels for managing a wide variety of potential hazards.

**Emergency Public Information.** Information disseminated primarily in anticipation of an emergency or during an emergency. In addition to providing situational information

to the public, it also frequently provides directive actions required to be taken by the general public.

**Emerging Infectious Diseases.** New or recurring infectious diseases of people, domestic animals and/or wildlife, including identification, etiology, pathogenesis, zoonotic potential and ecological impact.

**First Responder.** Local and nongovernmental police, fire and emergency personnel who in the early stages of an incident are responsible for the protection and preservation of life, property, evidence and the environment, including emergency response providers as defined in Section 2 of the Homeland Security Act of 2002 (6 U.S.C. 101), as well as emergency management, public health, clinical care, public works and other skilled support personnel (such as equipment operators) who provide immediate support services during prevention, response and recovery operations. First responders may include personnel from federal, state, local, tribal or nongovernmental organizations.

**Incident.** An occurrence or event, natural or human caused, that requires an emergency response to protect life or property. Incidents can, for example, include major disasters, emergencies, terrorist attacks, terrorist threats, wildland and urban fires, floods, hazardous materials spills, nuclear accidents, aircraft accidents, earthquakes, hurricanes, tornadoes, tropical storms, war-related disasters, public health and medical emergencies, and other occurrences requiring an emergency response.

**Incident Action Plan.** An oral or written plan containing general objectives reflecting the overall strategy for managing an incident. It may include the identification of operational resources and assignments. It also may include attachments that provide direction and important information for management of the incident during one or more operational periods.

**Incident Command System (ICS).** A standardized on scene emergency management construct specifically designed to provide for the adoption of an integrated organizational structure that reflects the complexity and demands of single or multiple incidents, without being hindered by jurisdictional boundaries. ICS is the combination of facilities, equipment, personnel, procedures and communications operating with a common organizational structure, designed to aid in the management of resources during incidents. ICS is used for all kinds of emergencies and is applicable to small, as well as large and complex incidents. ICS is used by various jurisdictions and functional agencies, both public and private, or organized field-level incident management operations.

**Incident Commander (IC).** The individual responsible for all incident activities, including the development of strategies and tactics and the ordering and release of resources. The IC has overall authority and responsibility for conducting incident operations and is responsible for the management of all incident operations at the incident site.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

**Joint Field Office (JFO).** A temporary federal facility established locally to provide a central point for federal, state, local and tribal executives with responsibility for incident oversight, direction and/or assistance to effectively coordinate protection, prevention, preparedness, response, and recovery actions. The JFO will combine the traditional functions of the JOC, the FEMA DFO and the JIC within a single federal facility.

**Joint Information Center (JIC).** A facility established to coordinate all incident- related public information activities. It is the central point of contact for all news media at the scene of the incident. Public information officials from participating agencies should collocate at the JIC.

**Joint Information System (JIS).** Integrates incident information and public affairs into a cohesive organization designed to provide consistent, coordinated, timely information during a crisis or incident operations. The mission of the JIS is to provide a structure and system for developing and delivering coordinated interagency messages; developing, recommending and executing public information plans and strategies on behalf of the IC; advising the IC concerning public affairs issues that could affect a response effort; and controlling rumors and inaccurate information that could undermine public confidence in the emergency response effort.

**Joint Operations Center (JOC).** The JOC is the focal point for all federal investigative law enforcement activities during a terrorist or potential terrorist incident or any other significant criminal incident, and is managed by the SFLEO. The JOC becomes a component of the Joint Field Office when the National Response Framework (NRF) is activated.

**Local Government.** A county, municipality, city, town, township, local public authority, school district, special district, intrastate district, council of governments (regardless of whether the council of governments is incorporated as a nonprofit corporation under state law), regional or interstate government entity, or agency or instrumentality of a local government; an Indian tribe or authorized tribal organization or, in Alaska, a Native Village or Alaska Regional Native Corporation; or a rural community, unincorporated town or village, or other public entity. (As defined in Section 2(10) of the Homeland Security Act of 2002, Public Law 107-296, 116 Stat. 2135, et seq. (2002).)

**Major Disaster.** As defined by the Stafford Act, any natural catastrophe (including any hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm or drought) or, regardless of cause, any fire, flood or explosion, in any part of the United States, which in the determination of the president causes damage of sufficient severity and magnitude to warrant major disaster assistance under this act to supplement the efforts and available resources of states, local governments and disaster relief organizations in alleviating the damage, loss, hardship or suffering caused thereby.

**Mutual Aid Agreement.** Written agreement between agencies, organizations and/or jurisdictions that they will assist one another on request by furnishing personnel, equipment and/or expertise in a specified manner.

**National Disaster Medical System (NDMS).** A coordinated partnership between DHS, USHHS, DOD and the Department of Veterans Affairs established for the purpose of responding to the needs of victims of a public health emergency. NDMS provides medical response assets and the movement of patients to health care facilities where definitive medical care is received when required.

**National Incident Management System (NIMS).** A system mandated by Homeland Security Presidential Directive-5 (HSPD-5) that provides a consistent, nationwide approach for federal, state, local and tribal governments; the private sector; and Nongovernment Organizations (NGOs) to work effectively and efficiently together to prepare for, respond to and recover from domestic incidents, regardless of cause, size or complexity. To provide for interoperability and compatibility among federal, state, local and tribal capabilities, the NIMS includes a core set of concepts, principles and terminology. HSPD-5 identifies these as the Incident Command System (ICS); multiagency coordination systems; training; identification and management of resources (including systems for classifying types of resources); qualification and certification; and the collection, tracking, and reporting of incident information and incident resources.

**Nongovernmental Organization (NGO).** A nonprofit entity based on interests of its members, individuals or institutions, but may work cooperatively with government. Such organizations serve a public purpose, not a private benefit. Examples of NGOs include faith-based charity organizations and the American Red Cross.

**Preparedness.** The range of deliberate, critical tasks and activities necessary to build, to sustain and to improve the operational capability to prevent, to protect against, respond to and to recover from domestic incidents. Preparedness is a continuous process involving efforts at all levels of government and between government and private-sector and nongovernmental organizations to identify threats, to determine vulnerabilities and to identify required resources.

**Prevention.** Actions taken to avoid an incident or to intervene to stop an incident from occurring. Prevention involves actions taken to protect lives and property. It involves applying intelligence and other information to a range of activities that may include such countermeasures as deterrence operations; heightened inspections; improved surveillance and security operations; investigations to determine the full nature and source of the threat; public health and agricultural surveillance and testing processes; immunizations, isolation, or quarantine; and, as appropriate, specific law enforcement operations aimed at deterring, pre-empting, interdicting or disrupting illegal activity and apprehending potential perpetrators and bringing them to justice.

**Private Sector.** Organizations and entities not part of any governmental structure.

Illinois Pandemic Influenza Preparedness and Response Plan                    Version 5.1
March 2020

Includes for-profit and not-for-profit organizations, formal and informal structures, commerce and industry, private emergency response organizations and private voluntary organizations.

**Public Health.** Protection, safety, improvement and interconnections of health and disease prevention among people, domestic animals and wildlife.

**Public Information Officer (PIO).** A member of the Command Staff responsible for interfacing with the public and the news media or with other agencies with incident related information requirements.

**Resources.** Personnel and major items of equipment, supplies and facilities available, or potentially available, for assignment to incident operations and for which status is maintained. Resources are described by kind and type and may be used in operational support or supervisory capacities at an incident or at an Emergency Operations Center.

**Response.** Activities that address the short-term, direct effects of an incident. Response includes immediate actions to save lives, to protect property and to meet basic human needs. Response also includes the execution of emergency operations plans and of incident mitigation activities designed to limit the loss of life, personal injury, property damage and other unfavorable outcomes. As indicated by the situation, response activities include applying intelligence and other information to lessen the effects or consequences of an incident; increased security operations; continuing investigations into the nature and source of the threat; ongoing public health and agricultural surveillance and testing processes; immunizations, isolation or quarantine; and specific law enforcement operations aimed at pre-empting, interdicting, or disrupting illegal activity, and apprehending actual perpetrators and bringing them to justice.

**State.** Any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any possession of the United States. (As defined in Section 2(14) of the Homeland Security Act of 2002, Public Law 107-296, 116 Stat. 2135, et seq. (2002).)

**Subject-Matter Expert (SME).** An individual who is a technical expert in a specific area or in performing a specialized job, task, or skill.

**Unified Command.** An application of Incident Command System (ICS) used when there is more than one agency with incident jurisdiction or when incidents cross political jurisdictions. Agencies work together through the designated members of the Unified Command to establish their designated Incident Commanders at a single Incident Command Post (ICP) and to establish a common set of objectives and strategies and a single Incident Action Plan.

## 3.0    Internet Resources on Pandemic Influenza

### Federal Departments

- Department of Defense - http://www.defenselink.mil/
- Department of Education - http://www.ed.gov/
- Department of Energy - http://www.energy.gov/engine/content.do
- Department of Health and Human Services - http://www.hhs.gov/
- National Vaccine Program Office http://www.dhhs.gov/nvpo
- Office of the Assistant Secretary for Preparedness and Response (ASPR) – http://www.hhs.gov/aspr/
- Department of Homeland Security - http://www.dhs.gov/dhspublic/index.jsp
- National Disaster Medical System- http://ndms.dhhs.gov/index.html
- Federal Emergency Management Agency (FEMA) - http://www.fema.gov/
- Department of Justice - http://www.usdoj.gov/
- Department of State - http://www.state.gov/
- Department of Transportation - http://www.dot.gov/
- Department of Veterans Affairs - http://www.va.gov/
- CDC – http://cdc.gov/h1n1flu/
  CDC Guidance – for clinicians on care of patients with H1N1 – http://www.cdc.gov/h1n1flu/guidance_HIV.htm
- Food and Drug Administration (FDA) - http://www.fda.gov/
- HRSA - http://www.hrsa.gov/
- National Institute of Health (NIH) - http://www.nih.gov/
- NIH, National Institute of Allergy and Infectious Diseases - http://www.niaid.nih.gov/

### Illinois Agencies and Departments

- Office of the Governor – http://www.ready.illinois.gov
- IDPH – http://www.idph.state.il.us
- IEMA – http://www.state.il.us/iema

### Other Organizations

- Association of State and Territorial Health Officials (ASTHO) – http://www.astho.org/
- Infectious Disease Society of America www.idsociety.org
- National Foundation for Infectious Diseases www.nfid.org
- Institute of Medicine (IOM) - http://www.iom.edu/

- World Health Organization (WHO) – www.who.int/
- American Red Cross – http://www.redcross.org/preparedness

### Other Influenza Background Information

**CDC -** Presents information on the symptoms, treatment and complications of the disease, prevention and control, the types of influenza viruses, questions and answers on symptoms, vaccinations and myths. http://www.cdc.gov/flu/index.htm

**National Vaccine Program Office** – Presents a historical overview of pandemics that occurred throughout the past century (Spanish Flu, Asian Flu, Hong Kong Flu), and three influenza scares (Swine Flu, Russian Flu and Avian Flu). http://www.dhhs.gov/nvpo/pandemics/

**World Health Organization** – Defines an influenza pandemic, explains how a new influenza virus can cause a pandemic, presents the consequences of an influenza pandemic, explains the global surveillance systems and provides links to other pandemic plans from other nations. http://www.who.int/csr/disease/influenza/pandemic/en/

### Additional Response Resources

**ASPR Bioterrorism and Emergency Preparedness Grants and Cooperative Agreements** – Provides information about ASPR programs for bioterrorism and emergency preparedness activities available for state and local jurisdictions. www.hhs.gov/aspr

**The Public Health Preparedness and Response Capacity Inventory** - Provides a resource for state and local health departments undertaking comprehensive assessments of their preparedness to respond to bioterrorism, outbreaks of infectious disease or other public health threats and emergencies. **http://www.rivcophepr.org/downloads/medical_community/NPSsmpxv1.pdf**

**CDC Cooperative Agreements on Public Health Preparedness** – Provide funding to state and local public health jurisdictions for preparedness for and response to bioterrorism, other outbreaks of infectious diseases, and other public health threats and emergencies. http://www.bt.cdc.gov/planning/continuationguidance/index.asp

**Epidemic Information Exchange** – Provides a secure, Web-based communications network for information exchange among CDC, state and local health departments, and other public health professionals. http://www.cdc.gov/mmwr/epix/epix.html

**Strategic National Stockpile** – Provides information on the availability and rapid deployment of life-saving pharmaceuticals, antidotes, other medical supplies and equipment necessary to counter the effects of nerve agents, biological pathogens and chemical agents. http://www.bt.cdc.gov/stockpile/index.asp

## Joint Committee on Administrative Rules

# ADMINISTRATIVE CODE

TITLE 77: PUBLIC HEALTH
CHAPTER I: DEPARTMENT OF PUBLIC HEALTH
SUBCHAPTER k: COMMUNICABLE DISEASE CONTROL AND IMMUNIZATIONS
PART 690 CONTROL OF COMMUNICABLE DISEASES CODE
SECTION 690.1330 ORDER AND PROCEDURE FOR ISOLATION, QUARANTINE AND
CLOSURE

---

**Section 690.1330  Order and Procedure for Isolation, Quarantine and Closure**

a) *The Department or* certified local health department *may order a person or group of persons to be quarantined or isolated or may order a place to be closed and made off limits to the public on an immediate basis without prior consent or court order if, in the reasonable judgment of the Department* or certified local health department, *immediate action is required to protect the public from a dangerously contagious or infectious disease.* (Section 2(c) of the Act) The determination that immediate action is required shall be based on the following:

   1) The Department or the certified local health department has reason to believe that a person or group of persons is, or is suspected to be, infected with, exposed to, or contaminated with a dangerously contagious or infectious disease that could spread to or contaminate others if remedial action is not taken; and

   2) The Department or the certified local health department has reason to believe that the person or group of persons would pose a serious and imminent risk to the health and safety of others if not detained for isolation; and

   3) The Department or the certified local health department has first made efforts, which shall be documented, to obtain voluntary compliance with requests for medical examination, testing, treatment, counseling, vaccination, decontamination of persons or animals, isolation, and inspection and closure of facilities, or has determined that seeking voluntary compliance would create a risk of serious harm.

b) *All police officers, sheriffs and all other officers and employees of the State or any locality shall enforce the rules and regulations so adopted and orders issued by the Department* or the certified local health department.  (Section 2(a) of the Act)  The

EXHIBIT
6

Department or certified local health department may request the assistance of police officers, sheriffs, and all other officers and employees of any political subdivision within the jurisdiction of the Department or certified local health department to immediately enforce an order given to effectuate the purposes of this Subpart.

c) If the Department or certified local health department orders the immediate isolation or quarantine of a person or group of persons:

  1) The immediate isolation or quarantine order shall be for a period not to exceed the period of incubation and communicability, as determined by the Department or certified local health department, for the dangerously contagious or infectious disease.

  2) The Department or certified local health department shall issue a written isolation or quarantine order within 24 hours after the commencement of isolation or quarantine pursuant to a verbal order, which shall specify the following:

   A) The identity of all persons or groups subject to quarantine or isolation, if known;

   B) The premises subject to quarantine, isolation or closure;

   C) *Notice of the right to counsel;*

   D) *Notice that if the person or owner is indigent, the court will appoint counsel for that person or owner;*

   E) *Notice of the reason for the order for isolation, quarantine or closure,* including the suspected dangerously contagious or infectious disease, if known;

   F) *Notice of whether the order is an immediate order, and if so, the time frame for the Department* or certified local health department *to seek consent or to file a petition requesting a court order;*

   G) *Notice of the anticipated duration of the isolation, quarantine, or closure,* including the dates and times at which isolation, quarantine, or closure commences and ends (Section 2(c) of the Act);

   H) A statement of the measures taken by the Department or the certified local health department to seek voluntary compliance or the basis on which the Department or the certified local health department determined that seeking voluntary compliance would create a risk of serious harm;

   I) A statement regarding the medical basis on which isolation,

quarantine, or closure is justified, e.g., clinical manifestations; physical examination; laboratory tests, diagnostic tests or other medical tests; epidemiologic information; or other evidence of exposure or infection available to the Department or certified local health department at the time;

J)      A statement that such persons may refuse examination, medical monitoring, medical treatment, prophylaxis, or vaccination, but remain subject to isolation or quarantine; and

K)      A statement that, at any time while the isolation, quarantine or closure order is in effect, persons under isolation, quarantine, or closure may request a hearing to review the isolation, quarantine or closure order as set forth in Section 690.1345 of this Subpart.

d)      Verbal Orders.

1)      The Department or certified local health department may issue a verbal order of isolation, quarantine, or closure without prior notice to the person or group of persons if the delay in imposing a written order of isolation, quarantine, or closure would jeopardize the Department's or certified local health department's ability to prevent or limit:

A)      The transmission of a dangerously contagious or infectious disease that poses a threat to the public; or

B)      The transmission of an infectious agent or possibly infectious agent that poses a threat to the public health;

2)      A verbal order of isolation, quarantine, or closure issued under this Subpart:

A)      Is valid for 24 hours and shall be followed up with a written order;

B)      May be verbally communicated by a first responder to the person or group of persons subject to isolation, quarantine, or closure; and

C)      May be enforced by the first responder until a written order is issued.

e)      *In the event of an immediate order issued without prior consent or court order, the Department or certified local health department shall, as soon as practical, within 48 hours after issuing the order, obtain the consent of the person or owner or file a petition requesting a court order authorizing the isolation, quarantine or closure. When exigent circumstances exist that cause the court system to be unavailable or that make it impossible to obtain consent or file a petition within 48 hours after issuance of an immediate order, the Department or certified local health department must obtain consent or file a petition requesting a court order as soon as reasonably possible.*  (Section 2(c) of the Act)

1)      The petition for a court order authorizing involuntary isolation or quarantine of a person or group of persons or the closure of premises shall specify the following:

     A)      The identity of all persons or groups subject to isolation or quarantine, if known;

     B)      The premises subject to isolation, quarantine or closure;

     C)      The reason for the order for isolation, quarantine or closure, including the suspected dangerously contagious or infectious disease if known;

     D)      The date and time at which isolation, quarantine or closure will commence;

     E)      The anticipated duration of isolation, quarantine, or closure based on the suspected dangerously contagious or infectious disease, if known;

     F)      The measures taken by the Department or the certified local health department to seek voluntary compliance or the basis on which the Department or the certified local health department determined that seeking voluntary compliance would create a risk of serious harm;

     G)      The medical basis on which isolation, quarantine or closure is justified, e.g., clinical manifestations; physical examination; laboratory tests, diagnostic tests or other medical tests; epidemiologic information; or other evidence of exposure or infection available to the Department or certified local health department at the time.

2)      The petition shall be accompanied by the declaration of the Department or the certified local health department attesting to the facts asserted in the petition, together with any further information that may be relevant and material to the court's consideration.

f)      Upon filing a petition requesting a court order authorizing the isolation, quarantine or closure, or a petition requesting continued isolation, quarantine, or closure, the Department or certified local health department shall serve a notice of the hearing upon the person or persons who are being quarantined or isolated or upon the owner of the property that is being closed at least 24 hours before the hearing. If it is impractical to provide individual notice to large groups who are isolated or quarantined, a copy of the notice shall be posted in a designated location. The notice shall contain the following information:

1)      The time, date and place of the hearing;

2)      The grounds and underlying facts upon which continued isolation, quarantine or closure is sought;

3)      The person's right to appear at the hearing; and

4)      The person's right to counsel, including the right, if the person is indigent, to be represented by counsel designated by the court.

g)      *To obtain a court order, the Department* or certified local health department, *by clear and convincing evidence, must prove that the public's health and welfare are significantly endangered by a person or group of persons that has, that is suspected of having, that has been exposed to, or that is reasonably believed to have been exposed to a dangerously contagious or infectious disease, including non-compliant tuberculosis patients or* that the public's health and welfare have been significantly endangered *by a place where there is a significant amount of activity likely to spread a dangerously contagious or infectious disease. The Department* or certified local health department *must also prove that all other reasonable means of correcting the problem have been exhausted and no less restrictive alternative exists. For purposes of this subsection, in determining whether no less restrictive alternative exists, the court shall consider evidence showing that, under the circumstances presented by the case in which an order is sought, quarantine or isolation is the measure provided for in a rule of the Department or in guidelines issued by the Centers for Disease Control and Prevention or the World Health Organization.*  (Section 2(c) of the Act)

1)      Isolation, quarantine, or closure authorized as a result of a court order shall be for a period not to exceed 30 days from the date of issuance of the court order.

2)      The Department or certified local health department may petition the court to continue the isolation, quarantine, or closure beyond the initial 30 days.

3)      The Department or the certified local health department may petition the court to provide interpreters.

4)      Prior to the expiration of a court order for continued isolation, quarantine, or closure, the Department or certified local health department may petition the court to continue isolation, quarantine, or closure, provided that:

A)      The Department or certified local health department provides the court with a reasonable basis to require continued isolation, quarantine, or closure to prevent a serious and imminent threat to the health and safety of others.

B)      The request for a continued order shall be for a period not to exceed 30 days.

(Source:  Added at 32 Ill. Reg. 3777, effective March 3, 2008)



## OFFICE OF THE ATTORNEY GENERAL
### STATE OF ILLINOIS

**Jim Ryan**
ATTORNEY GENERAL

July 2, 2001

I - 01-028

EMERGENCY PREPAREDNESS:
Emergency Authority to Respond to
an Outbreak of Foot and Mouth Disease

Michael Chamness
Director
Illinois Emergency Management Agency
110 East Adams Street
Springfield, Illinois  62701-1109

Dear Mr. Chamness:

     I have your letter wherein you inquire:  (1) whether
the discovery of a single confirmed case of foot and mouth
disease in Illinois would justify the declaration of a "disaster"
under section 7 of the Illinois Emergency Management Act (20 ILCS
3305/7 (West 2000)); (2) whether the Governor's emergency powers
after the declaration of a disaster include the authority to
restrict persons from entering or leaving areas of the State
other than those in which diseased animals are located; and (3)
whether the Governor may exercise emergency powers for a period
in excess of 30 days after the declaration of a disaster.  In
accordance with your request, I will comment informally upon the
questions you have raised.

     You have noted in your letter that foot and mouth
disease is extremely contagious and spreads easily among cloven-
hoofed animals, such as cattle, sheep, pigs, goats and deer.
Although the disease is not always fatal to infected animals, it
reduces their economic value by interfering with weight gain,
reproduction and milk production both during the course of the
illness and after recovery.  Although foot and mouth disease is
not considered a human health risk, humans can carry the virus on
their clothing, shoes, body and personal items, thereby transmit-

500 South Second Street, Springfield, Illinois  62706  (217) 782-1090  •  TTY: (217) 785-2771  •  FAX: (217) 7
100 West Randolph Street, Chicago, Illinois  60601  (312) 814-3000  •  TTY: (312) 814-3374  •  FAX: (312) 8
1001 East Main, Carbondale, Illinois  62901  (618) 529-6400  •  TTY: (618) 529-6403  •  FAX: (618) 529-4

EXHIBIT
7

Michael Chamness - 2.

ting the disease to animals.  Introduction of the disease into Illinois could have severe adverse consequences for the livestock industry and wildlife community.

Section 4 of the Illinois Emergency Management Act (20 ILCS 3305/4 (West 2000)) defines "disaster" as follows:

"          * * *

'Disaster' means an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause, including but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, or hostile military or paramilitary action.

* * *          "

(Emphasis added.)

The definition of "disaster" is intentionally broad, so as to include all types of occurrences, both natural and man-made, and to permit prevention as well as remediation of damage and loss.  (See Remarks of Rep. Mahar, May 19, 1975, House Debate on House Bill No. 1109, at 190.)  The definition includes the threat of injury or loss of property as well as of life, and to blight and infestation as well as epidemic.  The term "blight" generally refers to plant diseases, and "infestation" to parasites affecting either plants or animals.  (Webster's Third New International Dictionary (1993), 233, 1158-59.)  The use of these terms, together with the expressed legislative intent to include all types of occurrences within the purview of the Act, clearly contemplates that threats to economically important plants and animals, as well as to the health and safety of people, may be considered "disasters".

The cattle and swine industries, in particular, are of great importance to the economy of this State.  The 1997 Census of Agriculture lists Illinois as fourth among the 50 States in

Michael Chamness - 3.

hog production, with the value of animals sold annually exceeding
$1 billion.  Illinois also ranks among the top 20 States in dairy
products and cattle sales, with a combined annual value exceeding
$800 million.  (National Agricultural Statistics Service, U.S.
Department of Agriculture, 1997 Census of Agriculture, Tables 27-
29.)  Related industries, from the manufacture of farm equipment
to food processing and marketing, depend upon the health of the
livestock industry, and, in turn upon the health of the animals
themselves.  Losses which could result from an epidemic of foot
and mouth disease would be no less a disaster to this State and
its inhabitants than the consequences of floods, tornadoes or
earthquakes.

        Available information concerning foot and mouth disease
(see, e.g., the U.S. Department of Agriculture web site at
www.aphis.usda.gov) indicates that morbidity in cattle and swine
is 100%; consequently, virtually all cattle and swine exposed to
the virus become ill.  The disease is apparently less serious and
less virulent in sheep and goat populations, but these animals
can nonetheless transmit it to other, more susceptible, species.
Thus, except in the unlikely event that the disease would appear
in a quarantined animal, a single confirmed case would almost
certainly be the precursor to the appearance of the disease in
all animals with which the infected animal has been in contact.
Moreover, because the virus survives on people, their clothing
and inanimate objects, animals which have had contact with those
caring for the diseased animal may also become ill.  Based upon
the nature of this disease and the potential loss of livestock
its appearance could bring, it must be concluded that the occur-
rence of even a single confirmed case could justify the declara-
tion of a "disaster" due to the "threat of widespread or severe
damage" that the disease would cause if unchecked.

        You have also inquired whether the emergency powers of
the Governor would include the authority to quarantine areas
other than those in which diseased animals are located.  Subsec-
tion 7(a)(8) of the Emergency Services and Disaster Act (20 ILCS
3304/7(a)(8) (West 2000)) provides:

            "Emergency Powers of the Governor.  (a)
            In the event of a disaster, as defined in
            Section 4, the Governor may, by proclamation
            declare that a disaster exists.  Upon such
            proclamation, the Governor shall have and may

Michael Chamness - 4.

exercise for a period not to exceed 30 days
the following emergency powers;   * * *

* * *

(8) To control ingress and egress
to and from a disaster area, the move-
ment of persons within the area, and the
occupancy of premises therein.

* * *                          "

Subsection 7(a)(8) clearly authorizes the Governor to
control travel to, from and within a declared disaster area, but
does not purport to confer authority to control travel outside of
the declared disaster area.  Where the intention of the General
Assembly is clearly expressed, the plain meaning of the statute
must be given effect.  (Finley v. Finley (1980), 81 Ill. 2d 317,
326.)  Consequently, it does not appear that the emergency powers
of the Governor extend to controlling ingress and egress to and
from areas that are not included within the declared disaster
area.  In this regard, it must also be recognized that the
authority to control travel to, from or through the State is
limited by the power of Congress to control interstate commerce
(U.S. Const., art. I, sec. 8) and the right of citizens to travel
among the several States (U.S. Const., art. IV, sec. 2).

Therefore, it appears that the authority of the Gover-
nor to control travel under subsection 7(a)(8) of the Act will
necessarily depend upon the extent of the area which is encom-
passed within the declared "disaster area", as well as any
possible Federal response under Federal civil defense legislation
(42 U.S.C.A. §§ 5121 et seq.; 50 App. U.S.C.A. §§ 2251 et seq.).
If the facts surrounding the discovery of the infection in one or
more animals warrant doing so, it is conceivable that the entire
State could be declared a disaster area, in which case limita-
tions upon ingress and egress to and from as yet disease-free
areas might well be justified.  If, however, the facts indicate
that the threat of exposure to the disease is limited, the area
reasonably subject to travel controls will necessarily be less
extensive.

Lastly, you have inquired whether, under the provisions
of the Illinois Emergency Management Act, an extension of the 30
day time frame within which the Governor may exercise emergency

Michael Chamness - 5.

powers would be permitted.  Subsection 7(a)(1) of the Act (20
ILCS 3305/7(a)(1) (West 2000)) provides:

> "Emergency Powers of the Governor. (a)
> In the event of a disaster, as defined in
> Section 4, the Governor may, by proclamation
> declare that a disaster exists.  Upon such
> proclamation, the Governor shall have and may
> exercise for a period not to exceed 30 days
> the following emergency powers; provided,
> however, that the lapse of the emergency
> powers shall not, as regards any act or acts
> occurring or committed within the 30 days
> period, deprive any person, firm, corpora-
> tion, political subdivision, or body politic
> of any right or rights to compensation or
> reimbursement which he, she, it, or they may
> have under the provisions of this Act:
>
> > (1) To suspend the provisions of
> > any regulatory statute prescribing pro-
> > cedures for conduct of State business,
> > or the orders, rules and regulations of
> > any State agency, if strict compliance
> > with the provisions of any statute,
> > order, rule, or regulation would in any
> > way prevent, hinder or delay necessary
> > action, including emergency purchases,
> > by the Illinois Emergency Management
> > Agency, in coping with the disaster.
>
> > > * * *                              "

In construing a statute, all of its terms and provi-
sions are to be read and considered as a whole to determine not
only its intent and meaning, but also the method of accomplishing
the object to be attained.  (Pascal v. Lyons (1958), 15 Ill. 2d
41, 45.)  An attempt should be made to give meaning to the
expressed intent of the legislature, and to avoid a construction
that would render any portion of the statute meaningless or void.
People v. Tarlton (1982), 91 Ill. 2d 1, 5.

Subsection 7(a)(1) clearly authorizes the Governor to
exercise emergency powers for up to 30 days.  A construction of
its provisions to allow the Governor to extend the 30 day period

Michael Chamness - 6.

would render the limitation clause meaningless.  A more reasonable construction, taking into consideration the other provisions of the Act, is that the Governor would be required to seek legislative approval for the exercise of extraordinary measures extending beyond 30 days.

This construction is supported by references to section 9 of the Act (20 ILCS 3305/9 (West 2000)), which pertains to the financing of disaster response measures.  Section 9 provides for the Governor's use of particular appropriated funds for emergency purposes, and, if necessary and the General Assembly is not in session, the transfer of funds from other accounts or the borrowing of additional funds, but only "until such time as a quorum of the General Assembly can convene in regular or extraordinary session".  The purpose of this provision, like section 7 of the Act, is to empower the Governor to deal immediately with emergency situations.  Even though many disaster situations could require remediation for a period long in excess of 30 days, normal governmental processes, including legislative action, can be set in motion to meet such needs within 30 days of the occurrence.

In conclusion, it appears that a single confirmed case of foot and mouth disease in Illinois could provide the basis for the Governor's declaration of a disaster.  The Governor's emergency powers do not extend to the control of travel to or from areas which are not within a declared disaster area.  Further, the emergency powers granted to the Governor cannot be extended beyond the 30 day period permitted in subsection 7(a) of the Illinois Emergency Management Act without legislative approval.

Sincerely,

MICHAEL J. LUKE
Senior Assistant Attorney General
Chief, Opinions Bureau

MJL:KJS:cj

Exhibit B

COPY

**IN THE CIRCUIT COURT
FOR THE FOURTH JUDICIAL CIRCUIT
CLAY COUNTY, ILLINOIS**

**FILED**

**APR 27 2020**


CIRCUIT CLERK OF THE
FOURTH JUDICIAL CIRCUIT
CLAY COUNTY ILLINOIS

| | |
|---|---|
| Darren Bailey | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2020-CH-06 |
| | ) |
| Governor Jay Robert Pritzker, | ) |
| in his official capacity. | ) |
| | ) |
| Defendant. | ) |

## TEMPORARY RESTRAINING ORDER WITH NOTICE

This Cause coming to be heard on Plaintiffs' Motion for Temporary Restraining

Order, notice having been given, the Court finds as follows:

1. Plaintiff has filed a verified Complaint and verified Motion for Temporary

    Restraining Order and Preliminary Injunction.

2. Plaintiff also filed a brief in support along with a supplemental brief and

    accompanying documentation.

3. Defendant has filed his written response.

4. The Court has considered the pleadings filed to date and has further considered

    the arguments of counsel made in open court on this date.

5. Plaintiff has shown he has a clearly ascertainable right in need of immediate

    protection, namely his liberty interest to be free from Pritzker's executive order of

    quarantine in his own home.

6. Plaintiffs' Verified Complaint, Verified Motion for Temporary Restraining Order

    and Preliminary Injunction, along with his accompanying legal brief as well as its

    supplement, show Plaintiff has a reasonable likelihood of succeeding on the

COPY

merits.

7. Plaintiff has shown he will suffer irreparable harm if the Temporary Restraining order is not issued.

8. Plaintiff has shown he has no adequate remedy at law or in equity in that absent a Temporary Restraining Order being entered, Plaintiff, will continue to be isolated and quarantined in his home.

WHEREFORE, based on the above findings of this Court, IT IS HEREBY ORDERED:

A. Governor Jay Robert Pritzker, or anyone delegated by him, is hereby enjoined from in anyway enforcing the March 20 Executive Order against Darren Bailey forcing him to isolate and quarantine in his home;

B. Governor Jay Robert Pritzker is hereby enjoined from entering any further Executive Orders against Darren Bailey forcing him to isolate and quarantine in his home;

C. This Temporary Restraining Order shall remain in full force and effect ~~for ten~~ ~~days from the date hereof or~~ until _A DATE TO BE AGREED UPON BY THE_ ~~[a.m.] [p.m.] on~~ _PARTIES, NOT TO EXCEED 30 DAYS from TODAY, WHEREIN A PRELIMINARY_ ~~, 2020, unless sooner modified or~~ _INJUNCTION WILL BE HEARD ON THAT DATE._ ~~dissolved by this Court.~~

D. This Temporary Restraining Order is entered at ___3:15___ [a.m.] (p.m.) on ___APRIL 27,___ , 2020

DATED this ___27___ day of ___April___ , 2020.

_Michael D. May_
JUDGE

2020-CH-06
Page 2 of 3

COPY

Thomas DeVore
IL Bar No. 6305737
**DeVore Law Offices, LLC**
Attorney for Plaintiff
118 North Second Street
Greenville, Illinois 62246
Telephone 618.664.9439
tom@silverlakelaw.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 27, 2020, I electronically filed the foregoing Notice of Interlocutory Appeal with the Clerk of the Circuit Court for the Fourth Judicial Circuit, Clay County, Illinois, by using the Odyssey eFileIL system.

I further certify that the other participant in this appeal, named below, is not a registered service contact on the Odyssey eFileIL system, and thus was served by transmitting a copy from my e-mail address to the e-mail address of record indicated below on April 27, 2020.

> Thomas G. DeVore
> tom@silverlakelaw.com

Under penalties as provided by law pursuant to section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth in this instrument are true and correct to the best of my knowledge, information, and belief.

> /s/ Nadine J. Wichern
> NADINE J. WICHERN
> Assistant Attorney General
> 100 West Randolph Street
> 12th Floor
> Chicago, Illinois 60601
> (312) 814-5659/1497
> Primary e-service:
> CivilAppeals@atg.state.il.us
> Secondary e-service:
> nwichern@atg.state.il.us

Exhibit C



**\*254243\***

Law firm ref#:

# IN THE CIRCUIT COURT
# FOR THE FOURTH JUDICIAL CIRCUIT
# CLAY COUNTY, ILLINOIS

**Darren Bailey,**
    Plaintiff(s),
vs.

**Case No.: 2020CH6**

**Governor Jay Robert Pritzker, in his official capacity,**
    Defendant(s).



## AFFIDAVIT OF SPECIAL PROCESS SERVER

Jason Holinka, Being first duly sworn on oath, deposes and states the following:

I am over the age of 18 and not a party to this action. I am an employee of ATG LegalServe, Inc., Illinois Department of Financial and Professional Regulation number 117.001494.

**INDIVIDUAL/ENTITY TO BE SERVED: Jay Robert Pritzker, in his official capacity as Governor of Illinois**

I, Served the within named INDIVIDUAL/ENTITY on April 24, 2020 @ 3:40 PM

CORPORATE SERVICE: by leaving a copy of this process with **Ann Spillane** . (Title): **General Counsel** , a person authorized to accept service. I informed that person of the contents thereof.

TYPE OF PROCESS: **Summons, Legal Brief in Support of Darren Bailey's Verified Complaint for Declaratory Judgement and Injunctive Relief, Verified Complaint for Declaratory Judgement and Injunctive relief, Verified Motion for Motion for Temporary Restraining Order and Preliminary Injunction With Notice**

**ADDRESS WHERE SERVED: 100 W. Randolph Street, #16-100, Chicago, IL 60601**

The sex, race and approximate age of the individual with whom the copy of this process was left is as follows:

Sex: **Female** - Race: **White** - Hair: **Brown** - Approx. Age: **45-55** - Height: **5ft 08in** - Weight: **130 lbs**

The undersigned verifies that the statements set forth in this Affidavit of Service are true and correct.

State of _Illinois_

County of _Cook_

Jason Holinka, Process Server
Dated _4-28-20_

This instrument was subscribed and sworn to before me on _4-28-2020_ (date)
By _Jason Holinka_ (name/s of person/s)

_Walter Sindelar_
Signature of Notary Public

OFFICIAL SEAL
WALTER SINDELAR
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/08/21

ATG LegalServe Inc
105 W. Adams Street, Suite 1350
Chicago, IL 60603
312-855-0303

# Exhibit D

# IN THE CIRCUIT COURT
# FOR THE FOURTH JUDICIAL CIRCUIT
# CLAY COUNTY, ILLINOIS

**FILED**

APR 2 3 2020

CIRCUIT CLERK OF THE
FOURTH JUDICIAL CIRCUIT
CLAY COUNTY ILLINOIS

 **COPY**

Darren Bailey                                          )
                                       )
         Plaintiff,                        )         **2020CH6**
                                         )
   vs.                                                )        Case No. 2020-CH-_____
                                         )
Governor Jay Robert Pritzker,                         )
in his official capacity.                             )
                                         )
        Defendant.                        )

### *SUMMONS*

Respondent:    Jay Robert Pritzker, in his official capacity as Governor of Illinois
                   Office of the Governor
                   207 State House
                   Springfield, IL 62706

YOU ARE SUMMONED and required to appear in this cause, or otherwise file your answer, in the office of the Clerk of the Circuit Court, Clay County, P.O. Box 100, 111 Chestnut, Louisville, IL 62858, within thirty (30) days after service of this summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT OR DECREE BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS ATTACHED HERETO.

E-filing is now mandatory for documents in civil cases with limited exemptions. To e- file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or speak to your local Circuit Clerk's Office.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This summons may not be served and returned latter than three (3) days before the date of appearance.

                                 Clerk of the Circuit Court

DATED:   4/23/2020 _____    By:_____ /s/ Tammy Traub

Thomas G. DeVore
IL Bar Reg. No. 06305737
**DeVore Law Offices, LLC.**
Attorneys for Plaintiffs
118 N. 2nd St.
Greenville, IL 62246
Telephone - 618-664-9439
tom@silverlakelaw.com

Date of Service:_____, 2020.
(To be inserted by officer on copy left with defendant or other person)

## AFFIDAVIT OF SERVICE

I certify that I served the foregoing Summons along with a copy of the complaint in this matter on the defendant as follows:

(a) (Individual Defendants-personal):

(The officer or other person making service, shall (a) identify as to sex, race and approximate age of the Defendant with whom he left the Summons, and (b) state the place where (whenever possible in terms of an exact street address and the date and time of the day when the Summons was left with the Defendant.)

_____

_____

(b) (Individual defendants-abode):

By leaving a copy of this summons and a copy of the Complaint at the usual place of abode of each individual defendant with a person or his/her family, of the age of 13 years or older, informing that person of the contents of the Summons. (The officer or other person making service, shall (a) identify as to sex, race and approximate age of the person, other than the Defendant, with whom he left the Summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of day when the Summons was left with such person.)

_____

_____

_____

And also by sending a copy of the Summons and of the Complaint in a sealed envelope with postage fully prepaid, addressed to each individual Defendant at his/her usual place of abode, as follows:

Name of Defendant Mailing Address Date of Mailing

_____   _____   _____

_____   _____   _____

(c) (Corporation defendants)

By leaving a copy of this Summons and a copy of the Complaint with the registered agent, officer or agent of each Defendant corporation, as follows:

Defendant Corporation Registered agent, officer or agent Date of Service

_____   _____   _____

_____   _____   _____

By:_____

Exhibit E

FILED
Clay Co. Circuit Court
4th Judicial Circuit
Date: 4/23/2020 4:03 PM
Crystal Ballard

**IN THE CIRCUIT COURT
FOR THE FOURTH JUDICIAL CIRCUIT
CLAY COUNTY, ILLINOIS**

Darren Bailey                              )
                                        )
          Plaintiff,                )           **2020CH6**
                                          )
      vs.                        )      Case No. 2020-CH-_____
                                          )
Governor Jay Robert Pritzker,      )
in his official capacity.             )
                                          )
         Defendant.          )

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

COMES NOW Plaintiff, Darren Bailey, (hereinafter referred to as "Bailey") by and through his attorneys, Thomas G. DeVore, Erik Hyam, and DeVore Law Offices, LLC, and for his Verified Complaint for Declaratory Judgment and Injunctive Relief against Defendant, Governor Jay Robert Pritzker (hereinafter referred to as "Pritzker"), in his official capacity, and hereby alleges as follows:

1. On March 09, 2020, Pritzker issued a proclamation declaring, as of that date, a disaster existed within Illinois. (See Exhibit 1 hereinafter referred to as the "March 09 Proclamation")

2. Pritzker issued the proclamation pursuant to the authority granted him under the Illinois Emergency Management Agency Act. (See Section 1 of the March 09 Proclamation) (See also 20 ILCS 3305 *et seq.* which is hereinafter referred to as the "Act")

3. The Act states: "In the event of a disaster, as defined in Section 4, the Governor may by proclamation declare that a disaster exists. (See 20 ILCS 3305/7)

4. Section 4 of The Act defines a disaster as follows:

   "Disaster" means an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause, including

1

but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, hostile military or paramilitary action, public health emergencies, or acts of domestic terrorism.  (See 20 ILCS 3305/4)

5.  Pritzker determined the COVID-19 pandemic to be a "public health emergency" (See the March 09 Proclamation)

6.  As a result of the COVID-19 pandemic, Pritzker declared all 102 counties within Illinois a disaster area. (See Section 1 of March 09 Proclamation)

7.  Bailey is citizen and lawful resident of Cole County Illinois.

8.  Subsequent to a disaster proclamation, The Act confers specific enumerated powers upon the Governor of the State of Illinois.  (See 20 ILCS 3305/2(a)(2))

9.  Amongst those enumerated powers are thirteen (13) emergency powers as provided in section 7 of The Act.  (See 20 ILCS 3305/7)

10. Section 7 of the Act expressly states:

"Upon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days the following emergency powers…. (See 20 ILCS 3305/7)

11. Pursuant to the statutory authority granted Pritzker via 20 ILCS 3305/7, resulting from the March 09 Proclamation, on March 20, 2020 he issued Executive Order 2020-10.  (See attached Exhibit 2) (hereinafter referred to as the "March 20 Executive Order")

12.  The March 20 Executive Order, *inter alia*, limits Bailey's constitutionally protected freedoms in that it ordered him to stay at home, or at his place of residence, as well as limited his ability to travel within the state. (See Section 1 of the March 20 order)

13. The March 20 Executive Order on its face was effective from March 21, 2020 through April 07, 2020.  (See the "therefore" clause of the March 20 Executive Order)

14. On April 01, 2020 Pritzker issued a second proclamation.  (See Exhibit 3) (hereinafter referred to as the "April 01 Proclamation")

15. In the April 01 Proclamation, Pritzker declares the COVID-19 pandemic to be a "continuing public health emergency".  (See the April 01 Proclamation)

16. On that same date of April 01, 2020, Pritzker issues Executive Order 2020-18. (See attached Exhibit 4) (hereinafter referred to as the "April 01 Executive Order")

17. In the April 01 Executive Order, Pritzker specifically acknowledges the March 09 Proclamation and the April 01 Proclamation were both in direct response to the COVID-19 pandemic. (See the April 01 Executive Order)

18. The April 01 Executive Order, *inter alia*, extended the duration of the March 20 Executive Order until April 30, 2020. (See the April 01 Executive Order)

19. As a direct result of the April 01 Executive Order, Pritzker has acted to restrain Bailey within his residence, as well as limit his travel, for a period of time from March 21, 2020 until April 30, 2020 as the result of the COVID-19 pandemic which was declared a disaster on March 09, 2020.

20. Additionally, Pritzker on announced publicly on April 23, 2020 on his daily 2:30 P.M. press conference, that effective May 01, 2020, he will issue another extension of the March 20, 2020 order restrain Bailey within his residence, as well as limit his travel, within the state.

<u>COUNT I</u>
<u>DECLARATORY JUDGMENT</u>

21. Plaintiff restates paragraphs 1-20 as if more fully stated herein.

22. In relation to the specific matters raised herein, Pritzker must act within the statutory authority granted him in The Act.

3

23. Bailey is a citizen and resident of Clay County, Illinois and as such has a right to demand the executive orders issued by Pritzker pursuant to a declaration of a disaster are within the confines of the authority granted Pritzker by the legislature pursuant to The Act.

24. Pursuant to The Act, Pritzker issued the March 09 Proclamation wherein he determined the COVID-19 pandemic to be a disaster.

25. As a result of the March 09 Proclamation, Pritzker issued the March 20 Executive Order wherein he, *inter alia*, ordered Bailey to remain within the confines of his home, as well as limited his travel, absent certain specific exceptions.

26. Assuming arguendo, the March 20 Executive Order doesn't suffer other fatal defects, The Act is unambiguous in that it limits Pritzker's authority to utilize such an emergency order for a period of time not to exceed 30 days from the date of the declaration of said disaster.

27. Given the proclamation of the COVID-19 disaster was March 09, 2020, the March 20 executive order was as a matter of law required to lapse on or before April 08, 2020.

28. On April 01, 2020 Pritzker issues the April 01 proclamation, wherein he declares COVID-19 to be a "continuing disaster".

29. On that same day of April 01, 2020, Pritzker issued the April 01 Executive Order, and ordered, *inter alia*, a continuance of his March 20 Executive Order until April 30, 2020.

30. As such, Pritzker, under the color of authority granted him by The Act, is utilizing the emergency powers for more than 30 days from the declaration of disaster resulting from the COVID-19 virus which was pronounced on March 09, 2020.

31. Pritzker is issuing redundant proclamations acknowledging the same COVID-19 virus as a "continuing disaster", wherein he is reenergizing the emergency provisions of The Act for

the sole purpose of rendering the statutory 30-day limitation placed on his emergency powers meaningless.

32. Bailey's interests are in opposition to Pritzker's in that Bailey insists Pritzker can only issue emergency executive orders within the confines of his authority delegated to him by the legislature under The Act. (See Bailey's Legal Brief which shall be incorporated herein by reference).

33. An actual controversy exists between the parties in regard to the authority of Pritzker to issue and enforce emergency orders under The Act for more than 30 days as a result of the ongoing COVID-19 disaster which began March 09, 2020.

34. An immediate and definitive determination is necessary to clarify the rights and interests of the parties.

WHEREFORE, Plaintiff, Darren Bailey, herein request that this court enter an Order:

A.    Entering an order finding Pritzker declared the COVID-19 pandemic a state-wide disaster on March 09, 2019;

B.    Entering an order finding the emergency powers granted Pritzker as a result of the March 09 Proclamation lapsed on April 08, 2020;

C.    Entering an order declaring the March 20 Executive Order lapsed at the end of April 07, 2020;

D.    Entering a finding that Pritzker's April 01 Emergency Order extending the effective date of his March 20 Executive Order until April 30, 2020 was in excess of the authority granted him under The Act;

E.    Enter an order finding that any further emergency executive orders in response to the COVID-19 continuing disaster, be it continuations or otherwise, issued

subsequent to April 08, 2020 ordering Bailey remain within the confines of his home, as well as limited his travel, absent certain specific exceptions are void ab initio; and

F.      Awarding the Plaintiff his costs incurred in this matter as may be allowed by law;

G.      That the Court grant such other and further relief as is just and proper.

COUNT II
REQUEST FOR INJUNCTION

35. Plaintiff restates paragraphs 1-34 as if more fully stated herein.

36. The Act clearly limits Pritzker's authority to issue emergency orders under The Act for a period of time not to exceed 30 days from the declaration of a disaster.

37. Bailey has a right to insist Pritzker's executive orders comport to the confines of the authority delegated to Pritzker under The Act.

38. Bailey is being irreparably harmed each and every day beyond April 08, 2020 in which he continues to be subjected to Pritzker's ultra vires executive order.

39. Bailey has no adequate remedy at law to prohibit Pritzker from enforcing the executive orders against him absent an injunction from This Court ordering the same.

40. There is a reasonably likelihood of success on the merits in that the disaster proclamation resulting from the COVID-19 pandemic originated on March 09, 2020 and as such any emergency order of Pritzker resulting from this proclaimed disaster lapsed on April 08, 2020 under the clear and unambiguous language of The Act.

WHEREFORE, Plaintiff, Darren Bailey, prays that this Court enter judgment in his favor and finds and declares that:

A.      Finding the Plaintiff has a right to insist Pritzker's executive orders relative to this cause were issued within the authority delegated by the legislature.

6

B.     Finding Bailey is irreparably harmed each day he is subjected to the executive orders relative to this cause.

C.     Finding Bailey has no adequate remedy at law to protect his rights against any unlawful orders of Pritzker beyond injunctive relief.

D.     Finding Bailey has a likelihood of success on the merits that the April 01 Executive Order extending the March 20 Executive Order until April 30, 2020 is void.

E.     Enter an injunction permanently enjoining Pritzker, or anyone under his authority, from enforcing the March 20 Executive Order against Bailey from this date forward.

F.     For such other relief as this Court deems just and proper.

Respectfully submitted,


By:     /s/ Thomas Devore
          Thomas G. DeVore
          IL Bar Reg. No. 6305737
          **DeVore Law Offices, LLC**
          Attorneys for Plaintiff
          118 N. 2nd St.
          Greenville, IL 62246
          Telephone - 618-664-9439
          tom@silverlakelaw.com

          /s/ Erik Hyam
          Erik Hyam
          IL Bar No. 6311090
          **DeVore Law Offices, LLC**
          Attorneys for Plaintiff
          118 N. Second Street
          Greenville, IL 62246
          Tel. (618) 664.9439
          Fax (618) 664.9486
          erik@silverlakelaw.com

## VERIFICATION

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct except as to matters therein stated to be on information and belief, if any, and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be true.

Date: 4-23 , 2020          By: _____

                                Darren Bailey

8



# STATE OF ILLINOIS

## EXECUTIVE DEPARTMENT

## Proclamation

WHEREAS, in late 2019, a new and significant outbreak of Coronavirus Disease 2019 (COVID-19) emerged in China; and,

WHEREAS, COVID-19 is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

WHEREAS, certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

WHEREAS, we are continuing our efforts to prepare for any eventuality given that this is a novel illness and given the known health risks it poses for the elderly and those with serious chronic medical conditions; and,

WHEREAS, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 31, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

WHEREAS, the World Health Organization has reported 109,578 confirmed cases of COVID-19 and 3,809 deaths attributable to COVID-19 globally as of March 9, 2020; and,

WHEREAS, in response to the severe COVID-19 outbreak in China, Iran, Italy and South Korea, the Centers for Disease Control and Prevention ("CDC") has deemed it necessary to prohibit or restrict non-essential travel to or from these countries; and,

WHEREAS, the CDC has advised older travelers and those with chronic medical conditions to avoid nonessential travel, and has advised all travelers to exercise reduced precautions; and,

WHEREAS, the CDC currently recommends community preparedness and everyday prevention measures be taken by all individuals and families in the United States, including voluntary home isolation when individuals are sick with respiratory symptoms, covering coughs and sneezes with a tissue, washing hands often with soap and water for at least 20 seconds, use of alcohol-based hand sanitizers with at least 60% alcohol if soap and water are not readily available, and routinely cleaning frequently touched surfaces and objects to increase community resilience and readiness for responding to an outbreak; and,

WHEREAS, a vaccine or drug is currently not available for COVID-19; and,

WHEREAS, in communities with confirmed COVID-19 cases, the CDC currently recommends mitigation measures, including staying at home when sick, when a household member is sick with respiratory diseases symptoms or when instructed to do so by public health officials or a health care provider and keeping away from others who are sick; and,

WHEREAS, despite efforts to contain COVID-19, the World Health Organization and the CDC indicate that it is expected to spread; and,

WHEREAS, there are currently 11 confirmed cases of COVID-19 and an additional 190 persons under investigation in Illinois; and,

WHEREAS, one of the confirmed cases of COVID-19 in Illinois has not been linked to any travel activity or an already confirmed COVID-19 case, which indicates community transmission in Illinois; and,

WHEREAS, based on the foregoing, the circumstances surrounding COVID-19 constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that the effects of COVID-19 are mitigated and minimized and that residents and visitors in the State remain safe and secure; and,

WHEREAS, this proclamation will enable Illinois agencies to coordinate State and Federal resources, including the Strategic National Stockpile of medicines and protective equipment, to support local governments in preparation for any action that may be necessary related to the potential impact of COVID-19 in the State of Illinois; and,

WHEREAS, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the issuance of a proclamation of disaster;

NOW, THEREFORE, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

Section 1.  Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area.

Section 2.  The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to coordinate its resources with others with respect to planning for and responding to the present public health emergency.

Section 3.  The Illinois Department of Public Health is further directed to coordinate with the Governor, other State agencies and local authorities, including local public health authorities, in the development of strategies and plans to protect the public health to remain in sync with the present public health emergency.

Section 4.  The Illinois Emergency Management Agency is directed to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

Section 5.  To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law. If necessary, and in accordance with Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

Section 6.  Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation activates the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

Section 7.  The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to recommend, and, as appropriate, take necessary actions to ensure consumers do not face financial barriers to accessing diagnostic testing and treatment services for COVID-19.

Section 8.  The Illinois State Board of Education is directed to recommend, and, as appropriate, take necessary actions to address obstacle education due to transmission of COVID-19 and to eliminate any barriers to the use of e-learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

Section 9.  Pursuant to Section 7(13) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(13), to ensure to the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect.

Section 10.  This proclamation can facilitate a request for Federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

Section 11.  This proclamation shall be effective immediately and remain in effect for 30 days.

**In Witness Whereof,** *I have hereunto set my hand and caused the Great Seal of the State of Illinois to be affixed.*

*Done at the Capitol in the City of Springfield,*

*this* ___NINTH___ *day of* ___MARCH___ *, in the Year of Our Lord, two thousand and* ___TWENTY___ *, and of the State of Illinois, two hundred and* ___SECOND___ *.*



*Jesse White*
SECRETARY OF STATE

**EXHIBIT**
1

*JB Pritzker*
GOVERNOR

**GUBERNATORIAL DISASTER PROCLAMATION**

**WHEREAS**, in late 2019, a new and significant outbreak of Coronavirus Disease 2019 (COVID-19) emerged in China; and,

**WHEREAS**, COVID-19 is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS**, certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS**, we are continuing our efforts to prepare for any eventuality given that this is a novel illness and given the known health risks it poses for the elderly and those with serious chronic medical conditions; and,

**WHEREAS**, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS**, the World Health Organization has reported 109,578 confirmed cases of COVID-19 and 3,809 deaths attributable to COVID-19 globally as of March 9, 2020; and,

**WHEREAS**, in response to the recent COVID-19 outbreaks in China, Iran, Italy and South Korea, the Centers for Disease Control and Prevention ("CDC") has deemed it necessary to prohibit or restrict non-essential travel to or from those countries; and,

**WHEREAS**, the CDC has advised older travelers and those with chronic medical conditions to avoid nonessential travel, and has advised all travelers to exercise enhanced precautions; and,

**WHEREAS**, the CDC currently recommends community preparedness and everyday prevention measures be taken by all individuals and families in the United States, including voluntary home isolation when individuals are sick with respiratory symptoms, covering coughs and sneezes with a tissue, washing hands often with soap and water for at least 20 seconds, use of alcohol-based hand sanitizers with at least 60% alcohol if soap and water are not readily available, and routinely cleaning frequently touched surfaces and objects to increase community resilience and readiness for responding to an outbreak; and,

**WHEREAS**, a vaccine or drug is currently not available for COVID-19; and,

**WHEREAS**, in communities with confirmed COVID-19 cases, the CDC currently recommends mitigation measures, including staying at home when sick, when a household

member is sick with respiratory disease symptoms or when instructed to do so by public health officials or a health care provider and keeping away from others who are sick; and,

**WHEREAS**, despite efforts to contain COVID-19, the World Health Organization and the CDC indicate that it is expected to spread; and,

**WHEREAS**, there are currently 11 confirmed cases of COVID-19 and an additional 260 persons under investigation in Illinois; and,

**WHEREAS**, one of the confirmed cases of COVID-19 in Illinois has not been linked to any travel activity or to an already-confirmed COVID-19 case, which indicates community transmission in Illinois; and,

**WHEREAS**, based on the foregoing, the circumstances surrounding COVID-19 constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS**, it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that the effects of COVID-19 are mitigated and minimized and that residents and visitors in the State remain safe and secure; and,

**WHEREAS**, this proclamation will assist Illinois agencies in coordinating State and Federal resources, including the Strategic National Stockpile of medicines and protective equipment, to support local governments in preparation for any action that may be necessary related to the potential impact of COVID-19 in the State of Illinois; and,

**WHEREAS**, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the issuance of a proclamation of disaster;

**NOW, THEREFORE**, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1**. Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area.

**Section 2**. The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3**. The Illinois Department of Public Health is further directed to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4**.  The Illinois Emergency Management Agency is directed to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

**Section 5**.  To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law.  If necessary, and in accordance with Section 7(1) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6**.  Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation activates the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7**.  The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to recommend, and, as appropriate, take necessary actions to ensure consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8**.  The Illinois State Board of Education is directed to recommend, and, as appropriate, take necessary actions to address chronic absenteeism due to transmission of COVID-19 and to alleviate any barriers to the use of e-learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9**.  Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect:

**Section 10**.  This proclamation can facilitate a request for Federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

**Section 11**.  This proclamation shall be effective immediately and remain in effect for 30 days.

Issued by the Governor March 9, 2020
Filed by the Secretary of State March 9, 2020

Case: 1:20-cv-02665 Document #: 1-1 Filed 05/21/20 Page 204 of 238 PageID #:21

**STATE OF ILLINOIS**

**EXECUTIVE DEPARTMENT**

**SPRINGFIELD, ILLINOIS**

FILED
INDEX DEPARTMENT

MAR 2 0 2020

IN THE OFFICE OF
SECRETARY OF STATE

**EXHIBIT**

**2**

March 20, 2020

Executive Order 2020-10

<u>**EXECUTIVE ORDER IN RESPONSE TO COVID-19**</u>
<u>**(COVID-19 EXECUTIVE ORDER NO. 8)**</u>

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (Gubernatorial Disaster Proclamation) in response to the outbreak of Coronavirus Disease 2019 (COVID-19); and,

**WHEREAS**, in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS**, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19;

**WHEREAS**, COVID-19 has resulted in significant economic impact, including loss of income and wages, that threaten to undermine housing security and stability;

**WHEREAS**, the enforcement of eviction orders for residential premises is contrary to the interest of preserving public health and ensuring that individuals remain in their homes during this public health emergency;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(8), 7(10), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective March 21, 2020 at 5:00 pm and for the remainder of the duration of the Gubernatorial Disaster Proclamation, which currently extends through April 7, 2020:

**Section 1. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations**

1. <u>**Stay at home or place of residence.**</u>  With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order.  To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order.  All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.

Health (IDPH)). Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location. For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease.** All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open. To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order. Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order. Nothing in this Executive Order prohibits the gathering of members of a household or residence.

   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

   This Executive Order supersedes Section 2 of Executive Order 2020-07 (COVID-19 Executive Order No. 5), which prohibited gatherings of 50 people or more.

4. **Prohibited and permitted travel.** All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.** For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

   a. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

   b. **For necessary supplies and services.** To obtain necessary services or supplies for themselves and their family or household members, or to deliver those

c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, playgrounds may increase spread of COVID-19, and therefore shall be closed.

d. **For certain types of work.** To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

e. **To take care of others.** To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

7. **Healthcare and Public Health Operations.** For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts

Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, group day care homes, and day care centers licensed as specified in Section 12(s) of this Executive Order; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.** For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.** For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential

11. **Businesses covered by this Executive Order**. For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations**. For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:[1]

   a. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

   b. **Food, beverage, and cannabis production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

   c. **Organizations that provide charitable and social services**. Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

   d. **Media**. Newspapers, television, radio, and other media services;

   e. **Gas stations and businesses needed for transportation.** Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

   f. **Financial institutions**. Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;

   g. **Hardware and supply stores**. Hardware stores and businesses that sell electrical, plumbing, and heating material;

cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services.** Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions.** Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools are ordered closed through April 7, 2020;

k. **Laundry services.** Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home.** Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations.** Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q. **Residential facilities and shelters**. Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r. **Professional services**. Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

s. **Day care centers for employees exempted by this Executive Order**. Day care centers granted an emergency license pursuant to Title 89, Section 407.400 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation.

t. **Manufacture, distribution, and supply chain for critical products and industries**. Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

u. **Critical labor union functions**. Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible.

v. **Hotels and motels**. Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

w. **Funeral services**. Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations**. For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

Basic Operations.

   b. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

   c. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

   d. Travel to return to a place of residence from outside the jurisdiction.

   e. Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

   f. Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements**. For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

   a. **Required measures.** Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

      i. **Designate six-foot distances**. Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

      ii. **Hand sanitizer and sanitizing products.** Having hand sanitizer and sanitizing products readily available for employees and customers;

      iii. **Separate operating hours for vulnerable populations**. Implementing separate operating hours for elderly and vulnerable customers; and

      iv. **Online and remote access**. Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Executive Order**. The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements. All provisions of this Executive Order should be interpreted to effectuate this intent.

17. **Enforcement**. This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

specific location for a limited period of time, including the duration of this public health emergency. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

**Section 2. Order ceasing evictions.**

Pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(2), (8), and (10), all state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential premises for the duration of the Gubernatorial Disaster Proclamation. No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage.

**Section 3. Savings clause.**

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

JB Pritzker, Governor

Issued by the Governor March 20, 2020
Filed by the Secretary of State March 20, 2020

FILED
INDEX DEPARTMENT

MAR. 2 0 2020

IN THE OFFICE OF
SECRETARY OF STATE



# EXECUTIVE DEPARTMENT

F I L E D
INDEX DEPARTMENT

APR 8 1 2020

IN THE OFFICE OF
SECRETARY OF STATE



## Proclamation



EXHIBIT
3

**WHEREAS,** Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS,** certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS,** the State of Illinois is continuing its efforts to prepare for any eventuality given that this is a novel illness and given the known health risks it poses for the elderly and those with serious chronic medical conditions; and,

**WHEREAS,** the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and has reported more than 750,000 confirmed cases of COVID-19 and 36,500 deaths attributable to COVID-19 globally as of March 31, 2020; and,

**WHEREAS,** the Centers for Disease Control and Prevention (CDC) currently recommends that all United States residents take precautions to contain the spread of COVID-19, including that they: (1) practice social distancing by maintaining 6 feet of distance from others and avoiding all gatherings; (2) be alert for symptoms such as fever, cough, or shortness of breath, and take their temperature if symptoms develop; and (3) exercise appropriate hygiene, including covering coughs and sneezes with a tissue, washing hands often with soap and water for at least 20 seconds, using of alcohol-based hand sanitizers with at least 60% alcohol if soap and water are not readily available, and routinely cleaning frequently touched surfaces and objects to increase community resilience and readiness for responding to an outbreak; and,

**WHEREAS,** the CDC also recommends the following precautions for household members, caretakers and other persons having close contact with a person who is symptomatic, during the period from 48 hours before onset of symptoms until the symptomatic person meets the criteria for discontinuing home isolation: (1) stay home until 14 days after last exposure and maintain social distance (at least 6 feet) from others at all times; (2) self-monitor for symptoms, including checking their temperature twice a day and watching for fever, cough, or shortness of breath; and (3) avoid contact with people at higher risk for severe illness (unless they live in the same home and had the same exposure); and,

**WHEREAS,** a vaccine or drug is currently not available for COVID-19; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization and the CDC indicate that it is expected to continue spreading; and,

over all financial stability and security for individuals and businesses throughout Illinois; and,

**WHEREAS,** on March 13, 2020, the President declared a nationwide emergency pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"), covering all states and territories, including Illinois; and,

**WHEREAS,** on March 26, 2020, the President declared a major disaster in Illinois pursuant to Section 401 of the Stafford Act; and,

**WHEREAS,** I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 in response to the outbreak of COVID-19; and,

**WHEREAS,** based on the foregoing, the circumstances surrounding COVID-19 constitute a continuing public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS,** the circumstances surrounding COVID-19 have resulted in the occurrence and threat of widespread and severe damage, injury, and loss of life and property under Section 4 of the Illinois Emergency Management Agency Act; and,

**WHEREAS,** it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that the effects of COVID-19 are mitigated and minimized to the greatest extent possible and that Illinoisans remain safe and secure; and,

**WHEREAS,** this proclamation will assist Illinois agencies in coordinating State and Federal resources, including the Strategic National Stockpile of medicines and protective equipment, to support local governments in preparation for any action that may be necessary related to the potential impact of COVID-19 in the State of Illinois; and,

**WHEREAS,** these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the issuance of a proclamation of disaster;

**NOW, THEREFORE,** in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1.** Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a continuing disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area. This proclamation continues the Governor's authority to exercise all of the emergency powers provided in Section 7 of the Illinois Emergency Management Agency Act, 20, ILCS 3305/7, including but not limited to those specific emergency powers set forth below.

**Section 2.** The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to continue to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3.** The Illinois Department of Public Health is further directed to continue to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development and implementation of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4.** The Illinois Emergency Management Agency is directed to continue to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6.** Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation continues the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7.** The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to continue to recommend, and, as appropriate, take necessary actions to ensure consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8.** The Illinois State Board of Education is directed to continue to recommend, and, as appropriate, take necessary actions to address chronic absenteeism due to transmission of COVID-19 and to alleviate any barriers to the use of e-learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9.** All State agencies are directed to cooperate with the Governor, other State agencies and local authorities in the development and implementation of strategies and plans to cope with and recover from the economic impact of COVID-19.

**Section 10.** Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect.

**Section 11.** This proclamation can facilitate requests for federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

**Section 12.** This proclamation shall be effective immediately and remain in effect for 30 days.

**In Witness Whereof** *I have hereunto set my hand and caused the Great Seal of the State of Illinois to be affixed.*



*Done at the Capitol in the City of Springfield this first day of April, in the Year of Our Lord two thousand and twenty, and the State of Illinois two hundred and second.*

FILED
INDEX DEPARTMENT

EXECUTIVE DEPARTMENT  F I L E D
INDEX DEPARTMENT

SPRINGFIELD, ILLINOIS

APR 0 1 2021

IN THE OFFICE OF
SECRETARY OF STATE

**EXHIBIT**
4

April 1, 2020

Executive Order 2020-18

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
## (COVID-19 EXECUTIVE ORDER NO. 16)

**WHEREAS,** Coronavirus 2019 (COVID-19) is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization (WHO) and the federal Centers for Disease Control and Prevention (CDC) have declared that it is expected to spread; and,

**WHEREAS,** certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS,** in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS,** social distancing, which requires maintaining at least a six-foot distance between people, is a paramount strategy for minimizing the spread of COVID-19 in our communities; and,

**WHEREAS,** current testing availability has identified further spread of confirmed cases throughout the State of Illinois, and it is expected that increased testing capacity would demonstrate that COVID-19 is circulating in communities across Illinois that currently have not identified a confirmed case; and,

**WHEREAS,** the number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois, indicating that drastic social distancing measures are needed, even in communities where confirmed cases have not yet been identified, to reduce the number of people who become sick at any given time and the possibility of exhausting our health care resources; and,

**WHEREAS,** I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (the First Gubernatorial Disaster Proclamation) in response to the outbreak of COVID-19; and,

**WHEREAS,** I again declared all counties in the State of Illinois as a disaster area on April 1,

**WHEREAS**, I find it necessary to continue and extend the Executive Orders issued to date in response to the outbreak of COVID-19, Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, 2020-10, 2020-11, 2020-12, 2020-13, 2020-14, 2020-15, 2020-16, and 2020-17, and hereby incorporate the WHEREAS clauses of those Executive Orders;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, pursuant to Sections 7(1), 7(2), 7(3), 7(8), 7(9), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following:

## Part 1: Continuing and Extending Prior Executive Orders.

Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, 2020-10, 2020-11, 2020-12, 2020-13, 2020-14, 2020-15, 2020-16, and 2020-17 hereby are continued and extended by this Executive Order 2020-18 as follows:

### Executive Order 2020-04 (Closure of James R. Thompson Center; Waiver of Sick Leave Requirement for State Employees):

Section 1.  Beginning March 16, 2020, the James R. Thompson Center located at 100 W. Randolph Street, Chicago, Illinois, is closed for the duration of the Gubernational Disaster Proclamations to members of the public, except as necessary for the conduct of state business, to obtain services from a state agency or constitutional office, or to operate a business located in the James R. Thompson Center. This closure does not affect public access to businesses located on the ground floor in the James R. Thompson Center through exterior entrances, except as otherwise specified in this Order.

Section 2.  Beginning March 13, 2020, the two-year continuous service requirement for state employees to receive advancement of sick leave pursuant to Title 80, Section 303.110 of the Illinois Administrative Code Personnel Rules, is suspended during the duration of the Gubernational Disaster Proclamations.

### Executive Orders 2020-05 and 2020-06 (School Closures):

Executive Orders 2020-05 and 2020-06 are continued and extended in their entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

### Executive Order 2020-07 (Suspension of on-premises consumption at restaurants and bars; Unemployment insurance; Open Meetings Act):

Section 1.  Beginning March 16, 2020 at 9 p.m. through **April 30, 2020**, all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—must suspend service for and may not permit on-premises consumption. Such businesses are permitted and encouraged to serve food and beverages so that they may be consumed off-premises, as currently permitted by law, through means such as in-house delivery, third-party delivery, drive-through, and curbside pick-up. In addition, customers may enter the premises to purchase food or beverages for carry-out. However, establishments offering food or beverages for carry-out, including food trucks, must ensure that they have an environment where patrons maintain adequate social distancing. Businesses located in airports, hospitals, and dining halls in colleges and universities are exempt from the requirements of this Executive Order. Hotel restaurants may continue to provide room service and carry-out. Catering services may continue.

<u>Section 3</u>.  Nothing in this Executive Order shall amend or supersede the authority of the Illinois Department of Public Health pursuant to Section 2310-15 of the Department of Public Health Powers and Duties Law, 20 ILCS 2310/2310-15.

<u>Section 4</u>.  During the duration of the Gubernatorial Disaster Proclamations, the provision of the Unemployment Insurance Act, 820 ILCS 405/500(D), requiring a one-week waiting period for unemployment insurance claims is suspended for claimants who are unemployed and who are otherwise eligible for unemployment insurance benefits.

<u>Section 5</u>.  During the duration of the Gubernatorial Disaster Proclamations, the provisions of the Open Meetings Act, 5 ILCS 120, requiring or relating to in-person attendance by members of a public body are suspended. Specifically, (1) the requirement in 5 ILCS 120/2.01 that "members of a public body must be physically present" is suspended; and (2) the conditions in 5 ILCS 120/7 limiting when remote participation is permitted are suspended. Public bodies are encouraged to postpone consideration of public business where possible. When a meeting is necessary, public bodies are encouraged to provide video, audio, and/or telephonic access to meetings to ensure members of the public may monitor the meeting, and to update their websites and social media feeds to keep the public fully apprised of any modifications to their meeting schedules or the format of their meetings due to COVID-19, as well their activities relating to COVID-19.

**<u>Executive Order 2020-08 (Secretary of State Operations):</u>**

Executive Order 2020-08 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**<u>Executive Order 2020-09 (Telehealth):</u>**

Executive Order 2020-09 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**<u>Executive Order 2020-10 (Stay at Home; Social distancing; Evictions ceased):</u>**

Executive Order 2020-10 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**<u>Executive Order 2020-11 (Revisions to Executive Orders 2020-05 and 2020-10; Department of Corrections notification period):</u>**

Executive Order 2020-11 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**<u>Executive Order 2020-12 (Health care worker background checks; Department of Juvenile Justice notification period; Coal Mining Act):</u>**

Executive Order 2020-12 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**<u>Executive Order 2020-13 (Suspending Department of Corrections admissions from county jails):</u>**

Executive Order 2020-13 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

revised as follows:

       h.   The signatory must transmit by <u>overnight mail</u>, fax, or electronic means a legible copy of the entire signed document directly to the witness no later than the day after the document is signed;

       i.   The witness must sign the transmitted copy of the document as a witness and transmit the signed copy of the document back via <u>overnight mail</u>, fax, or electronic means to the signatory within 24 hours of receipt; and

### Executive Order 2020-15 (Suspending provisions of the Illinois School Code):

Executive Order 2020-15 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

### Executive Order 2020-16 (Repossession of vehicles; suspension of classroom training requirement for security services):

Executive Order 2020-16 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

### Executive Orders 2020-03 and 2020-17 (Cannabis deadlines and applications):

<u>Section 1</u>. The application submission deadlines in the Cannabis Regulation and Tax Act and implementing regulations for submitting applications by March 16, 2020, which previously were suspended pursuant to Executive Order 2020-03 and extended through March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, hereby are suspended as follows:

       a.   The March 16, 2020, deadline for submission of craft grower license applications pursuant to Title 8, Section 1300.300(b) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to **April 30, 2020**; and

       b.   The March 16, 2020, deadline for submission of infuser license applications pursuant to Section 35-5(b) of the Cannabis Regulation and Tax Act, 410 ILCS 705/35-5(b) and Title 8, Section 1300.400(b) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to **April 30, 2020**; and

       c.   The March 16, 2020, deadline for submission of transporter license applications pursuant to Section 40-5(b) of the cannabis Regulation and Tax Act, 40 ILCS 705/40-5(b) and Title 8, Section 1300.510(b)(1)(A) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to **April 30, 2020**.

<u>Section 2</u>. Any statutory or regulatory requirement to accept such applications in-person is suspended and the Department of Agriculture is directed to cease accepting in-person applications beginning 5 p.m. Central Time March 12, 2020.

<u>Section 3</u>. The Illinois Department of Agriculture is further directed to accept all craft grower, infuser, and transporter license applications post-marked on or before April 30,

**Part 2: Savings Clause.** If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

JB Pritzker, Governor

Issued by the Governor April 1, 2020
Filed by the Secretary of State April 1, 2020

FILED
INDEX DEPARTMENT

APR 01 2020

IN THE OFFICE OF
SECRETARY OF STATE

# Exhibit F

FILED
Clay Co. Circuit Court
4th Judicial Circuit
Date: 4/23/2020 4:03 PM
Crystal Ballard

## IN THE CIRCUIT COURT
## FOR THE FOURTH JUDICIAL CIRCUIT
## CLAY COUNTY, ILLINOIS

| | | |
|---|---|---|
| Darren Bailey | ) | |
| | ) | |
| Plaintiff, | ) | **2020CH6** |
| | ) | |
| vs. | ) | Case No. 2020-CH-_____ |
| | ) | |
| Governor Jay Robert Pritzker, | ) | |
| in his official capacity. | ) | **EXPEDITED CONSIDERATION** |
| | ) | **REQUESTED** |
| Defendant. | ) | |

## VERIFIED MOTION FOR TEMPORARY RESTRAINING
## ORDER AND PRELIMINARY INJUNCTION WITH NOTICE

COMES NOW Plaintiff, Darren Bailey, by and through his attorneys, Thomas G. DeVore,

Erik Hyam, and DeVore Law Offices, LLC, and for his Verified Motion for Temporary Restraining

and Preliminary Injunction in this matter, allege as follows:

1. A verified petition and its exhibits ("Petition"), which includes as Count II a request for an

   adjudication of injunctive relief, has been filed in this matter which Petition is incorporated

   herein by reference.

2. In support of the Petition, Bailey also filed a legal brief in support, which legal brief shall

   be incorporated herein by reference.

3. The Petition alleges that a certain part of Pritzker's April 01 Executive Order, which

   extended the March 20 Executive Order until April 30, 2020, was in excess of the authority

   granted him under The Act.

4. The Petition alleges the March 20 Executive Order was required by law to lapse on or

   before April 08, 2020 due to the COVID-19 pandemic having been declared a disaster on

   March 09, 2020.

5. Bailey has an absolute right to insist any executive order issued pursuant to The Act be lawful and not beyond the power granted to Pritzker by the legislature.

6. Immediate and irreparable harm is being suffered by Bailey every day which passes wherein he is being ordered by Pritzker to stay at home, or at his place of residence, as well as limiting his ability to travel within the state.

7. Bailey requires a temporary restraining order and preliminary injunction issue to enjoin enforcement of the terms of the March 20 Executive Order, as extended by the April 01 Executive Order, until the Court renders a final verdict in this matter.

8. Additionally, as of April 23, 2020, Pritzker publicly announced his intention to continue his ultra vires executive order until at least May 30, 2020.

9. Any such extension which is to be issued to continue the emergency orders would also be ultra vires.

10. Bailey has no other adequate remedy at law to prohibit enforcement against him until such time as the Court renders a final verdict in this matter.

11. There is a reasonable likelihood that Bailey will succeed on the merits of the case as shown by the Petition, and legal brief, both of which are incorporated herein by reference.

WHEREFORE, the Plaintiff, Darren Bailey, respectfully prays that this Court enter an order that provides for:

A.   Entry of a Temporary Restraining Order enjoining Pritzker, or anyone on his behalf, from taking any action to enforce the March 20, 2020 Executive Order against Darren Bailey; and

B.      Entry of a Temporary Injunction enjoining Pritzker, or anyone on his behalf, from taking any action to enforce the provisions of the March 20, 2019 Executive Order against Darren Bailey; and

C.      Entry of a Temporary Restraining Order enjoining Pritzker, or anyone on his behalf, from taking any action to enter further executive orders, continuances or otherwise, as a result of the COVID-19 disaster declaration which orders Darren Bailey to stay at home, or at his place of residence, as well as limiting his ability to travel within the state; and

D.      Entry of a Temporary Injunction enjoining Pritzker, or anyone on his behalf, from taking any action to enter further executive orders, continuances or otherwise, as a result of the COVID-19 disaster declaration which orders Darren Bailey to stay at home, or at his place of residence, as well as limiting his ability to travel within the state; and

E.      Such further relief as this Court deems just and equitable.


Respectfully submitted,


By:     /s/ Thomas Devore
        Thomas G. DeVore
        IL Bar Reg. No. 6305737
        **DeVore Law Offices, LLC**
        Attorneys for Plaintiff
        118 N. 2nd St.
        Greenville, IL 62246
        Telephone - 618-664-9439
        tom@silverlakelaw.com


VERIFICATION

Fax  (618) 664.9486
erik@silverlakelaw.com

**VERIFICATION**

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct except as to matters therein stated to be on information and belief, if any, and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be true.

Date: 4-23 , 2020          By: _____

                               Darren Bailey

4

# Exhibit G

FILED
Clay Co. Circuit Court
4th Judicial Circuit
Date: 4/23/2020 4:03 PM
Crystal Ballard

# IN THE CIRCUIT COURT
## FOR THE FOURTH JUDICIAL CIRCUIT
### CLAY COUNTY, ILLINOIS

Darren Bailey                                )
                                             )
      Plaintiff,                       )               **2020CH6**
                                             )
  vs.                                    )     Case No. 2020-CH-_____
                                             )
Governor Jay Robert Pritzker,                )
in his official capacity.                    )
                                             )
      Defendant.                       )

## LEGAL BRIEF IN SUPPORT OF DARREN BAILEY'S
## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

COMES NOW Plaintiff, Darren Bailey, by and through his attorneys, Thomas G. DeVore, Erik Hyam, and DeVore Law Offices, LLC, and provides this legal brief in support of his complaint for declaratory and injunctive relief, as well as a temporary restraining order and preliminary injunction.

## LEGAL STANDARD

1. As Governor, Pritzker has the supreme executive power, and shall be responsible for the faithful execution of the laws. (See Ill. Const. 1970, art. V, § 8.)

2. The legislative power is vested in a General Assembly. (See Ill. Const. 1970, art. IV, § 1.)

3. The legislative and executive branches are separate. (See Ill. Const. 1970, art. II, § 1.)

4. The power to make laws belongs solely to the legislature, and the legislature cannot delegate its power to make law. *Chicagoland Chamber of Commerce v. Pappas*, 378 Ill.App.3d 334, 348, 317 Ill.Dec. 113, 880 N.E.2d 1105 (2007).

5. The legislature may delegate to others the authority to do those things which the legislature might properly do, but cannot do as understandingly or advantageously. (*Board of*

1

*Education v. Page*, 33 Ill.2d 372, 211 N.E.2d 361; *People ex rel. Daesch v. Mayor of Belleville*, 22 Ill.2d 226, 174 N.E.2d 678; *City of Evanston v. Wazau*, 364 Ill. 198, 4 N.E.2d 78, 106 A.L.R. 789.)

6. The Illinois Emergency Management Act intended by device to delegate certain enumerated powers upon the Office of Governor.  (See 20 ILCS 3305/2(a)(2))

7. These certain enumerated powers with the Illinois Emergency Management Act included temporary emergency powers.  (See 20 ILCS 3305/7)

8. Of those enumerated temporary emergency powers delegated to the Office of Governor was the power "to control ingress and egress to and from a disaster are, the movement of persons within the area, and the occupancy of the premises therein.  (See 20 ILCS 3305/2(7)(8))

9. The express language of the Illinois Emergency Management Act established a 30-day limitation upon the emergency power provided for in 20 ILCS 3305/2(7)(8), which 30-days began on the date of the proclamation of the disaster.  (See 20 ILCS 3305/7)

10. The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. *Acme Markets, Inc. v. Callanan*, 236 Ill.2d 29, 37, 337 Ill.Dec. 867, 923 N.E.2d 718 (2009).

11. The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill.2d 546, 552, 328 Ill.Dec. 942, 905 N.E.2d 831 (2009); *Am. Fed'n of State v. State, Dep't of Cent. Mgmt. Servs.*, 33 N.E.3d 757 (Ill. App. 2015)

## **ARGUMENT**

I) **COVID-19 Pandemic is the disaster established on March 09, 2020**

12. The emergency powers granted Pritzker sprung forward as a result of his proclamation of the existence of a disaster on March 09, 2020.  (See 20 ILCS 3305/7)

13. The Illinois Emergency Management Act clearly defines a disaster:

   "Disaster" means an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause, including but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, hostile military or paramilitary action, public health emergencies, or acts of domestic terrorism.  (See 20 ILCS 3305/4)

14. Pritzker's basis for the proclamation of March 09, 2020, is found in the last "whereas" clause wherein he finds the conditions enumerated therein regarding the COVID-19 pandemic provided him legal justification of proclaiming a disaster.

15. The Plaintiff does not contest Pritzker's having declared that COVID-19 was a qualifying disaster under the Illinois Emergency Management Act.

16. Parsing the language of the Illinois Emergency Management Act as to what constitutes a disaster under its definition in 20 ILCS 3305/4 clearly leads one to find COVID-19 was as of March 09, 2020 a disaster.

   a) an occurrence or threat

   b) of widespread or severe damage, injury or loss of life or property

   c) resulting from any natural or technological cause, including but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination

   d) requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, hostile military or paramilitary action, public health emergencies, or acts of domestic terrorism.

3

17. The COVID-19 pandemic as of March 09, 2020 was certainly a (threat) of (widespread or severe loss of life) (resulting from a natural cause) and (requiring emergency action to avert an epidemic or public health emergency).

## II. COVID-19 Pandemic is still the disaster which existed on April 01, 2020

18. On April 01, 2020, Pritzker issued a second disaster proclamation.

19. Pritzker acknowledges in the April 01, 2020 proclamation the basis for which he had declared a disaster on March 09, 2020 was COVID-19.

20. In the April 01, 2020 proclamation, declares a "continuing disaster" exists within the State of Illinois.

21. Pritzker's basis for the proclamation of April 01, 2020, is found in the last "whereas" clause wherein he finds the conditions enumerated therein regarding the COVID-19 pandemic provided him legal justification of proclaiming a disaster.

## III) Pritzker's legislative delegation of emergency power regarding the disaster which arose as a result of the COVID-19 pandemic must have ceased on or before April 08, 2020.

24) The Plaintiff does not contest Pritzker was delegated certain emergency powers as a result of the COVID-19 disaster proclamation.

25) The COVID-19 disaster proclamation occurred on March 09, 2020.

26) For 30-days subsequent to the disaster proclamation, Pritzker was authorized to exercise his delegated authority to protect the health, safety and welfare of the people.

27) The March 20, 2020 executive order restraining Bailey's rights of free movement within the State of Illinois, regardless of substantive rights violations which may have existed, had to lapse on or before April 08, 2020 pursuant to the clear mandate of the legislature in the Illinois Emergency Management Act.

4

28) The April 01, 2020 Proclamation declares a "continuing disaster" as a result of the same COVID-19 pandemic.

29) Priztker seemingly believes he can issue continuing proclamations recognizing the same COVID-19 pandemic as a "continuing disaster" every thirty (30) days whereby he can continually invoke the emergency powers of the Illinois Emergency Management Act into perpetuity.

30) As of April 23, 2020, at his 2:30 daily briefing to the public, Pritzker announced his intention to extend his emergency executive orders yet again.

31) If the legislature intended to delegate to the Office of Governor the emergency powers for the complete duration of a continuing disaster they would have written as much into the Illinois Emergency Management Act.

32) The legislature intended to limit the use of the emergency powers by the Governor in the event of disaster for a 30-day period as provided in the clear and unambiguous language of the Illinois Emergency Management Act.

33) The emergency powers granted to Office of Governor ensured a quick response to a disaster event until such time as the legislature had ample time to convene and address whether any laws need to be codified to further protect the health, safety and welfare of the people of the State of Illinois.

34) In fact, the legislature contemplated lapse of the emergency powers as provisions for such lapse are provided in 20 ILCS 3305/7.

35) Relative to this cause, there has only been one disaster facing Pritzker and that is the COVID-19 pandemic.

36) Until such time as the legislature delegates continuing emergency powers to the Office of

Governor during a disaster, Bailey has a right to insist the emergency powers being utilized by Pritzker are limited to the 30-days from the initial declaration of the COVID-19 pandemic.

37) Any other interpretation of the relevant provision of the Illinois Emergency Management Act would render the 30-day limitation meaningless.

38) Given the legislature has not acted to broaden the powers of the Office of Government pursuant to the Illinois Emergency Management Act, Pritzker's powers provided therein have long since lapsed.

39) If additional legal safeguards are required to protect the good people of the State of Illinois from the COVID-19 pandemic, it is far past time for the legislative branch to act.

Respectfully submitted,

By:     /s/ Thomas Devore
        Thomas G. DeVore
        IL Bar Reg. No. 6305737
        **DeVore Law Offices, LLC**
        Attorneys for Plaintiff
        118 N. 2nd St.
        Greenville, IL 62246
        Telephone - 618-664-9439
        tom@silverlakelaw.com

# Exhibit H



# SUPREME COURT OF ILLINOIS

SUPREME COURT BUILDING
200 East Capitol Avenue
SPRINGFIELD, ILLINOIS 62701-1721

CAROLYN TAFT GROSBOLL
Clerk of the Court

(217) 782-2035
TDD: (217) 524-8132

May 11, 2020

FIRST DISTRICT OFFICE
160 North LaSalle Street, 20th Floor
Chicago, IL 60601-3103
(312) 793-1332
TDD: (312) 793-6185

Sarah Ann Hunger
Office of the Illinois Attorney General
100 West Randolph Street, 12th Floor
Chicago, IL 60601

      In re:   Bailey v. Pritzker
              125952

Dear Sarah Ann Hunger:

Enclosed is an order entered May 11, 2020, by the Supreme Court of Illinois in the above-captioned cause.

Very truly yours,

*Carolyn Taft Grosboll*

Clerk of the Supreme Court

cc:   Benna Ruth Solomon
      Jessica Megan Scheller
      Hon. Michael D. McHaney
      Nadine Jean Wichern
      Paul Anthony Castiglione
      Stephen Grassie Collins
      Steven Mark Wallace
      Thomas Guy DeVore

125952

IN THE

SUPREME COURT OF ILLINOIS

---

Darren Bailey, )
)
   Appellee )
) Appeal from
v. ) Appellate Court
) Fifth District
Governor Jay Robert Pritzker, in his ) 5-20-0148
official capacity, ) 20CH6
)
   Appellant )
)
)
)
)
)
)

---

O R D E R

    This cause coming to be heard on the motion of appellant, Jay Robert Pritzker, an

objection having been filed by appellee, Darren Bailey, and the Court being fully advised

in the premises;

    IT IS ORDERED that the supplemental emergency motion for a supervisory

order is <u>denied</u>.  Appellant's request to withdraw the motion for direct appeal pursuant to

Supreme Court Rule 302(b) and/or a supervisory order is <u>allowed</u>.

    Order entered by the Court.

**FILED**
May 11, 2020
SUPREME COURT
CLERK

# Exhibit I

NOTICE
Decision filed 05/01/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 200148-U

NO. 5-20-0148

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| DARREN BAILEY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Clay County. |
| | ) | |
| v. | ) | No. 20-CH-6 |
| | ) | |
| J.B. PRITZKER, in His Official Capacity as the | ) | |
| Governor of the State of Illinois, | ) | Honorable |
| | ) | Michael D. McHaney, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Barberis and Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where the plaintiff-appellee consented to the requested relief sought by the defendant-appellant to vacate the circuit court's entry of a temporary restraining order, such relief is granted.

¶ 2   On April 23, 2020, the plaintiff, Darren Bailey, filed a complaint against the defendant, Governor of Illinois J.B. Pritzker, in the circuit court of Clay County. The complaint sought a declaration that the defendant's emergency powers lapsed 30 days following his initial disaster proclamation and an injunction preventing the defendant from enforcing a stay-at-home order against him. The plaintiff additionally filed a motion for a temporary restraining order (TRO) and a preliminary injunction. On April 27, 2020, the

circuit court granted the requested TRO enjoining the defendant from enforcing the stay-at-home order against the plaintiff and from further entering any similar executive orders against the plaintiff. On that same day, the defendant filed a timely notice of interlocutory appeal from said order. On April 30, 2020, the plaintiff filed in this court a consent to entry of order vacating temporary restraining order. In that motion, the plaintiff stated that he consented to the vacating of the TRO entered by the circuit court and asked that the TRO be vacated and the matter remanded back to the circuit court for further proceedings.

¶ 3    As a result of the plaintiff's consent to the relief sought by the defendant and pursuant to the plaintiff's request, we hereby vacate the TRO entered by the circuit court and this matter is remanded to the circuit court for further proceedings.

¶ 4    Vacated and remanded.