**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| DARREN BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. <u>3:20-cv-00474-GCS</u> |
| Governor JAY ROBERT PRITZKER, | ) | |
| in his official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF INTEREST ON BEHALF OF
<u>THE UNITED STATES OF AMERICA</u>**

The United States of America respectfully files this Statement of Interest, pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case "pending in a court of the United States." The United States thus routinely files Statements of Interest in pending matters to which it is not a party without requiring either intervention or leave of Court to do so.

**INTRODUCTION**

In the midst of the COVID-19 pandemic, the state and federal governments have a shared interest in promoting the best possible public health strategies to combat the virus to protect the people of the United States from harm. But that interest does not justify government restrictions imposed upon its citizens without legal authority. Indeed, action contrary to law is likely to erode public confidence in, and compliance with, legitimate efforts taken to address the COVID-19 pandemic. This case accordingly implicates issues of national public importance regarding the interplay between a State's compelling interest in protecting public health and safety from COVID-19 and the equally compelling interest in preserving civil liberties.

The United States supports the plaintiff's emergency motion for remand (SDIL Case 3:20-cv-00474-GCS, Doc. 9) and asks the Court promptly to return this matter to the Illinois Circuit Court, where it belongs, because the plaintiff makes no federal claim.  Rather, he alleges that the Governor has exceeded the statutory authority granted under the Illinois Emergency Management Agency Act.  Am. Compl., ¶¶ 69, 77, 97, & 109.  To be sure, resolution of the plaintiff's claim could have implications for federal claims brought in other litigation.  But mere federal implications from resolution of a state law claim have never been sufficient to justify removal to a federal court.

The federal government has an interest in preventing the limited resources of the federal courts from being drawn into state-law disputes that lie outside of their jurisdiction.  True, the plaintiff's argument may bear on federal due process challenges to the executive orders in other litigation.  But the only claim at issue in his suit is under state law.  A timely remand is required to allow the Illinois courts to resolve this issue quickly, which may affect the lives of each of the nearly 13 million residents and business owners in the state of Illinois.

## BACKGROUND[1]

In passing the Illinois Emergency Management Agency Act, the Illinois Legislature declared its purpose "to insure that th[e] State w[ould] be prepared to and w[ould] adequately deal with any disasters, preserve the lives and property of the people of th[e] State and protect the public peace, health, and safety in the event of a disaster."  20 ILCS 3305/2(a).  The Act accordingly "confer[red]" upon the Governor, 20 ILCS 3305/2(a)(2), the power to "by proclamation declare that a disaster exists" and, "[u]pon such proclamation, . . . [to] have and . . . exercise for a period not to exceed 30 days" certain specified emergency powers.  20 ILCS 3305/7.  As relevant here,

---

[1]  The United States submits this brief on the basis of the facts alleged in the complaint and reflected in the accompanying exhibits.

these emergency powers include the power to "control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein," 20 ILCS 3305/7(8); to "[c]ontrol, restrict, and regulate by . . . the use, sale or distribution of food, feed, fuel, clothing and other commodities, materials, goods, or services;" and to "perform and exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population," 20 ILCS 3305/7(12).  The Act does not "[l]imit, modify, or abridge the authority of the Governor to proclaim martial law or exercise any other powers vested in the Governor under the constitution, statutes, or common law of th[e] State, independent of or in conjunction with any provisions of th[e] Act."  20 ILCS 3305/3(d).

Over the last two months, the Governor has relied upon the authority conveyed upon him under the Illinois Emergency Management Agency Act to restrict, in many cases significantly, the liberties of citizens within the State.  On March 9, 2020, the Governor proclaimed that "the circumstances surrounding COVID-19 constitute a public health emergency" and "all counties in the State of Illinois a[re] a disaster area."  Am. Compl., Ex. 1.  On March 20, 2020, the Governor issued an executive order requiring "all individuals currently living within the State of Illinois . . . to stay at home or at their place of residence except" for certain specified "Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations," through the duration of the disaster proclamation, which at that point extended through April 7, 2020.  Am. Compl., Ex. 2.  On April 1, 2020, the Governor issued another proclamation, in which he designated "the circumstances surrounding COVID-19 [as] a continuing public health emergency" and asserted that the designation "continue[d] the Governor's authority to exercise all of the emergency powers provided in Section 7 of the Illinois Emergency Management Agency Act" for another 30 days.  Compl., Ex. 3.  The same day, the Governor extended Executive Order

2020-10, along with numerous other Executive Orders that he had issued pursuant to his original disaster proclamation, for the same 30 days.  Compl., Ex. 4.

Darren Bailey ("Bailey" or "Plaintiff") filed this suit on April 23, 2020, seeking a declaratory judgment that the Governor's Orders are unauthorized and related injunctive relief. He also filed a motion for a temporary restraining order and preliminary injunction the same day. The state court concluded that Bailey had established "a reasonable likelihood of succeeding on the merits," as well as irreparable harm, and issued a Temporary Restraining Order (TRO) on April 27, 2020, to continue not longer than 30 days and only until the Court had an opportunity to hear a motion for preliminary injunction.  See TRO at 1-2.  Plaintiff subsequently agreed to vacatur of the TRO and expedited summary judgment briefing on an amended complaint.  That amended complaint sought declaratory judgments that the Governor's April 30, 2020, proclamation was void under state law because it did not meet the statutory definition of disaster, that the Governor lacked authority under the Act to exercise emergency powers after April 8, 2020, and that the Illinois Department of Public Health Act applied to the Governor's actions, along with related injunctive relief.  Am. Compl. ¶¶ 72, 98, 118, 120.  The hearing on Plaintiff's motion for summary judgment was set for May 22, 2020.  Notice of Hearing, May 18, 2020.

On May 21, 2020, the Governor filed a notice of removal.  SDIL Case 3:20-cv-00474-GCS, Doc. 1.  In that notice, he attempts to characterize the plaintiff's purely state-law complaint as seeking redress for alleged deprivations of Bailey's federal constitutional rights caused by actions taken under color of state law.  Doc. 1 ¶ 3.  Certainly, Bailey could have advanced those constitutional claims.  But he did not.  Instead, he brought only state law claims.  And as such, the case belongs in state court.

Plaintiff has set forth a strong case that the Orders exceed the authority granted to the Governor by the Illinois legislature.  The United States also agrees with the Governor's apparent recognition that, although violations of state law do not ordinarily amount to a federal due process violation, state actions that are both wholly unauthorized by state law and impose broad and intrusive restrictions on individual liberties may raise federal due process concerns.  But those federal concerns cannot transform a complaint that presses only state-law claims into a complaint over which this Court has jurisdiction.

## ARGUMENT

### I.  The Case Should Be Remanded to Illinois Circuit Court Because Plaintiff's Complaint Does Not Arise Under Federal Law.

#### A.    Plaintiff's Amended Complaint Does Not Allege a Federal Cause of Action.

Federal removal is governed by 28 U.S.C. § 1441.  The removing party typically bears the burden of showing removal is proper.  *Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 911 (7th Cir. 1993).  "Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Id.*  To be sure, "a plaintiff may not defeat removal by omitting to plead necessary federal questions."  *Citadel Sec., LLC v. Chicago Bd. Options Exch., Inc.*, 808 F.3d 694, 701 (7th Cir. 2015) (citations and internal quotation marks omitted).  But, at all times, the plaintiff remains "the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law."  *Caterpillar, Inc.*, 482 U.S. at 392 (footnote omitted).

Federal question jurisdiction exists when the "complaint standing alone" establishes either: (i) "that federal law creates the cause of action"; or (ii) "that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 298 (7th Cir. 2003) (citation omitted).[2]  "[F]ederal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action created by federal law (*e.g.,* claims under 42 U.S.C. § 1983)." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  Here, however, the complaint does not allege a federal cause of action—a fact the Governor does not dispute in the notice of removal.  That leaves only the second route.

### B.  The Court Lacks Jurisdiction Over Plaintiff's State Law Claims.

Although state law claims are generally committed to the jurisdiction of the state courts, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton,* 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314).

*Grable* sets a high bar.  "Federal jurisdiction is rarely established on this basis." *Webb v. Fin. Indus. Regulatory Auth., Inc.*, 889 F.3d 853, 860 (7th Cir. 2018); *Gunn*, 568 U.S. at 258 (cautioning that *Grable* applies only to a "slim category" of cases).  It is rare for a reason: Congress has only granted federal courts jurisdiction in cases "arising under" the laws of the United States, *see* § 1331, and, by definition, state law claims rarely arise under federal law.  Nor does *Grable*

---

[2]      The Governor purports to remove this action "under 28 U.S.C. § 1343(a)(3)."  Notice at ¶ 3.  Section 1343(a)(3) does not authorize removal, but does have a parallel removal statute in § 1443.  Both statutes extend "only to rights that are granted in terms of equality and not to the whole gamut of constitutional rights." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 622 (1979) (citation and quotation marks omitted) (expressly excluding due-process-clause claims from the scope of § 1443).  This is not one of those cases, and § 1443's specific requirements are not met here.  At any rate, § 1343(a)(3) is largely defunct, and the removal analysis should proceed under § 1441. *See Myles v. United States*, 416 F.3d 551, 554 (7th Cir. 2005) ("Section 1343(a)(3) covers only civil rights claims against state actors and has had no legal effect since 1976, when Congress amended § 1331 to eliminate any amount-in-controversy requirement.").

allow for removal simply because "the predominant issue concerns federal law." *Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1034 (7th Cir. 2014); *see Webb*, 889 F.3d at 860 (explaining "an issue of federal law must be the 'cornerstone' of the plaintiff's complaint") (citation omitted).

The Governor's notice of removal asserts that this standard is met because the amended complaint allegedly asserts "harm to Bailey's rights that are protected under the United States Constitution" in order to show standing.   Dkt. 1 ¶ 4.  It also allegedly seeks "redress" of those rights.  *Id.*  This misreads the amended complaint and falls far short of meeting *Grable*'s test.

First, the Governor cannot show that any federal issue is necessarily raised by the complaint.  The Governor cannot, for example, "contend that the only material issue is federal" because to do so would require him to "concede" that Plaintiff has "a good claim under state law." *Hartland*, 756 F.3d at 1033.  "Yet far from conceding this," the Governor has so far denied that Plaintiff has "valid state-law claims," *id.*; that is, that the Governor lacked authority under the Act. Any such concession is not clear from the face of the notice of removal.

Second, no reference to federal constitutional rights appears "on the face of" the amended complaint, giving rise to an actual dispute over such rights in this case.  *See Caterpillar, Inc.*, 482 U.S. at 392.  Indeed, the paragraphs that the Governor cites as alleging constitutional violations contain no references to the federal constitution at all:

- Due Process in ¶¶ 37, 41, 48, and 105-110.  Paragraphs 37, 41, and 48 summarize the requirements *of the Illinois Department of Public Health Act* and supporting administrative regulations, with citations.  Paragraphs 105-110 allege that, *under Illinois law*, police powers are vested in the legislative branch, not in the executive. Not one of these paragraphs references federal due process.

- Free Exercise in ¶ 71.  Paragraph 71 alleges that the challenged executive orders and proclamations, among other things, prevent Bailey from "attending religious services."  This example of the challenged actions' effect contains no reference to the federal Constitution, nor asks for relief thereunder.

- Freedom to travel in ¶¶ 105-110.  Again, these paragraphs allege that, *under Illinois law*, police powers are vested in the legislative branch, not in the executive.  They make no reference to a federal right to travel.

- Art. IV, § 4 in ¶ 84-85.  These paragraphs broadly describe the perceived effect of the Governor's actions on the legislative power in the State of Illinois.  To the degree these paragraphs make any constitutional assertions (and on their face they do not), it would be under the Illinois Constitution's provisions governing the separation of powers.  The paragraphs contain no reference to a federal right to a republican form of government.

In sum, the Governor may conceive of constitutional arguments against his course of action, but Plaintiff has not asserted them.  *Caterpillar, Inc.*, 482 U.S. at 392.

Third, Plaintiff's motion to remand disclaims any reliance on federal constitutional rights. *See* SDIL Case 3:20-cv-00474-GCS Doc. 8, Pl.'s Memo. in Support at 6 ("Plaintiff's complaint and first amended complaint do not so much as hint that he seeks a resolution on the basis of infringement of rights conferred under the United States Constitution.").  Indeed, he seems surprised to learn that he might be implying them.  *Id.*  These judicial admissions will bind him "once the case is sent back to state court."  *Ctr. For Wildlife Ethics, Inc. v. Clark*, 325 F. Supp. 3d 911, 915-16 (N.D. Ind. 2018) (remanding even where a complaint made "seemingly superfluous references to the U.S. Constitution" because plaintiff "disclaim[ed] any potential federal

questions" in its motion to remand).  So there can be no federal question actually raised and disposed of here.

Fourth, Plaintiff may prove standing under Illinois state law, so the Governor cannot show that any federal question is "necessarily raised," "actually disputed," and "substantial" by Plaintiff's claim to standing in this case.  *Gunn*, 568 U.S. at 258.  Here, state law appears to provide an array of theories whereby Plaintiff can show redressable injury.  The procedural protections he cites, for example, may be enforceable in a way that provides him relief, and the Illinois Constitution contains parallel protections for each of the federal rights the Governor says were asserted in the amended complaint.

The Governor argues that Plaintiff's amended complaint may only be read as alleging that the Governor's orders violate the U.S. Constitution, but that argument fails to account for the state Constitution.  Specifically, the Governor reads Plaintiff's complaint as alleging that the Orders violate his Fourteenth Amendment "liberty interests" because they restrict his movements and require him to quarantine in his home (Doc. 1 ¶¶ 5 & 6), violate his First Amendment right to the free exercise of religion by preventing him from attending religious services (*id.* at ¶ 6), and restrict his right to travel (*id.* at ¶ 8).  But of course, none of these provisions of the U.S. Constitution is cited in Plaintiff's complaint, and each of these rights is likewise secured to Plaintiff by the Illinois Constitution.  For example, Art. 1, § 2 of the Illinois constitution guarantees that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied equal protection of the laws," and the Illinois Supreme Court has explained that the guarantee of "liberty" in that constitutional provision is coextensive with that in the federal Constitution and "is deemed to embrace the right of every person to be free in the use of his or her powers, faculties, and property, in such *lawful* ways as he or she may choose, 'subject only to such restraints as are necessary to

secure the common welfare." *People v. Shepard,* 152 Ill.2d 489, 501 (Ill. 1992) (emphasis in original) (citing Ill. Const. 1970, art. 1, § 2) (case citation omitted).  Art. 1, § 3 of the Illinois Constitution "forever" guarantees Illinois citizens like Plaintiff "[t]he free exercise and enjoyment of religious profession and worship," and the Illinois courts have interpreted the provision as providing "protections of religious practice . . . [that] are coextensive with those of the United States Constitution." *Mefford v. White,* 331 Ill.App.3d 167, 179 (4th Dist. 2002) (*citing People v. Falbe,* 189 Ill.2d 635, 645 (Ill. 2000)).  The right to travel is "among those protected personal liberties which have long been recognized" by the due process clause, *City of Chicago v. Morales,* 177 Ill.2d 440, 459-60 (Ill. 1997), and is thus equally protected under the Illinois Constitution, *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton,* 105 Ill.2d 389, 397 (Ill. 1985).

The Governor also cites ¶¶ 84-85 of Plaintiff's amended complaint to assert a violation of Art. IV, ¶ 4 of the U.S. Constitution, which guarantees to every state a republican form of government.  Dkt. 1, ¶ 10.  Not even a liberal construction of Bailey's complaint, however, supports the Governor's argument that Bailey is asserting a federal constitutional claim in this regard.  Bailey makes his observation that "[t]he legislative branch during this period of executive rule under the emergency powers has been rendered meaningless" in the context of arguing that the Governor has misconstrued his emergency powers under the Act—a pure issue of state law, not a federal constitutional claim.  *See* Am. Comp. ¶¶ 73-98.  To the extent that Plaintiff's assertions can be read as raising a constitutional claim, it is that the Governor's reading of the Act improperly usurps for himself "[t]he legislative power [which] is vested in [the] General Assembly" in violation of the *Illinois* Constitution.  Ill. Const., Art. 4, § 1;  *see also* Am. Comp. ¶¶ 73-98.

As the plaintiff, it is well settled that Bailey is the "master[ ] of the complaint" and "may include (or omit) claims or parties in order to determine the forum." *Garbie v. DaimlerChrysler Corp.,* 211 F.3d 407, 410 (7th Cir. 2000). Here, Plaintiff has elected to proceed on only state law claims, and removal is thus improper.

## II.  Governor Pritzker's Orders Appear Unsupported By State Law

If the Court declines to remand the case to Illinois Circuit Court, then it should find that the Governor exceeded his authority when issuing the executive orders.

The Constitution establishes a unique federal structure for the United States of America in which the States play a significant role. It "establishes a National Government with broad, often plenary authority over matters within its recognized competence" while also "assum[ing] the States' continued existence and active participation in the fundamental processes of governance." *Alden v. Maine*, 527 U.S. 706, 713 (1999) (citation omitted). Indeed, were there any doubt about the "vital role reserved to the States by the constitutional design," the Tenth Amendment "confirm[ed] the premise implicit in the original document: 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'" *Id.* at 713-14 (quoting U.S. Const. amend. X) (citations omitted). This federal structure "preserves to the people numerous advantages. It assures a decentralized government that will be more sensitive to the diverse needs of a heterogeneous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (citations omitted).

One critical aspect of the powers reserved to the States is the "autonomy to establish their own governmental processes."  *See Ariz. State Legislature v. Ariz. Independent Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015) (citations omitted); *see also id.* ("Whenever the States may choose to substitute other republican forms, they have a right to do so.") (citation and quotation marks omitted).  Because States' powers "proceed, not from the people of America, but from the people of the several states; [these powers] remain, after the adoption of the constitution, what they were before, except so far as they may be abridged by that instrument." *Sturges v. Crowninshield*, 17 U.S. 122, 193 (1819).  And the right of a State to establish its own governmental processes is of fundamental importance, for it is "[t]hrough the structure of its government, and the character of those who exercise government authority, [that] a State defines itself as a sovereign." *Gregory*, 501 U.S. at 460.

Here, Illinois has defined its governmental processes through the Illinois Emergency Management Agency Act.  The Illinois Legislature recognized "the possibility of the occurrence of disasters" resulting from explosions, "fire, flood, earthquake, telecommunications failure, or other natural or technological causes."  20 ILCS 3305/2(a).  And it decided, *inter alia*, "[t]o confer upon the Governor and upon the principal executive officer of the political subdivisions of the State" certain broad, but specified, powers.  20 ILCS 3305/2(a).  These powers are keyed to the proclamation of a disaster, which is broadly defined as follows:

> "Disaster" means an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause, including but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, hostile military or paramilitary action, public health emergencies, or acts of domestic terrorism.

20 ILCS 3305/4. "In the event of [such] a disaster, . . . the Governor may, by proclamation declare that a disaster exists." 20 ILCS 3305/7. "Upon such proclamation, . . . the Governor shall have and may exercise for a period not to exceed 30 days the [specified] powers." *Id.*

But nowhere in the Act does it say that the Governor can extend a proclamation for the same disaster. *Compare* 20 ILCS 3305/7 *with* 42 U.S.C. § 247d(a) ("Any such determination of a public health emergency terminates upon the Secretary [of Health and Human Services] declaring that the emergency no longer exists, or upon the expiration of the 90-day period beginning on the date on which the determination is made by the Secretary, whichever occurs first. Determinations that terminate under the preceding sentence may be renewed by the Secretary . . . .").

The Office of the Illinois Attorney General has, in the past, informally opined that the Act does not authorize the extension of emergency powers for a single disaster. In 2001, the Opinions Bureau opined, "A construction of [Subsection 7(a)(1)'s] provisions to allow the Governor to extend the 30 day period would render the limitation clause meaningless. A more reasonable construction, taking into consideration the other provisions of the Act, is that the Governor would be required to seek legislative approval for the exercise of extraordinary measures extending beyond 30 days." Am. Compl. Ex. 7, Office of the Attorney General, Emergency Preparedness: Emergency Authority to Respond to an Outbreak of Foot and Mouth Disease, July 2, 2001, at 5-6. The Bureau further noted, "Even though many disaster situations could require remediation for a period long in excess of 30 days, normal governmental processes, including legislative action, can be set in motion to meet such needs within 30 days of the occurrence."[3] *Id.* at 6.

---

[3]     The powers afforded to the Governor in the Illinois Emergency Management Agency Act are broad, allowing the Governor to affect nearly every aspect of Illinois citizens' lives. They allow him, for example, "to take possession of, and to acquire full title or a lesser specified interest in, any personal property as may be necessary," subject to certain provisions for compensation, 20 ILCS 3305/7(4); "[t]o recommend the evacuation of all or part of the population from any stricken or threatened area within the State," 20 ILCS 3305/7(6); "[t]o control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein," 20 ILCS 3305/7(8); to "control, restrict, and regulate by rationing, freezing, use of quotas, prohibitions on

The Governor triggered his emergency powers in his March 9, 2020, Proclamation, and 30 days following that Proclamation concluded on April 8, 2020. Although it is for the Illinois' courts, not the United States, to interpret state law, it is not clear from the face of the Act from where the Governor derived his authority to issue a second proclamation of public health emergency relating to COVID-19 and, in any event, his Executive Order, which purported to continue until April 30, 2020, far exceeded the 30-day limit set forth in the Act.

Although the Governor has, in the state court, also invoked his authorities under the Illinois Constitution, art. V, § 8, to support the Orders, *see, e.g.*, Mot. to Dismiss, ¶ 1, he did not rely upon any such authority in the Orders themselves, *see* Compl., Exs. 1-4. We note, without expressing a view on the proper interpretation or application of the Illinois Constitution, that the Supreme Court of Illinois has previously declined to consider alternative assertions of authority for an executive order. *Buettell v. Walker*, 59 Ill.2d 146, 154 (1974) ("The defendants have also suggested that the order may be justified as a rule or regulation under section 5 of the Illinois Purchasing Act . . . We find it unnecessary to pursue this suggestion beyond noting that the order on its face purports to be the exercise by the Governor of an authority independently derived from the Constitution, and not the exercise of a delegated power.").

Moreover, it is far from clear that such authority exists under the Illinois Constitution as interpreted by the Illinois Supreme Court. Article V, section 8, provides, "The Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws." The Illinois Constitution does not attempt to define the executive power so conferred, *People v.*

---

shipments, price fixing, allocation or other means, the use, sale, or distribution of food, feed, fuel, clothing and other commodities, materials, goods, or services; and [to] perform and exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population," 20 ILCS 3305/7(12). The breadth of these authorities may explain why the Illinois legislature, as a policy matter, may have included a 30-day time period.

*Hammond*, 355 Ill. Dec. 1, 16 (2011), but the Supreme Court of Illinois has previously held that this power does not include the power "to formulate a new legal requirement rather than to execute an existing one."  *Buettell*, 59 Ill.2d at 153-54.  The Attorney General of Illinois has accordingly opined: "[T]he Governor does not have power to legislate by executive order, and, therefore, unless authorized by law, an executive order relating to matters other than executive reorganization can be no more than a policy directive to agencies under the Governor's control.  To conclude otherwise would cede to the Governor legislative powers which he is prohibited from exercising by the separation of powers doctrine."  Office of the Attorney General, Applicability of Executive Orders, Administrative Orders, and Directives Limiting the Use of Appropriated Funds to Executive Agencies Not Under the Governor's Jurisdiction, Dec. 23, 2013, at 6.

## III.   This Case Has Federal Implications, But Such Implications Are Not Sufficient To Support Removal.

The United States does not typically weigh in on alleged violations of state law, and it defers to the Illinois courts' resolution of such matters.  After all, it is the States, in the exercise of their retained sovereignty, who are tasked with remedying violations of state law.  But the Orders at issue are not only of critical importance to the people of Illinois, they implicate a broader national issue about constitutional rights in the time of a pandemic.  As this Court is well aware, the federal government, the District of Columbia, and all 50 States have declared states of emergency and taken essential steps to contain the spread of the COVID-19 pandemic. *See*, *e.g.*, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020).[4]

---

[4]       Presidential Proclamation, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 F.R. 15337 (Mar. 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

The Constitution does not hobble States from taking necessary, temporary measures to meet a genuine emergency.  According to the Supreme Court, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905).  In *Jacobson*, for example, the Court explained that "[a]n American citizen arriving at an American port" who had traveled to a region with yellow fever "may yet, in some circumstances, be held in quarantine against his will." *Id.*  The "settled rule [from *Jacobson*]," a federal court of appeals recently concluded, "allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020).[5]

For that reason, courts generally review State action taken to preserve public health during a pandemic under a deferential standard of review.  *See, e.g.*, *Jacobson*, 197 U.S. at 28 ("Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the State, to protect the people at large, was arbitrary and not justified by the necessities of the case."); *Compagnie Francaise de Navigation a Vapeur v. La State Bd. of Health*, 186 U.S. 380, 397 (1902) (upholding Louisiana's quarantine of healthy passengers aboard a vessel during an outbreak of yellow fever against a Fourteenth Amendment challenge); *Prince v. Massachusetts,* 321 U.S. 158, 166-67 (1944) ("[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease").

---

[5]     *Jacobson* dealt with a state statute and county board of health regulation, and the Supreme Court thus had no occasion to pass upon the powers of the federal government in the context of a national public health emergency, nor any constitutional limitations that may apply to such powers.

But that deferential standard of review is not an abdication of judicial review. Even in the context of a pandemic, State actions undertaken pursuant to the police power are subject to important limitations. *See Jacobson*, 197 U.S. at 31, 38-39; *Robinson v. Attorney Gen.*, 957 F.3d. 1171, 1177 (11th Cir. 2020) ("[J]ust as constitutional rights have limits, so too does a state's power to issue executive orders limiting such rights in times of emergency."). That is, even during a pandemic, state actions undertaken in service of the public health cannot be divorced from that end and cannot clearly infringe constitutional rights. Thus, "if a statute purporting to have been enacted to promote the public health, the public moral or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Jacobson*, 197 U.S. at 31.

State action may impermissibly deviate from having a "real or substantial relation" to the public health in a number of ways. *First*, State action may be "exercised in particular circumstances and in reference to particular persons" in "an arbitrary, unreasonable manner." *Id*. at 28. For example, rules that allow recreational marijuana dispensaries to operate, but not flower shops, may be a sign that State action is impermissibly arbitrary and bears "no real or substantial relation" to its proffered public health end. Although "the day is gone when th[e Supreme] Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought," the Supreme Court still requires that a law be "rationally related to the public health and welfare." *See Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488-89 (1955). And when certain fundamental rights are at issue, Supreme Court precedent requires more. *See, e.g.*, *Maryvale Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613

(6th Cir. 2020) ("We don't doubt the Governor's sincerity in trying to do his level best to lessen the spread of the virus or his authority to protect the Commonwealth's citizens . . . . But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom.").

*Second*, the Supreme Court has held that, even in a pandemic, a State may exceed the bounds of its police power when it "go[es] so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Jacobson*, 197 U.S. at 28; *id.* (upholding Massachusetts' mandatory vaccination requirement in part because smallpox was "prevalent and increasing at Cambridge"); *see also Lee Optical of Oklahoma, Inc.*, 348 U.S. at 488.

*Third*, a State action, purportedly taken pursuant to its police power, may raise federal constitutional concerns in certain extraordinary cases where the action both is wholly unauthorized and imposes broad and intrusive restrictions on individual liberties. After all, a pandemic does not excuse a State from following its own law governing procedures to protect the public health. *See German Alliance Ins. Co. v. Hale*, 219 U.S. 307, 317 (1911) ("[A]ll corporations, associations, and individuals, within the jurisdiction of a state, are subject to such regulations, in respect of their relative rights and duties, as the state may, in the exercise of its police power, and *in harmony with its own and the Federal Constitution*, prescribe for the public convenience and the general good." (emphasis added)); *Jacobson*, 197 U.S. at 12 (noting that the board of health in Cambridge possessed the statutory authority to require and enforce the vaccination of its inhabitants). And although "a mere error of state law is not a denial of due process," *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011), the Supreme Court has also held that the Due Process Clause of the Fourteenth

Amendment to the U.S. Constitution operates as a bulwark against arbitrary and oppressive action by the States, *see, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

Although Bailey, as master of his complaint, elected not to press a constitutional claim— or, indeed, any federal claim—the arguments he makes implicate this potential limit on state action. The Supreme Court has held that the "right to remove from one place to another according to inclination [is] an attribute of personal liberty protected by the Constitution," *Chicago v. Morales*, 527 U.S. 41, 53 (1999), and the Orders plainly restrict that right, *see* Compl., Ex. 2, § 1 ("[A]ll individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order."). Indeed, the Governor himself acknowledges numerous constitutional violations that may be implicated by Bailey's complaint as result of his Orders. Case 3:20-cv-00474-GCS, Doc. 1, Notice at ¶ 5-11 (First Amendment right to free exercise of religion, Fourteenth Amendment right to procedural due process, "liberty interests" and the right to interstate travel, and the right to a Republican Form of Government conferred by Article IV, Section 4 of the United States Constitution).

If Bailey is correct that these executive orders are wholly without authorization under Illinois law, then the Orders' imposition of broad and intrusive restrictions on the people of Illinois would raise real questions about whether the people of Illinois have been deprived of their liberties without constitutionally adequate process. And these constitutional claims will likely be raised in other litigation. *Cf. Compagnie Francaise de Navigation a Vapeur v. State Bd. of Health*, 186 U.S. 380, 393 (1902) (contrasting the quarantine law upheld against a Due Process Clause challenge in that case with one not "lawfully adopted and enforced"). But for all of the reasons discussed in Part I, potential implications for federal claims in other cases has never been sufficient to support

removal to a federal court.  *See Gunn*, 568 U.S. at 258 (emphasizing the "special and small category of cases in which arising under jurisdiction still lies").

## CONCLUSION

The Court should remand this matter to the Illinois Circuit Court, which is limited to the question whether the Governor has overstepped his authority under the Illinois statute.  While this case is important, it does not arise under federal law and thus falls outside this Court's jurisdiction. It is up to the Illinois courts to rule on Plaintiff's claims, which, because of the sweeping nature of the Orders, may affect millions of lives and raise significant constitutional concerns in other litigation.

Even in the face of a pandemic—indeed, one might say *especially* in the face of a pandemic—States must follow the legal processes they have established to protect their people's health, while also protecting their people's rights.  Such legal processes enable the States to make the sensitive policy choices in a manner responsive to the people and, in doing so, both respect and serve the goals of our broader federal structure, including the guarantee of due process in the U.S. Constitution.  A remand of this matter will likewise respect our federal structure and allow those processes to unfold.


Dated:  May 22, 2020

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General

ALEXANDER V. MAUGERI
Deputy Assistant Attorney General

ERIC W. TREENE
Special Counsel

JAMES M. CUTCHIN
Assistant United States Attorney

PETER T. REED
Assistant United States Attorney

*s/ Steven D. Weinhoeft*

STEVEN D. WEINHOEFT
United States Attorney
Southern District of Illinois
Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
IL ARDC #6239656

E-mail: Steven.Weinhoeft@usdoj.gov

*Counsel for the United States of America*